1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

10

11

12

13

14

15

16

17

18

19

20

21

ALUCARD TAYLOR, HAN ZHENG, DAVID
LIAO, KAREN KING, LISA KNUDSON,
EYDALIA THURSTON, KYLE SILVA,
DALE KOGER, JOHN CADY, and REBECCA
BRUCALIERE, individually and on behalf of
themselves and all others similarly situated,

            Plaintiffs,

    v.

ZILLOW, INC., ZILLOW GROUP, INC.,
ZILLOW HOMES, INC., and ZILLOW
LISTING SERVICES, INC., Washington
Corporations, ZILLOW HOME LOANS, LLC,
a California Corporation, WORKS
INDUSTRIES, LLC, an Oregon Corporation,
GK PROPERTIES, a Nevada Corporation, and
FRANO TEAM, a Florida Organization,

            Defendants.

Case No. 2:25-cv-01818-JLR


**AMENDED CLASS ACTION
COMPLAINT**


**JURY TRIAL DEMANDED**

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
Case No. 2:25-cv-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................................1

II.   PARTIES ......................................................................................................6

      A.    Plaintiffs ...........................................................................................6

            1.    Alucard Taylor ......................................................................6

            2.    Han Zheng ............................................................................7

            3.    David Liao ............................................................................7

            4.    Karen King ............................................................................7

            5.    Lisa Knudson .......................................................................7

            6.    Eydalia Thurston ..................................................................8

            7.    Kyle Silva .............................................................................8

            8.    Dale Koger ...........................................................................8

            9.    John Cady .............................................................................9

            10.   Rebecca Brucaliere .............................................................9

      B.    Defendants .......................................................................................9

            1.    The Zillow Defendants .........................................................9

            2.    The Real Estate Defendants ...............................................10

III.  JURISDICTION AND VENUE ...................................................................12

IV.   FACTUAL ALLEGATIONS .......................................................................13

      A.    Real Estate Industry Background....................................................13

      B.    Zillow's Illegal Steering Practices and Conduct............................15

      C.    The Harmful and Long-Lasting Economic Impacts of Zillow's
            Steering ...........................................................................................22

      D.    Defendants' Fraudulent Conduct ...................................................23

      E.    Current and Former Flex Agents Confirm Zillow's RESPA
            Violations and Fraudulent Conduct ...............................................32

            1.    Confidential Real Estate Agent 1.........................................32

            2.    Confidential Real Estate Agent 2.........................................33

AMENDED CLASS ACTION COMPLAINT – i
Case No. 2:25-cv-01818-JLR
011313-11/3353895 V1
011313-11/3353895 V1

- i -

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

3. Confidential Real Estate Agent 3................................................34

4. Confidential Real Estate Agent 4................................................35

5. Confidential Real Estate Agent 5................................................36

6. Confidential Real Estate Agent 6................................................37

7. Confidential Real Estate Agent 7................................................38

8. Confidential Real Estate Agent 8................................................40

9. Confidential Real Estate Agent 9................................................42

10. Confidential Real Estate Agent 10................................................42

11. Confidential Loan Officer 1................................................43

12. Confidential Loan Officer 2................................................45

F. Defendants' Anti-Competitive Conduct ................................................47

G. Zillow's Choice of Law Clause ................................................49

V. CLASS ACTION ALLEGATIONS ................................................49

VI. TOLLING OF THE STATUES OF LIMITATIONS ................................................52

VII. CLAIMS FOR RELIEF ................................................53

COUNT I VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1962(C)-(D) (ON BEHALF OF THE NATIONWIDE CLASS, AGAINST ALL DEFENDANTS)................................................53

1. The Zillow Fraudulent Business Enterprise................................................53

2. The Predicate Acts ................................................56

COUNT II VIOLATION OF THE REAL ESTATE SETTTLEMENT PROCEDURES ACT, 12 US.C. 2607(A) (ON BEHALF OF A NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS, AND ON BEHALF OF A NATIONWIDE STEERING SUBCLASS )................................................60

COUNT III VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. § 2607(B) (ON BEHALF OF A NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS)................................................62

COUNT IV VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010, *ET SEQ.*) (ON BEHALF OF A NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS)................................................65

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

COUNT V UNJUST ENRICHMENT (ON BEHALF OF A NATIONWIDE
    CLASS, AGAINST THE ZILLOW DEFENDANTS) ......................................................67

REQUEST FOR RELIEF ............................................................................................................68

DEMAND FOR JURY TRIAL ...................................................................................................68

AMENDED CLASS ACTION COMPLAINT – iii
Case No. 2:25-CV-01818-JLR
- iii -

011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

*"The term REALTOR® has come to connote competency, fairness, and high integrity resulting from adherence to a lofty ideal of moral conduct in business relations. No inducement of profit and no instruction from clients ever can justify departure from this ideal."*[1]

Plaintiffs Alucard Taylor, Han Zheng, David Liao, Karen King, Lisa Knudson, Eydalia Thurston, Kyle Silva, Dale Koger, John Cady, and Rebecca Brucaliere bring this action on behalf of themselves and on behalf of proposed classes defined below, and allege upon information and belief and the investigation of counsel, as follows:

## I.    INTRODUCTION

1.    The process of buying a home can be a harrowing ordeal. A home purchase is the largest investment most Americans will ever make. Home buyers in competitive markets have to make quick decisions to increase their offers or make other concessions to beat multiple bids for the house. The burden of this process is compounded by the opaque and byzantine rules of buying a home. Very few people truly understand the home buying process. Prospective buyers are uniquely vulnerable in this respect, and usually have no choice but to rely on real estate agents, who are supposed to represent them and serve their interests.

2.    Zillow surveyed this landscape and only saw pots of gold.  Zillow's practices and policies in the real estate industry are not simply indifferent to the agents' duties to protect their clients' interests;  Zillow actively schemes to subvert them.  Zillow's goal is simple: to monetize every step of the home buying process—even if illegally—and to encourage, incentivize, and ultimately coerce agents into violating their fiduciary duties by disregarding their clients' interests.  The very success of Zillow's scheme *depends on* the agents' willingness to place Zillow's interests above their clients' interests.  Zillow promotes itself as "transforming the way people buy, sell, rent and finance homes,"[2] but this "transformation" comes at a steep cost for home buyers.

---

[1] Code of Ethics and Standards of Practice of the NATIONAL ASSOCIATION OF REALTORS, Preamble (eff. Jan. 1, 2025), available at https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/2025-code-of-ethics-standards-of-practice.

[2] *See* https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2025/Zillow-Group-Reports-Fourth-Quarter-and-Full-Year-2024-Financial-Results/default.aspx.

AMENDED CLASS ACTION COMPLAINT – 1
Case No. 2:25-CV-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

3.      The Zillow predatory practices begin as soon as consumers visit Zillow.com to look for a home. When potential buyers are on Zillow's website, Zillow frequently tricks them into signing up with a Zillow agent, as described below. If the agent is part of Zillow's "Flex" program, Zillow gets 40% of the agent's commission—a payment on the back end that is undisclosed to all parties involved.

4.      When a house is for sale on Zillow, the Zillow website has a big button in bright blue lettering posted next to the house listing that says "Contact Agent":



5.      After clicking that button, potential buyers are asked to provide their contact information, which Zillow provides to a Zillow-affiliated agent. Buyers, however, naturally believe they are contacting the *listing* agent. Instead, they are routed to a Zillow-affiliated *buyer*'s agent, who arranges a tour of the home by getting the buyer to sign a "Touring Agreement." (The same process occurs if the potential buyer clicks the blue "Request a Tour" button.).  The "Touring Agreement" promises the buyer that the agent's services are "free," but this is deceptive and not true: if the sale goes through, the buyer's agent still receives a commission. In addition, if the Zillow-affiliated agent is a "Flex" agent, he or she has to pay Zillow up to 40% of the agent's commission. This cut of the commission paid to Zillow, for no services rendered related to the real estate sale, is never disclosed to the buyer or the seller (the "Hidden Zillow Fees").

6.      Zillow furthers its scheme to defraud buyers by effectively forcing home sellers and their agents to post on Zillow.com immediately after advertising the home for sale. If home sellers do not post on Zillow.com within 24 hours of going public, Zillow sends a violation notice to the seller's agent. If the selling agent violates this Zillow-imposed rule three times, the ad is banned on Zillow, effectively forcing the seller to fire her agent and find someone else who will acquiesce to Zillow's coercive tactics. This policy effectively requires sellers and their agents to forgo using other initial methods to advertise the home sale.  The effect of this policy is to inflate the unjustly earned

AMENDED CLASS ACTION COMPLAINT – 2
Case No. 2:25-cv-01818-JLR
011313-11/3353895 V1
011313-11/3353895 V1
- 2 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1   profits Zillow receives from its deceptive conduct, as it continues to increase its dominance of the

2   market.

3         7.    The effect of Zillow's policies and conduct is to increase the purchase price of homes

4   for the buyers. If buyers were directed to *sellers'* agents, they would be better positioned to negotiate

5   a lower purchase price, because the seller would not have to pay commissions to the seller's agent

6   and the buyer's agent. It also incentivizes Zillow Flex agents to prioritize receiving his/her full

7   commission at all costs, even if the buyer loses the bidding process. Since the Flex agents only

8   effectively receive a 1% commission from the purchase of a home (after paying the Hidden Zillow

9   fees and commissions to their team leadss), they have no practical flexibility in negotiating a lower

10  commission. Sellers are stuck with paying 6% commission (or more) because the buyer Flex agent

11  is receiving such a paltry sum in return, thereby increasing the purchase price of the home for the

12  buyer. Zillow's scheme has the intent and the effect of unlawfully maintaining high and inflexible

13  commissions that drive up the prices that buyers must pay.

14        8.    As the buying process continues, Zillow has found another scheme to extract value at

15  the customers' expense.  Zillow compels Zillow Flex agents to steer home buyers to use Zillow

16  Home Loans ("ZHL"), even though–as Zillow and the agents know–ZHL offers less loan packages

17  compared to competitors, its loans come with undisclosed and hidden fees, it has higher interest rates,

18  and it does not offer common assistance packages available to first time home buyers, who comprise

19  almost half of all buyers.[3]  If agents do not comply and fail to meet Zillow's steering quotas, the

20  agents are dropped from the Zillow Flex program, regardless of the agent's performance or the

21  client's satisfaction. This steering policy has driven ZHL's loan origination growth to nearly a billion

22  dollars last year, a 90% year-over-year increase.[4] Former Zillow Flex agents have reported that they

23  are terminated from the program precisely because they made loan recommendations that serve their

24  clients' interests, rather than steering them to ZHL who offers a product that does *not* serve the

25  clients' interests.  Zillow rewarded this behavior by terminating them from the Flex program.

26

27        [3] https://www.zillow.com/research/buyers-housing-trends-report-2024-34383/.

28        [4] *See* https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2025/Zillow-Group-Reports-Fourth-Quarter-and-Full-Year-2024-Financial-Results/default.aspx.

AMENDED CLASS ACTION COMPLAINT – 3
Case No. 2:25-CV-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

9.      Zillow's scheme and the fraudulent enterprise it uses to effectuate that scheme have been confirmed by current and former Zillow Flex agents.   As set forth below, Confidential Witnesses, consisting of numerous current and former agents, detail the facts surrounding the scheme that Zillow has implemented to capture the real estate market to the harm of home buyers. Commentators online have also described the worry about Zillow's practices.   Collectively, they assert that Zillow is illegally forcing agents to refer customers to Zillow Home Loans, in violation of their fiduciary duty as agents, and in violation of the Real Estate Settlement Procedures Act (RESPA), as detailed below. Twelve Confidential Witnesses, agents and loan officers, provide details that expose just how deliberate and destructive Zillow's policies are, including:

- To avoid putting anything in writing, Zillow personnel are now flying out to real estate offices, in order to instruct Zillow Flex agents in person on the need to meet ZHL quotas.

- Zillow loan officers frequently misrepresent or omit important details about the borrowers' true costs at closing, which leads to buyers either paying excessive costs or losing the house.

- Based on the Hidden Zillow Fees, Zillow Flex Agents are incentivized to "burn and churn" through clients, at the expense of their clients' interests.

- Similarly, ZHL "cherry-picks" only the most qualified borrowers, because the ZHL loan officers are inexperienced, underpaid, and incentivized to churn as many borrowers as possible without any regard for the clients' interests.

- Many Zillow Flex agents know virtually nothing about the real estate process, or the neighborhoods in which they are showing homes, yet these same agents are falsely promoted as a "Top Agent" on Zillow based solely on their participation in the Zillow Flex program.

- The Zillow Hidden Fees drive up commissions and the purchase price of homes.

- Zillow's requirement that Flex agents use Zillow's "Follow-Up Boss" allows Zillow to eavesdrop on communications between the agent and the buyer, violating the agent's duty of confidentiality.

- Zillow also uses the "Follow-Up Boss" to "catch" Flex agents who may recommend other loan providers to their clients, in order to censure them appropriately.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

10.     Zillow's scheme hinges on cooperation from the Zillow Flex agents, and their collective ability to work together to fraudulently induce prospective buyers into using Zillow Flex agents.  By working together as part of an enterprise, and using the mail in furtherance of their fraudulent scheme, Zillow, along with three real estate agencies and other unnamed co-conspirators, that acted as brokers for three Plaintiffs' sales, violated the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1962(c)).  The three Real Estate Defendants that were involved in the enterprise which directly harmed the Plaintiffs are Works Industries, LLC, GK Properties, and the Frano Team.

11.     Zillow's policy also violates RESPA (12 U.S.C. § 2607) in two ways.  **First,** by requiring Flex agents to steer clients to ZHL, Zillow is illegally both giving and receiving a "thing of value" related to referrals.  Zillow is providing leads to agents in exchange for compulsory referral of clients to ZHL.  This is a clear RESPA violation. *See* 12 U.S.C. § 2607(a).  In graphic form, it looks like this:



12.     **Second,** by requiring Flex agents to pay these hidden fees, Zillow is further violating RESPA because Zillow is receiving a payment that is not in exchange for completing the property transaction. RESPA prohibits receiving payments that are not "in connection with a transaction involving a federally related mortgage loan." 12 U.S.C. § 2607(b). The Zillow Hidden Fees are not

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1  in connection with the closing of the property sale, and Plaintiffs are entitled to treble damages under

2  the statute. *See* 12 U.S.C. § 2607(d)(2).

3      13.    Zillow's conduct also constitutes a violation of Washington State consumer

4  protection laws, which prohibit "unfair methods of competition and unfair or deceptive acts or

5  practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.96.010. Zillow

6  designs its website to trick potential buyers into connecting with a Zillow-affiliated agent instead of

7  the seller's agent. Zillow also unfairly and deceptively does not disclose to the buyer or the seller

8  that it is receiving the Hidden Zillow fees from the Flex agents at the tail end of the transaction—

9  facts that both the buyer and the seller would want to know as they negotiate the close of the property.

10      14.    Zillow has also unjustly enriched itself as a result of this scheme. It engaged in

11  patently unfair and deceptive behavior, and obtained a windfall of ill-gotten gains as a result. Zillow

12  is liable to Plaintiffs and the Class for all profits earned from its deceitful conduct.

13      15.    Plaintiffs on behalf of themselves and the proposed Classes accordingly brings this

14  lawsuit for Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act

15  ("RICO"), the Real Estate Settlement Procedures Act (12 U.S.C. § 2607), consumer protection

16  violations under the laws of the State of Washington, and common law unjust enrichment. Plaintiffs

17  accordingly seek treble damages, single damages, injunctive relief, disgorgement, and the costs of

18  this lawsuit, including reasonable attorneys' fees.

## II.    PARTIES

**A.    Plaintiffs**

**1.    Alucard Taylor**

22      16.    Plaintiff Alucard Taylor is a resident of Portland, Oregon. On July 1, 2022, Plaintiff

23  Taylor purchased a home in Portland using a Zillow agent, R.H. (R.H. is identified as a "Top Agent

24  on Zillow" on Zillow's website, which strongly suggests R.H. is a Zillow Flex agent.[5]). Prior to his

25  purchase, Plaintiff Taylor was browsing Zillow.com to look for houses, and identified a house that

26  interested him. He clicked on the "Contact Agent" button, believing that he was contacting the listing

---

[5] In addition, R.H.'s real estate agency posts on Instagram that it is part of "Zillow Flex Partners," and the agents also posts job listings for a "Zillow Flex Partner." *See* https://www.indeed.com/cmp/Works-Real-Estate/jobs/l-Seattle,-WA.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

agent; he did not know that he would be routed to a Zillow agent. In his dealings with R.H. prior to and during the purchase of his home, he did not believe he had any other option than to use R.H. to make the purchase. Plaintiff Taylor purchased the home using a lender which is regulated by an agency of the Federal Government.

**2.    Han Zheng**

17.    Plaintiff Han Zheng is a resident of Seattle, WA.  On March 20, 2025, Plaintiff Zheng purchased a home in Seattle using a Zillow agent, A.J. (A.J. is identified as a "Top Agent on Zillow" on Zillow's website, which strongly suggests R.H. is a Zillow Flex agent). Prior to his purchase, Plaintiff Zheng was browsing Zillow.com to look for houses, and identified a house that interested him.  He clicked on the "Schedule a Tour" on the belief that he was contacting the seller's agent for a tour.

**3.    David Liao**

18.    Plaintiff Liao is a resident of Northridge, California.  On February 12, 2021, Plaintiff Liao purchased a home in Las Vegas, Nevada, with agent V.P. (V.P. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggest V.P. is a Flex agent).  Plaintiff Liao used Zillow Home Loans to finance and close on the purchase.

**4.    Karen King**

19.    Plaintiff Karen King is a resident of Frankenmuth, Michigan.  On September 8, 2023, Plaintiff King purchased a home in Frankenmuth using a Zillow agent, J.K. Prior to her purchase, Plaintiff King was browsing Zillow.com to look for houses, and identified a house that interested her.  She clicked on the "Contact Agent" button, believing that she was contacting the listing agent; she did not know that she would be routed to a Zillow agent.

**5.    Lisa Knudson**

20.    Lisa Knudson is a resident of Black Mountain, North Carolina.  On April 25, 2025, Plaintiff Knudson purchased a home in Black Mountain using a Zillow agent, C.G.  (C.G. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests C.G. is a Flex Agent).  Prior to her purchase, Plaintiff Knudson was browsing Zillow to look for houses, and identified a house that interested her.  She clicked on the "Contact Agent" button, but did not

AMENDED CLASS ACTION COMPLAINT – 7
Case No. 2:25-CV-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

understand what "agent" she was contacting.  Plaintiff Knudson believed that she overpaid for the property, because she had to pay for an agent that she did not need.  She also did not have the opportunity to negotiate directly with the sellers' agent.

**6.    Eydalia Thurston**

21.    Eydalia Thurston is a resident of Stevens City, Virginia.  On December 27, 2024, Plaintiff purchased a home in Stevens City, using a Zillow agent, C.S.  (C.S. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests C.S. is a Flex Agent.)   Prior to her purchase, Plaintiff Thurston was browsing Zillow.com to look for houses, and identified a house that interested her.  She clicked on the "Contact Agent" button, but did not understand what "agent" she was contacting.

**7.    Kyle Silva**

22.    Kyle Silva is a resident of Canton, Georgia. On February 21, 2025, Plaintiff Silva purchased a home in Canton, Georgia, using a Zillow agent, A.M. (A.M. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests A.M. is a Flex Agent).  Prior to his purchase, Plaintiff Silva was browsing Zillow.com to look for houses, and identified a house that interested him.  He clicked on the "Contact Agent" button, in the belief that he was contacting the buyer's agent. He was put in touch with A.M., and initially believed A.M. was the seller's agent. (However, once they met in person, A.M. clarified that he/she was a buyer's agent.) Plaintiff Silva was referred to Zillow Home Loans and obtained a pre-approval letter from ZHL, but ultimately did not use ZHL to purchase the property.

**8.    Dale Koger**

23.    Dale Koger is a resident of Henderson, Nevada. On August 12, 2024, Plaintiff Koger purchased a home in Henderson, NV, using a Zillow agent, S.Z. Prior to his purchase, Plaintiff Koger was browsing Zillow.com to look for houses, and identified a house that interested him.  He clicked on the "Contact Agent" button, believing that he was contacting the seller's agent. Thereafter, he felt compelled to stay with that person as his agent. Plaintiff Koger believes that, because he was unable to contact the buyer's agent, he paid higher commissions because he had to pay his buyer's commission (as well as the seller agent's commission).



### 9.    John Cady

24.    John Cady is a resident of Melbourne, Florida. On September 19, 2025, Plaintiff Cady purchased a home in Melbourne, FL, using a Zillow agent, E.L. ("E.L." is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests E.L. is a Flex Agent.). Prior to his purchase, Plaintiff Cady was browsing Zillow.com to look for houses, and identified a house that interested him.  He clicked on the "Contact Agent" button, with the intent of contacting the seller's agent directly.  He wanted to contact the seller's agent directly in order to avoid paying buyer agent commissions, which would reduce the overall price he would pay. Plaintiff Taylor purchased the home using a lender which is regulated by an agency of the Federal Government.

### 10.    Rebecca Brucaliere

25.    Rebecca Brucaliere is a resident of Norwalk, Connecticut. On December 13, 2023, Plaintiff Brucaliere purchased a home in Norwalk, CT using a Zillow agent, H.D.  (H.D. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests H.D. is a Flex Agent). Prior to her purchase, Plaintiff Brucaliere and her husband were browsing Zillow.com to look for houses, and identified a house that interested them. She clicked on the "Request a Tour" button, believing she was contacting the seller's agent. When she first met H.D. in person, H.D. did not initially disclose that H.D. was a buyer's agent, but instead insisted that Plaintiff Brucaliere sign a touring agreement. After she signed, H.D. told her that Zillow assigned her to H.D., and that H.D. would represent her going forward. Plaintiff Brucaliere did not feel she had any other practical option but to use H.D. as the buyer's agent. During the buying process, H.D. urged her repeatedly to use Zillow Home Loans, but Plaintiff Brucaliere declined because she wanted to use USAA. Although Plaintiff Brucaliere was a first-time home buyer, H.D. never told her about first-time homebuyer assistance programs, which Plaintiff Brucaliere ultimately obtained through USAA.  USAA is regulated by an agency of the Federal Government.

### B.    Defendants

### 1.    The Zillow Defendants

26.    Zillow, Inc. is an online real estate marketplace. It is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Second Avenue, Floor 31, Seattle, Washington. Zillow maintains real estate brokerage licenses in several states.

27.    Zillow Group, Inc. offers online real estate services and is incorporated in the State of Washington with its principle executive offices located at 1301 Second Avenue, Floor 31, Seattle, Washington. Zillow is the most visited real estate website in the United States and provides its customers an on-demand experience for selling, buying, renting, and financing, "with transparency and nearly seamless end-to-end service."[6]

28.    Zillow Homes, Inc. is organized and existing under the laws of the State of Delaware, with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

29.    Zillow Listing Services, Inc. offers a variety of real estate services. It maintains real estate brokerage licenses in several states. It is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

30.    Zillow Home Loans, LLC ("ZHL") is a wholly-owned subsidiary of Zillow, Inc., and is headquartered at 2600 Michelson Drive, Suite 834, Irving, CA. ZHL primarily originates mortgage loans and sells them to other mortgage companies.

31.    Collectively, the Zillow entities identified above are referred to herein as the "Zillow Defendants."

**2.    The Real Estate Defendants**

32.    Works Industries, LLC is an Oregon corporation that owns Works Real Estate, a real estate agency serving Portland, Oregon and Seattle, Washington.[7] Works Real Estate is registered in the State of Washington.[8] It advertises on Instagram that it is part of "Zillow Flex Partners," and it also posts job listings for a "Zillow Flex Partner."[9] According to its Zillow profile, it has sold a

---

[6] *See What is Zillow?*, ZENDESK.COM, https://zillow.zendesk.com/hc/en-us/articles/202345030-What-is-Zillow (last visited Aug. 22, 2025).

[7] https://www.seattleworksrealestate.co/.

[8] https://ccfs.sos.wa.gov/?_gl=1*ab4s6n*_ga*MTgyMjc0NDYzMy4xNzYyNDY4MTIy*_ga_7B08VE04WV*czE3NjM0MTI2MTgkbzIkZzEkdDE3NjM0MTI2MjgkajUwJGwwJGgw*_ga_X6SDF160YQ*czE3NjM0MTI2MTgkbzIkZzEkdDE3NjM0MTI2MjgkajUwJGwwJGgw#/BusinessSearch/BusinessInformation.

[9] See https://www.indeed.com/cmp/Works-Real-Estate/jobs/l-Seattle,-WA.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    total of 3,745 properties, including 1,030 sales in the past 12 months, with an average sales price of

2    $518,000.[10]  As a result, its approximate total sales are $1.93 billion, including $533 million in sales

3    in the past 12 months.  Of the 208 real estate agents listed on Works Real Estate's Zillow profile, all

4    but one of them have the "Top Agent on Zillow" badge, despite the fact that 61 of these agents have

5    had *zero* sales in the past 12 months, and 29 of them have only had one.  One of Work Real Estate's

6    agents, "R.H.," acted as the buyer's agent for Plaintiff Alucard Taylor.

7         33.    GK Properties is a Nevada organization that houses the George Kypreos Team, part

8    of the Signature Real Estate Group. According to its website, it is part of Zillow Flex.[11]  According

9    to its Zillow profile, the George Kypreos Team has sold a total of 7,050 properties, including 397 in

10   the past 12 months, with an average sales price of $453,000.  As a result, its approximate total sales

11   are $3.2 billion, with $180 million in the last 12 months alone.  Of the 32 real estate agents listed on

12   the George Kypreos Team's Zillow profile, all of them have the "Top Agent on Zillow" badge,

13   despite the fact that three of the agents had zero sales in the past 12 months, and another agent had

14   only one sale.  One of the George Kypreos Team's agents, V.P., acted as the buyer's agent for

15   Plaintiff David Liao.

16        34.    Frano Team is a Florida organization that is part of Real Broker LLC. According to

17   Instagram postings, Frano Team is part of Zillow Flex. For example, a member of the Frano Team

18   recently posted on Instagram the Frano Team was "looking to add about 8 more hungry realtors to

19   our Iconic Group at REAL Broker who want the possibility of working some new buyers with our

20   Zillow Flex lead system . . . . We have a hybrid team structure that allows us to receive Zillow Flex

21   leads and still continue to build ur [sic] name and brand[.]"[12] In addition, every single one of the

22   Frano Team's agents has the "Top Agent on Zillow" badge, even as nearly a third of them either

23   have zero sales (14 agents) or only one sale (8 agents) in the past 12 months.[13] According to its

24   website, the Frano Team has a total of 793 sales, including 491 in the past 12 months, at an average

25

26        [10] https://www.zillow.com/profile/Works%20RE.
          [11] https://www.gkvegas.com/join-our-team/.
27        [12] https://www.instagram.com/p/DHbhrbLTL_K/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==.
          [13] https://www.zillow.com/profile/peter%20frano.
28   AMENDED CLASS ACTION COMPLAINT – 11
     Case No. 2:25-CV-01818-JLR                                    - 11 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

price of $344,000. As a result, its total sales are over $272 million, with nearly $169 million in the past 12 months. One of the Frano Team's agents, E.L., acted as the buyer's agent for Plaintiff John Cady.

35.      Collectively, the entities identified above are referred to herein as the "Real Estate Defendants."

### III.    JURISDICTION AND VENUE

36.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises from violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.

37.      This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 28 U.S.C. §§ 1331, 1337.

38.      This Court may also exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because they are so related to the RICO claim (within the Court's original jurisdiction) that they form part of the same case or controversy under Article III of the United States Constitution. This case does not present novel or complex issues of state law that predominate over claims for which this Court has original jurisdiction, and there are no compelling reasons for declining supplemental jurisdiction over those of Plaintiffs' claims that do not arise under RICO.

39.      This Court has personal jurisdiction over the Zillow Defendants and Defendant Works Industries, LLC because these Defendants have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

AMENDED CLASS ACTION COMPLAINT – 12
Case No. 2:25-cv-01818-JLR
- 12 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

40.     This Court has personal jurisdiction over each of the Real Estate Defendants because the ends of justice require that they be brought before this court, pursuant to 18 U.S.C. § 1965. Specifically, all members of the RICO enterprise should be tried together in a single jurisdiction. *See Butchre's Union Local No. 498, UFCW v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).

41.     Venus is proper in this District because each Zillow Defendant, and Defendant Works Industries, LLC, transacts substantial business in this District, as alleged throughout this Complaint. These Defendants reside in this District or transact business in this District. These Defendants also market and sell products and services in this District, have had continuous and systematic contacts with this District, and engaged in anticompetitive, unfair, and deceptive business practices that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Real Estate Industry Background

42.     State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm"), and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

43.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. As a result, a real estate brokerage contracts with sellers and buyers are required to be with brokers, not agents, and all payments to individual realtors or agents pass through brokers.

44.     In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

45.     A seller broker's compensation is set forth in a listing agreement, which is a contract between the seller and the seller broker. The listing agreement specifies the total commission that a

AMENDED CLASS ACTION COMPLAINT – 13
Case No. 2:25-CV-01818-JLR
- 13 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

home seller will pay to the seller broker and also specifies the amount earmarked to be paid to the buyer broker (in the event the buyer has a broker).

46. When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

47. If the buyer has a broker, the seller broker pays the buyer broker a commission out of the total commission paid by the seller.

48. As a result, the buyer brokers and agents—who are supposed to assist their clients in negotiating against the seller – receive their compensation from the total commission paid by the seller, not from the buyer they represent. According to industry insiders, there is "a lot of confusion around how commissions work," where even writers for real estate publications "never get[] a very clear cut answer from the industry or from anyone" on the subject.[14] And other market participants agreed that the practice is "confusing" and that most consumers "just don't understand how commission works."[15]

49. A Multiple Listing Service ("MLS") is a database of properties listed for sale within a certain geographic region. Only registered agents and brokerages that pay for membership can access an MLS database. There are over 500 MLSs in the United States.[16]

50. After a listing is registered with an MLS, companies like Zillow automatically obtain and display these listings through back-end technology feeds called the Internet Data Exchange ("IDX") or the Virtual Office Website ("VOW"). Zillow has obtained and maintained real estate brokerage licenses for sole purpose of collecting listings—upon information and belief, Zillow itself does not provide any brokerage services. Zillow thereby exploits the listings at little cost to squeeze

---

[14] FTC-DOJ Joint Public Workshop, Segment 1 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-1/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_1.pdf (last visited Aug. 22, 2025).

[15] FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf (last visited Aug. 22, 2025).

[16] *What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ*, RESO.ORG, https://www.reso.org/mls-faq/ (last visited Aug. 22, 2025).

AMENDED CLASS ACTION COMPLAINT – 14
Case No. 2:25-CV-01818-JLR

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3353895 V1
011313-11/3353895 V1

out profits from the listings, without any compensation to the MLSs, agents, or sellers who created the listings.

**B.      Zillow's Illegal Steering Practices and Conduct**

51.      Zillow is the undisputed market leader in online real estate listings. In investment presentations, it notes that it has 66% of the U.S. real estate audience share—twice as high as its nearest competitors.[17] It also promotes the fact that 80% of consumers come to Zillow directly, and that "Zillow revenue growth has meaningfully outperformed a challenged housing market."[18] According to Zillow, it has a "leading category traffic position" and "market-leading audience," with "4x the daily active app users of nearest competitors."[19]

52.      Behind the scenes, Zillow operates two different programs for prospective buyers' agents:  the "Flex" Program and the "Premier" Program. Based on accounts from real estate agents, if an agent has the following "Top Agent on Zillow" marker on his or her Zillow profile, then the agent is most likely a "Flex" agent:



53.      The Flex Program requires Flex agents to pay Zillow up to 40% of the commissions the agents earn on a sale (the Hidden Zillow Fees). Zillow Flex agents are also required to steer

---

[17] Zillow Group, *February 2025 Zillow Investor Presentation*, at 6, efaidnbmnnnibpcajpcglclefindmkaj/https://s24. q4cdn.com/723050407/files/doc_earnings/2024/q4/presentation/Zillow-4Q24-Investor-Presentation.pdf   (last   visited Aug. 22, 2025).

[18] *Id.* at 9.

[19] *Id.* at 3, 7.

011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

buyers to Zillow Home Loans; if the agents fail to meet certain quotes, they are dropped from the program.[20]

54. Zillow expressly ties ZHL referrals to continued leads on its "Flex Performance Terms – Compliance" website.[21]    The website is entitled "Flex Compliance Policies & The Disengagement Process." The website states as follows:

## Performance Standards

Flex Performance Standards are more than just benchmarks—they help you provide a consistent client experience and are your gateway to growth.

Meeting or exceeding standards means:

- Opportunity for more Flex connections
- Improved efficiency and team alignment
- Greater confidence in your client experience
- Continued eligibility and partnership with Zillow

Failing to meet the following minimum performance expectations may lead to disengagement and decreased connection volume for your team.

55. The "Performance Standards" include referring customers to ZHL:

## Agent Performance Standards

The agent performance standards provide the metrics that help Zillow Preferred agent partners understand how to convert more home shoppers and streamline their home shopping process. These updates empower Zillow Preferred agent partners to stand out, grow faster, and earn access to more connections.

[]

**Zillow Home Loans Pre-Approval Target:**

- **Definition:** Number of agent's customers who get pre-approved with Zillow Home Loans. This empowers consumers to navigate affordability during their home search by equipping them with Zillow Home Loans pre-approvals.
- **How it's calculated:** Approximately 10% of an agent's eligible Zillow Preferred connections that reached or passed "met with" status in the last 90 days. The pre-approvals do not need to solely be with Zillow Preferred delivered connections.
- **Standard:** 100% of target over the last three (3) month(s).

56. Zillow is not even being coy about what its policy is, and agents are taking note— with many agents speaking out about their concerns about the legality of this policy.  As just one

---

[20] *See Flex Program Standards*, ZILLOW.COM  (https://www.zillow.com/z/flex-performance-terms/performance-standards/ (last visited Sept. 19, 2025).

[21] *See* https://www.zillow.com/z/flex-performance-terms/compliance/.

AMENDED CLASS ACTION COMPLAINT – 16
Case No. 2:25-CV-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

example, in discussing the allegations in the previously filed Complaint in this case that Zillow requires agents to steer a certain percentage of its customers to ZHL, a real estate agent and commentator named Jared James on his podcast (posted on YouTube[22]) stated:

> My DMs, guys, have been flooded and they are flooded by team leads and agents who are Zillow Flex teams who basically say, "**Yeah, 100% true and worse than you think it is**." And every single one of them says, "don't mention my name.  Anonymous.  Do not mention my name."  But it's 100% happening.

> The first thing I want to do is one of you actually sent me the new manual for the new flex program updates that go into effect August, I'm sorry, October 1st.  . . . And there are key metrics, and some of these flex teams are irate about this, not just because of the metrics, but because of how they're being enforced and how it's happening.  And, uh, **one of them is that Zillow Home Loans pre-approval target**.  This is really interesting.  It says the number of connections agents should help get preapproved with Zillow home loans.  **Roughly 10% of Zillow eligible connections that reached or passed or uh met with status in 90 days.  And it's SO interesting because you're like, well, that's a target; like that starts to smell of RESPA otherwise you will not get these leads.  And that's a problem.**

57.    Jared James then discussed the notion that the 10% requirement is only for pre-approval, but in reality "you hear from a lot of these team leaders and flex agents that **behind the scenes they're telling them no, if you – if they don't close with us—if a certain percent do not close with us then you're getting downgraded**.  Like's there's a whole system, you know, green yellow red, like you will be downgraded green yellow red."

58.    James further stated, "Look, I'm used to people in our industry being angry toward Zillow, but **the messages people were sending me were, uh, pretty consistent**, all pretty much similar.  And I mean, **evidence, like they were sending me copies, recordings of phone calls, um, with reps and what they were saying that completely break, you know, what they're allowed to be doing[.]**"

59.    James noted that the Zillow managers are *flying out in person* to deliver these messages directly to the teams and agents, to describe the program in ways that they did not want in writing:  "Many of the big big teams that I talked to said that like the big ups, that **the bigger ups at Zillow flew out personally to tell them what was going to happen**.  Um, and a lot of it, I got to be honest, was because **they were having conversations they couldn't put on the record**, they

---

[22] https://www.youtube.com/watch?v=p75ykIO_k4I&t=2s.

011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1  couldn't email, they couldn't put over the phone, like they're meeting with them so they can tell
2  them the real deal."

3      60.    James stated he was not taking a position on whether this is steering, but "I'm just
4  reporting on my podcast what people are messaging me. Steering is a big one. You know, you're
5  not allowed to steer people to certain places. They're supposed to have choice. They're supported
6  to decide where they want to go based on who's the best rep. **And one of the biggest um complaints**
7  **that I got from people was that most of the Zillow Home Loan reps were newer and not great**
8  **and didn't have the same offerings as a lot of the other mortgage brokers**."

9      61.    James commented that the agents are telling him that ZHL loan officers are inferior
10  and offer an inferior product, but the agents are forced to refer customers to ZHL anyway: "And so
11  here you [the agent] are going, 'well, I don't want to give it to them because they number one don't
12  do a great job. They're new. **They're not great at it. And they don't have the same offerings**
13  **that my person's going to need in order to be able to close. And yet, if they don't send them**
14  **there anyway, they're getting penalized**.'"

15      62.    Although not expressing an opinion on RESPA, James was compelled to note that
16  "[g]etting or not getting those leads **is a thing of value. Huge.** I have people in my DMs right now
17  who are desperate, who 25 or 50% of their business is coming from these uh Zillow Flex deals that
18  are now changing completely. **And the idea the they don't think it's best for their client to go**
19  **talk to this [] loan officer through Zillow Home Loans, and if they don't they get downgraded,**
20  **these lose leads, they lose their business. I don't know how that's not a thing of value.**"

21      63.    Regarding the requirement that 10% of those who express interest in financing get
22  pre-approved, James stated that agents in his DMs "said the problem is that a buyer when they fill
23  out the form to talk to the agent **doesn't even realize at the bottom of the form it is auto-defaulted,**
24  **auto-checked as being 'yes, I want to a Zillow home agent[.]'** And the buyer doesn't even know
25  they've done that."

26      64.    "And then when the agent is talking to the buyer, they have no – like the buyer is not
27  even ready yet to talk to a loan officer, has no interest in it, has no whatever, and then the agent's

28

1   getting penalized because the Zillow rep is calling going, 'hey, why aren't you having them talk to

2   us? They're ready to talk to us. They check that they want to talk to us.' And the agent's going, 'no,

3   they didn't. You auto-defaulted that to check and they didn't even see it. They're not ready to talk

4   to a loan officer.' Like, **you tricked them into that**."

5          65.     As a result, "You [Zillow] are going to turn these agents against you and you're almost

6   holding them—not almost—**you're holding them hostage** because it's where most of their business

7   is coming from."

8          66.     James continues: "And now you take all of that, and **this is where this gets really**

9   **dirty**, because they're telling me now how these people are coming into their offices, and this is

10  what's crazy. I had more than one tell me that, hey, **I know that we have to put in writing, it's**

11  **10%. But I'm telling you now in this area, this is a competitive area, it needs to be 50%**. Or

12  the leads are going to someone else.' . . . . And they're like, 'hey, we're not going to put it in writing

13  because we're not allowed to put that in writing, but we're telling you, if it's 50%, we're going

14  to start moving your leads to other people.' **Now, that is clearly not allowed**."

15         67.     "And now you have these Zillow reps that are [] **bypassing the team lead and going**

16  **straight to the agents and chastising them and training them on how to not recommend other**

17  **lender**s. I heard that from more than one, okay, many actually. They're training the agents. . . . And

18  they're actually getting angry if they're [the agent] recommending other lenders, which again is not

19  choice. Okay? They buyer is supposed to have choice."

20         68.     "I had one guy tell me that he was fighting with the Zillow rep and he was telling

21  them, 'you can't do that. That's not allowed. Like, we have to give people what they want. We

22  have to let them use the lender that's going to close the loan and going to whatever.' And the Zillow

23  rep told them, uh, that you are such a pain in the butt and I'm just telling you now [] that **if you do**

24  **not do the things that we need you to do, we are going to be sending your leads elsewhere; like,**

25  **stop it's going to be 50% or we're going to send your leads elsewhere . . . I can't put this in**

26  **writing but like that's not how it's going to work now.**'"

27         69.     In response, one commentator under the YouTube video stated:

28

AMENDED CLASS ACTION COMPLAINT – 19
Case No. 2:25-CV-01818-JLR
011313-11/3353895 V1
011313-11/3353895 V1

- 19 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

You have no idea the pressure they place on the team leaders the brokerages. Every week we have a mandatory meeting. Can you believe that a mandatory meeting when you're an independent contractor? And every week it's the exact same thing. You're not making your numbers. You need to make your numbers. If you don't make your numbers you are no longer going to be part of flex. **It is a constant threat every single week**. You thought you were becoming a real estate agent to run your own business your way. Well if you're working for Flex you are working for Zillow. They may as well pay us hourly, but that's the scam. **They treat you like an hourly employee they force competition amongst you and your peers and they make all the money just for supplying you a name and number, and sometimes you dont even get a name.**

70.    In another example, on October 21, 2025 *The Capitol Forum* reported on agents' mounting concern and anxiety about Zillow's steering policies in an article entitled "Relators Are Required to Drive Business to Zillow's In-House Lending Arm, Potentially Raising Buyer Costs; Agents Express Concern they are Violating RESPA."[23] One real estate agent told *The Capitol Form* that, when the agent's team signed up for Zillow Flex, "the 'red flag' appeared when Zillow began coaching the team on how to refer buyers to ZHL products . . . 'Our team felt like they were basically forcing us to connect (buyers) to ZHL, and they were forcing us to sell ZHL services[.] **It just made us sick.  We felt like we were working for Zillow**."

71.    *The Capitol Forum* further describes the harmful economic impact on buyers from Zillow's policies:  "Retail lenders like ZHL can have higher rates and may offer fewer mortgage products, which can lead to buyers missing out on discount programs targeting groups like veterans or first-time homebuyers.  One Virginia real estate agent currently in the Flex program said one of her discomforts is it '**absolutely' raises costs to buyers to refer them to Zillow's lending business**." The agent stated that, if she referred her first-time homebuyer clients to ZHL, they "would miss out on some really good first-time homebuyer programs that offer significant rebates."  The Virgina agent further stated that Zillow is "holding leads hostage from agents that do not send clients to get preapproval from ZHL.  I just don't understand how this could be legal."

72.    The article further noted that Zillow "keeps close tabs on Flex agents."  (This is corroborated by accounts of agents themselves, as summarized below.)  According to the *Capitol Forum*, the Zillow platform "has immense ability to monitor how they do their jobs.  Agents must

---

[23] https://thecapitolforum.com/zillow-realtors-are-required-to-drive-business-to-zillows-in-house-lending-arm/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    take calls and manage their clients through the Zillow app or Zillow-owned Follow Up Boss, a
2    customer relations management app. Agents said that through these apps **Zillow records their**
3    **phone calls and rates them on metrics like how quickly they start reciting a script provided by**
4    **Zillow**."

5        73.    Pressure on Zillow agents to steer clients to Zillow Home Loans has been ongoing
6    since at least 2018. Zillow announced on August 6, 2018 that it had acquired Mortgage Lenders of
7    America.[24] Upon acquisition, Zillow immediately pivoted to pressuring agents to steer clients to
8    Zillow Mortgage (the predecessor to Zillow Home Loans).

9        74.    One leading real estate trainer, Glennda Baker, recently appeared on Jared James'
10   podcast (quoted above),[25] and discussed steering allegations against Zillow. According to Baker, she
11   was a founding member of the Zillow Agent Advisory Board, and described how she "absolutely
12   had a love affair with Zillow," and spent hundreds of thousands of dollars on leads with them. But
13   she stopped using Zillow based on a meeting with Zillow and 200 agents on October 16, 2018 in
14   Boston, Massachusetts. At that meeting, an agent confronted Greg Schwarz (the then-Zillow
15   President of Media and Marketplace) about the fact that her leads dropped 70% "in a heartbeat," and
16   she wanted to know why. In response, Schwarz presented a slide deck on how Zillow is changing.
17   According to Baker, Mr. Schwarz stated "we are going to send leads to [] elite agents based on their
18   integration of software and services provided by Zillow." Ms. Baker further explained that "I've
19   gotten hundreds of messages from agents that are [] absolutely it all depended on how many, how
20   many uh, deals we sent to Zillow Mortgage."

21       75.    Confidential Real Estate Agent 7 ("CA7," more fully summarized below), a longtime
22   Zillow agent, corroborates Baker's account.  According to CA7, beginning at least as early as 2019,
23   Zillow representatives were pressuring CA7 to push clients to use Zillow's products, including
24   Zillow Mortgage.  Zillow representatives told CA7 that CA7 needed to push these products,

25
26
27   _____
     [24]    https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2018/Zillow-Group-to-Acquire-Mortgage-Lenders-of-America/default.aspx.
     [25] https://www.youtube.com/watch?v=GfY98eYRwHc&t=3040s.

28



1  including Zillow Mortgage, and if not, CA7's leads would dry up.  CA7 also knows that other agents

2  were facing similar pressure during that time period.

3       76.    Another real estate agent ("CA 11") confirmed that, as early as 2018, Zillow was

4  pressing Zillow agents to use Zillow products, including Zillow Mortgage. CA11 worked as both a

5  Flex and a Premier Zillow agent.  CA11 stated that other teams were performing worse than CA11's

6  team, but were still getting rewarded with more leads, because they were referring clients to Zillow

7  Mortgage at a higher rate.

8  **C.    The Harmful and Long-Lasting Economic Impacts of Zillow's Steering**

9       77.    Zillow's steering practice can have long-lasting impacts on the housing market.  As

10  one article described Zillow's steering practice, "experts warn this apparent efficiency is masking a

11  system designed to steer homebuyers to the platforms' own mortgage lenders, squeezing out

12  competition and discouraging buyers from finding cheaper options.   It's part of massive

13  consolidation and restructuring efforts by Zillow and Redfin's corporate owners to corner the trillion-

14  dollar mortgage market, **which is already driving up housing costs and could heighten the risk**

15  **of a financial crisis.**"[26]

16       78.    Zillow's illegal conduct can also have devastating impacts on buyers over the long

17  run, particularly those saddled with a higher interest rate mortgage: "Unbeknownst to many

18  consumers, shopping around for a home loan can save homebuyers an average of more than $80,000

19  over a thirty-year mortgage. In states like California, Hawaii, and Washington, lifetime savings can

20  reach more than $100,000. Consumers who use real estate companies' in-house lenders may also be

21  forced to pay higher fees and interest charges than those who use alternative options." [27]

22       79.    At the same time, Zillow has profited handsomely from its steering policies.

23  According to Zillow, as of October 31, 2025, loan origination volume grew 57% year-over-year to

24  $1.3 billion.  Mortgage revenue increased 36% to $53 million in the third quarter this year.[28] By that

25  measure, its steering program has been a resounding success.

---

[26] https://jacobin.com/2025/09/zillow-redfin-mortgage-lending-competition.

[27] https://jacobin.com/2025/09/zillow-redfin-mortgage-lending-competition.

[28] https://zillowgroup.mediaroom.com/2025-10-30-Zillow-Group-Reports-Third-Quarter-2025-Financial-Results.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1

**D.    Defendants' Fraudulent Conduct**

2     80.    The overwhelming majority of houses for sale listed in an MLS are displayed on

3     Zillow's home search platform, and most prospective buyers search for homes on Zillow. But buyers

4     and sellers are not aware that Zillow generates the majority of its revenues by engaging in deceptive

5     business practices that inflate the purchase price of the homes. Financial analysts have called Zillow

6     the "clear leader" in the market and have stated that "Zillow's traffic share appears larger than that

7     of its next three competitors combined, and it reports that about 80% of its traffic comes from organic

8     or direct sources. This is a major competitive advantage for Zillow."[29]

9     81.    When prospective buyers identify homes they are interested in purchasing, Zillow

10    presents them with the option to click a large button with bold type labeled "Request a Tour" or

11    "Contact Agent" in close proximity to the home photos, sale price, and key property details—creating

12    the appearance that the potential buyer can contact the listing agent to ask questions about the

13    property, schedule a tour, or make an offer. Meanwhile, Zillow buries the listing agent in tiny print,

14    barely visible to the average reader.  Below is an example:

15

16

17

18

19

20

21

22

23

24

25

26

27    ---

[29] *See Zillow Group, Inc.: Initiation of Research Coverage*, WILLIAMBLAIR.COM (April 21, 2025), https://www.williamblair.com/News/Zillow-Group-Inc-Initiation#:~:text=%E2%80%9CImportantly%2C%20Zillow's%.20traffic%20share%20appears,from%20organic%20or%20direct%20sources (last visited Aug. 22, 2025).

28

AMENDED CLASS ACTION COMPLAINT – 23
Case No. 2:25-CV-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



17    82.    Prospective buyers who click on the "Request a Tour/Contact Agent" buttons

18    naturally believe they are reaching out to the *listing* agent who was hired by the home seller to "list"

19    the property. This is a ruse. Zillow actually directs the buyer *away* from the listing agent, and

20    redirects the buyer to a buyer agent who is working on a Zillow team, who lacks any specialized

21    knowledge about the subject property. In addition, Zillow Flex agents have agreed to pay the Hidden

22    Zillow fees. The Zillow agent who pays for the lead then attempts to contact the buyer and insert

23    herself into the transaction between the buyer and the listing agent so that she can extract a buyer

24    agent commission – typically around 3% of the purchase price of the property.

25    83.    On Zillow's website (as shown in the screenshot above), if potential buyers select

26    "Contact Agent" or "Request a Tour," the ultimate outcome is the same:  they are prompted to

27    provide their name, email, and phone number. Zillow then farms out these leads to Zillow-affiliated

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1  agents who are part of the Zillow Flex program. The agents contact the buyers, propose a tour, and

2  ask the buyers to sign Zillow's "Touring Agreement."[30] The "Touring Agreement" emphasizes that

3  the services are purportedly "free," as follows:

4
5
> **4. No Fee for the Touring Services.**
>     (a)   Buyer shall not owe or pay Broker any fee for the Touring Services.

6          84.    Although the touring services are technically "free," buyers are being tricked into

7  believing that the agent's services are free. In reality, if the buyer purchases the home, the buyer

8  agent will add a provision to the purchase offer agreement requiring the Seller to pay a commission

9  to the buyer agent (with no disclosure of the Hidden Zillow Fees if a Flex Agent is involved). Listing

10  agents have recently observed that approximately 80% of the prospective buyers they communicate

11  with about their listings have already spoken with a Zillow Agent who was using a Touring

12  Agreement.[31]

13          85.    This is precisely what happened to Plaintiff Taylor. In 2022, when browsing

14  Zillow.com to look for houses of interest to him, he clicked on the "Contact Agent" button, assuming

15  that he would be contacting a *listing* agent. Instead, he was routed to a Zillow agent. During the

16  touring and closing process, Plaintiff Taylor did not believe he had any other option other than to use

17  the Zillow agent. If Plaintiff Taylor was able to contact the listing agent, the seller could have paid

18  less commissions, and the purchase price could have been lower.  The Hidden Zillow Fees were not

19  disclosed to Plaintiff Taylor.

20          86.    As Forbes' Magazine described it, this is a classic bait-and-switch scheme by Zillow:

21
22  > [The Premier Agent Program], for many years Zillow's primary source of
23  > revenue, is based on what appears to me to be a classic bait-and-switch.
   > Each Zillow property page contains, in bold letters at the top, the name of
24  > an agent to contact. Ah, thinks the reader, this is the exclusive listing agent
   > who handles the property and is the person most knowledgeable about it.

25

---

26  [30] Touring Agreement Oregon, ZILLOWGROUP.COM, https://delivery.digitallibrary.zillowgroup.com/public/OR-FinalTouringAgreement_pdf_Original.pdf (last visited Sept. 19, 2025).

27  [31] *See, e.g.,* Jordan Teicher, *What Happens When a Buyer Contacts a Premier Agent Partner?*, ZILLOW.COM (July 19, 2024), https://www.zillow.com/premier-agent/when-buyers-contact-premier-agent/ ("78% of buyers use Zillow has part of their home-buying journey.") (last visited Aug. 22, 2025).

28  AMENDED CLASS ACTION COMPLAINT – 25
Case No. 2:25-CV-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1

2

But no, it's not. It's just the name of the agent who has PAID Zillow/StreetEasy for the privilege of being listed there.[32]

3

87.    Zillow acknowledges that the Touring Agreement is designated to "set[] up the

4

expectation of representation."[33]  Zillow further explains the Touring Agreement (described as a

5

"buyer agreement" below) as follows (*id.*):

6

## Why buyer agreements are important

7

8

9

Buyer agreements typically lay out exactly what the agent will do for a client. However, requiring an exclusive commitment upfront before the buyer feels comfortable can negatively impact the consumer experience. To put it simply, most people want to date before becoming exclusive.

10

11

12

At the same time, agents deserve to be compensated for the value they provide to buyers. Since this is an introductory agreement, we still anticipate that buyers and agents will sign a longer-term agreement that outlines compensation terms, if they choose to work together throughout the buying process.

13

14

The reference to "compensation terms" relates to commissions, not the Hidden Zillow Fees, which are not disclosed to the buyer or the seller.

15

16

17

88.    Zillow describes its Touring Agreement as a "buyer agreement," even though it is not labeled as such. But the "buyer agreement" is "limited," as Zillow acknowledges. Again from Zillow's website (*id.*):

18

19

20

This could be someone's first introduction to buyer agreements, so this approach lets you and the buyer enter the first showing with a signed limited services agreement that satisfies requirements outlined in the NAR settlement.

21

22

23

24

89.    Notwithstanding this "buyer's agreement," Zillow fails to disclose to home buyers that if they work with a Zillow-affiliated Flex agent, Zillow will collect up to 40% of that agent's commission (the Hidden Zillow Fees). Zillow-affiliated Flex agents, who must pay up to half of their commission to Zillow, are driving up the commission amounts to cover their costs. And buyers are

25

26

27

28

---

[32] *See* Frederick Peters, *Buyers Beware of this Advertising Tactic by Zillow and StreetEasy*, FORBES (Dec. 9, 2020), *available at* https://www.forbes.com/sites/fredpeters/2020/12/09/buyers-beware-of-this-advertising-tactic-by-zillow-and-streeteasy/ (last visited Sept. 18, 2025).

[33] *See* Zillow Premier Agent, *Zillow's New Touring Agreement Helps Agents Seamlessly Adjust to Industry Changes*, ZILLOW.COM (Aug. 1, 2024), https://www.zillow.com/premier-agent/zillow-touring-agreement-nar-settlement/#state (last visited Aug. 22, 2025).

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

forced to pay more for homes based on the rising commission costs. Traditionally, when necessary, in an ordinary situation non-Zillow agents are often willing to make concessions on their commission rates to get a deal done. But Zillow-affiliated Flex agents, who operate on far tighter margins, are less willing to reduce their commission amount to satisfy the demands of a home seller.

90.     Zillow takes steps to hide the Hidden Zillow Fees from buyers and sellers. Zillow's webpage suggests that the Hidden Zillow Fees are paid out of escrow,[34] but this is not true. The Hidden Zillow Fees are actually paid by the buyer broker directly to Zillow, so that the buyer and seller are never made aware of it during the closing process.

91.     Zillow maintains recordings of all introductory calls between buyers and Zillow-affiliated agents who paid for their referrals. Upon information and belief, Zillow-affiliated agents on these calls do not readily disclose that they are not the listing agent.[35]

92.     Sales of referrals or "leads" to real estate agents are Zillow's primary source of revenues, which grew to over $2 billion last year. As sellers pay inflated commissions, and traditional real estate brokers experience declining revenues, Zillow revenues continue to grow. Real estate agent and commentator Jon Brooks further describes Zillow's deceptive business practices and referral fees as follows:[36]

---

[34] *See Flex Compliance Policies & The Disengagement Process*, ZILLOW.COM, https://www.zillow.com/z/flex-performance-terms/compliance/#:~:text=Payment%20must%20be%20remitted%20to,.must%20show%.20Gross.%20Commission%20earned (last visited Aug. 22, 2025).

[35] *See* Byron Lazine, *From Lead to Appointment: The Zillow Buyer Script that Works* YOUTUBE.COM (Dec. 23, 2024), available at https://www.youtube..com/watch?v=Hcd2vROkyV0&t=114s (last visited Sept. 18, 2025).

[36] *See* John Brooks, *Zillow's Hidden 40% Agent Fee is Costing You Big*, YOUTUBE.COM (June 4, 205), https://www.youtube.com/watch?v=QnDIi-JT1SA (last visited Aug. 22, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX



These referral fees are what make it so expensive for agents to operate in the market because there's 204 million unique active users on Zillow.

[]

Zillow continues to gobble up more and more and more of your money that you're paying in commissions, and you didn't even know about it when you clicked the button on Zillow.

[]


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

This is a ton of money—of your money—that you think is going to the real estate agent that's not going to the real estate agent or the broker; it's going straight to Zillow off the top, and by the way, they have been raising these fees over time, as you can see that the top range actually increased it from 35% to 40%.

[]

Zillow is making just as much money as the agent is making and all Zillow is doing is selling your information to the real estate agent.

[]

Now where can you find the information of the agent who actually has the listing? So they are selling your information to the buyer agent; you're not getting in touch with the listing agent, the one who actually has the listing. The one who actually  -- and this is where they hide it – it is the person right here. You need to call this number right there in order to get in touch with the real estate agent who actually has the listing and knows about the property. And this is one of the problems; it's hidden down a little bit on the page where you can barely find it.



93.    In truth, contrary to Jon Brooks' statement, the Zillow listings do not routinely even include the seller agent's phone numbers. Many times it simply provides the agent's name, as excerpted below:

AMENDED CLASS ACTION COMPLAINT – 29
Case No. 2:25-cv-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1

- 29 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**$1,395,000**

| 2 beds | 2 baths | 1,442 sqft |

Est.: **$8,375/mo** Get pre-qualified

| 🏠 Single Family Residence | 🏡 Built in 1976 | 📐 5,998.21 Square Feet Lot |
| 📈 $1,329,600 Zestimate® | 📊 $967/sqft | 💲 $134/mo HOA |

**What's special**

NO-BANK SHORELINE    SPACIOUS DECK    TIMELESS CHARM

Experience quintessential Whidbey Island waterfront living with this well-maintained, classic 1976 single-level home offering 60 feet of coveted no-bank shoreline. Enjoy panoramic views of the Olympic Mountains and the Puget Sound shipping lanes from your spacious deck—perfect for entertaining or simply relaxing with the sights and sounds of the Salish Sea. The home is filled with timeless charm and has been lovingly

⌄ Show more

**1 day** on Zillow   |   **496** views   |   **13** saves   |   Likely to sell faster than **91%** nearby

Zillow last checked: 6 minutes ago
Listing updated: August 06, 2025 at 08:35am

Listed by: Louis Muniz, Windermere RE/South Whidbey, Jane A. Johnson, Windermere Real Estate Co.

Source: NWMLS, MLS#: 2412956

← **No Phone Number Listed**

Ad — Moving? Get BOOMING WiFi. Level up your internet with Xfinity. Learn More → **xfinity**

94.     Zillow charges Flex Agents up to 40% of their commission in exchange for the leads, and agents who are willing to pay this outsized fee are typically less skilled and experienced with real estate transactions, and less knowledgeable about the local residential real estate market, than agents who are not willing to pay the fee. Buyers are stuck with agents who offer inferior services for an inflated price.

95.     Ironically, Zillow promotes "independent representation" of buyers and sellers, while engineering a relationship such that the agents are entirely dependent on – and compromised by— Zillow. As the website states, "We strongly believe in the value of independent representation: Buyers and sellers deserve to work with an agent who is committed their best interests and only represents them."[37] This is plainly false; the agents effectively represent Zillow.

96.     Through its Hidden Zillow Fees scheme, Zillow is aiding and abetting the breaching of the agents' fiduciary duties to their clients. Under Oregon law, for example, a real estate agent representing a buyer has several duties, including an obligation to "act under a written representation

---

[37] *See* Zillow Premier Agent, *Zillow's New Touring Agreement Helps Agents Seamlessly Adjust to Industry Changes*, ZILLOW.COM (Aug. 1, 2024), https://www.zillow.com/premier-agent/zillow-touring-agreement-nar-settlement/#state (last visited Aug. 22, 2025).

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

agreement with the buyer. The representation agreement must (a) Be entered into before, or as soon as reasonably practicable after, the licensee has commenced efforts to assist the buyer in purchasing real property or in identifying real property for purchase." O.R.S. § 696.810(1). In addition:

> (5) A buyer's agent owes the buyer, other principals and the principals' agents involved in a real estate transaction the following affirmative duties:
>
> (a) To deal honestly and in good faith;
>
> (b) To present all written offers, written notices and other written communications to and from the parties in a timely manner without regard to whether the property is subject to a contract for sale or the buyer is already a party to a contract to purchase; and
>
> (c) To disclose material facts known by the buyer's agent and not apparent or readily ascertainable to a party.
>
> (6) A buyer's agent owes the buyer involved in a real estate transaction the following affirmative duties:
>
> (a) To exercise reasonable care and diligence;
>
> (b) To account in a timely manner for money and property received from or on behalf of the buyer;
>
> (c) To be loyal to the buyer by not taking action that is adverse or detrimental to the buyer's interest in a transaction;
>
> (d) To disclose in a timely manner to the buyer any conflict of interest, existing or contemplated;
>
> (e) To advise the buyer to seek expert advice on matters related to the transaction that are beyond the agent's expertise;
>
> (f) To maintain confidential information from or about the buyer except under subpoena or court order, even after termination of the agency relationship; and
>
> (g) Unless agreed otherwise in writing, to make a continuous, good faith effort to find property for the buyer, except that a buyer's agent is not required to seek additional properties for the buyer while the buyer is subject to a contract for purchase or to show properties for which there is no written agreement to pay compensation to the buyer's agent. [O.R.S. § 696.810(5) & (6).]

97.    Zillow Flex Agents are violating their fiduciary duties in many respects, including by not disclosing their Hidden Zillow fees, and not exercising reasonable skill and care on behalf of the buyers.

AMENDED CLASS ACTION COMPLAINT – 31
Case No. 2:25-cv-01818-JLR
- 31 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**E.    Current and Former Flex Agents Confirm Zillow's RESPA Violations and Fraudulent Conduct**

98.    Current and former Flex agents, as well as bank loan officers, have confirmed that the allegations detailed in this Complaint are not isolated incidents, or the result of "rogue" agents. Instead, it is Zillow's deliberate policy to (1) trick potential buyers into believing that they are dealing with the seller's agent when they click the "Contact Agent" or "Request a Tour" button; and (2) steer clients to ZHL, even though Zillow knows—and the agents know—that the customers are receiving an inferior product at ZHL.  The accounts of these agents are detailed below.

**1.    Confidential Real Estate Agent 1**

99.    Confidential Real Estate Agent 1 ("CA1") worked in the Zillow Premier Agent Flex program (as an agent and a team lead) from the Fall of 2019 to Spring 2023 in the Southwest.  CA1 was very successful in the program; during CA1's time in the Flex program, CA1 completed over $45 million in sales from Zillow referrals, resulting in over four hund thousand dollars paid to Zillow in referral fees.

100.    According to CA1, Zillow tracked the performance of the agents participating in the Flex program through multiple metrics, including customer satisfaction, or "CSAT," and closed transactions (a/k/a "conversions").

101.    According to CA1, in 2023, Zillow introduced a new performance metric, "transfers to Zillow Home Loans," to its Flex agent partners.  The new performance metric required Flex partners to refer buyers (who had been referred to the agent/team by Zillow) back to Zillow Home Loans during the home buying process, provided that the buyer in question had "opted-in" on the Zillow website to receive information from Zillow Home Loans. The requirement was for 25% of these leads to be referred to Zillow's lender through a "transfer" initiated by the agent through the Zillow Premier Agent app. The "opt-in" by the buyer was based on the pre-ticked box on the Zillow website, and was often unintentionally left there by buyers, who indicated that they had no interest in speaking with Zillow Home Loans.

102.    According to CA1, this performance metric (transferring buyers to Zillow Home Loans) became a central performance metric that was used to define which agents were allowed to

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1   continue participating in the Flex program (i.e. who would continue to receive leads generating

2   business income) and who would be dropped from the program.

3          103.    CA1 is and was familiar with RESPA, and understands that RESPA prohibits giving

4   anything "of value" in exchange for a referral of a settlement service, including residential mortgage

5   loans. According to CA1, the ability to continue participating in the Flex program was undoubtedly

6   something of substantial value.

7          104.    According to CA1, based on CA1's experience, including speaking with Zillow Home

8   Loans loan officers, the rates offered by Zillow Home Loans were substantially higher than that of

9   other lenders (often times by more than a full point).  CA1 also knows this from the purchase of

10   CA1's own house.

11          105.    CA1 was deeply uncomfortable with steering buyers to Zillow Home Loans, which

12   CA1 believed were more expensive and not beneficial to the buyers.  CA1 was dropped from the

13   program based on CA1's "failure" to steer sufficient buyers to ZHL.

14          106.    During CA1's participation in the Flex program, CA1 "failed" to comply with the

15   performance requirement to transfer at least 25% of Zillow buyers who had "opted in" to Zillow

16   Home Loans for a number of reasons. But the majority of the "opt in" buyers assigned to CA1 and

17   CA1's team made it clear they had, in fact, not deliberately opted in to be contacted by Zillow Home

18   Loans (but had rather failed to untick the pre-ticked box as an oversight). In addition, when CA1

19   discovered that the interest rates charged by ZHL greatly exceeded the interest rates offered by other

20   lenders (and thereby market rates), CA1 felt that it would be unethical and a violation of CA1's

21   fiduciary duties to CA1's clients if CA1 encouraged his/her clients to use Zillow Home Loans.

22          107.    According to CA1, it was, and remains, Agent's 1's belief that Zillow is abusing the

23   consumer trust that it has gained over the years to charge buyers excessive interest on its mortgage

24   loans.

25         **2.**      **Confidential Real Estate Agent 2**

26          108.    According to a real estate broker in the mid-Atlantic region of the United States

27   (Confidential Real Estate Agent 2, or "CA2"), who has supervised a Zillow Flex Agent team, as well

28

**HAGENS BERMAN**

1    as Premier Zillow agents, a prospective buyer on the Zillow website has "no idea" that they are not

2    connecting with the listing agent. CA2 has had to access the Flex training program, and in training

3    agents are encouraged to not reveal that they are buyer agents until they meet with the clients at the

4    home. Agents are also encouraged to take buyers out to show them properties, even if the buyers are

5    under contract with a different buyers' agent.

6    109.    According to CA2, buyers are completely unaware that many of the agents who

7    receive a Zillow lead are new, newer and/or completely inexperienced in the real estate market.

8    Many of these agents are trained just to convert the Zillow referral (sometimes called a "lead") and

9    get them in to show a property. According to CA2, these agents often know virtually nothing about

10   the real estate process, have no understanding of the real estate contracts and addendum, and are

11   woefully unequipped to properly represent these buyers. Their understanding of the real estate

12   market often centers around converting as many leads as possible into home buyers, and converting

13   home buyers into Zillow Home Loans customers, so they can keep the lead flow turned on.

14   According to CA2, he/she has witnessed this "ineptitude" personally in his/her own transactions, as

15   well as having to intervene as the Principal Broker in other transactions.

16   110.    According to CA2, Flex agents are facing increased pressure to steer buyers to ZHL;

17   otherwise, they will lose their Flex status. As of now, they must meet a specific quota in order to

18   retain their Flex status and lead flow. As a result, the buyers are receiving an inferior product, in that

19   they are not being informed about loan programs that Zillow does not offer, including first time buyer

20   down payment assistance. As a whole, Zillow customers are receiving loans that could have higher

21   costs and less benefits as a result when compared to local lender products.   This also affects buyers

22   in that it makes them less likely to win an offer when in a competitive bidding scenario.

23   **3.    Confidential Real Estate Agent 3**

24   111.    Confidential Real Estate Agent 3 ("CA3") has been in real estate and mortgage

25   banking for over 25 years. CA3 is currently in the Zillow Flex program. According to CA3, Zillow

26   is currently taking away leads provided via the Premier program, and moving agents to the Flex

27   program.

28

AMENDED CLASS ACTION COMPLAINT – 34
Case No. 2:25-CV-01818-JLR
- 34 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

112.    According to CA3, Zillow only offers basic loans, and buyers need to have very good credit or they have difficulty getting pre-approved. Zillow also does not offer chattel loans (which are used, for example, for manufactured housing in trailer parks).

113.    According to CA3, Zillow is steering customers to Zillow Home Loans, with consistent threats to drop agents from the Flex program if they do not meet certain quotas. Through ZHL, buyers are paying more at the back end, at closing, than other loan programs.

### 4.    Confidential Real Estate Agent 4

114.    Confidential Real Estate Agent 4 ("CA4") has been a real estate agent for over six years in the mid-Atlantic region of the United States. CA4 is a team lead, with over 10 agents on CA4's team. CA4 has not participated in the Zillow Flex or Premier program, but has seen and observed the impact of Zillow on the real estate industry.

115.    According to CA4, as a listing agent, CA4 spends considerable funds to prepare a listing, including staging the property, and taking photos and videos of the property. Through MLS, and at CA4's expense, Zillow monetizes CA4's listing for free, and diverts leads away from CA4 through its website to an agent that often is inexperienced and is incentivized to simply close the deal quickly, without real regard for the buyers' interests. In contrast, CA4 follows the approach that "not every house has to close," and he/she doesn't push a buyer into buying a specific house.

116.    According to CA4, buyers, to their detriment, trust the Zillow name, and assume that they are getting skilled and knowledgeable agents, which often is not true. Flex agents tend to be the least experienced, because more established agents are not willing to pay up to 40% of their commissions to Zillow.

117.    According to CA4, Zillow's Flex program, which requires agents to pay up to 40% of their commissions to Zillow, means that buyers' agents have no real flexibility to reduce their commissions to close a deal. Zillow Flex agents are incentivized to "turn and burn" leads, so that they can sell more houses to compensate for the high commissions paid to Zillow. The net effect is to keep commission inflated. CA4, on the other hand, has more flexibility to shave part of his/her commission to help soften the blow for clients.

AMENDED CLASS ACTION COMPLAINT – 35
Case No. 2:25-cv-01818-JLR
- 35 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    118.    According to CA4, Zillow also does not include all material information on its

2    website, in order to encourage potential buyers to request a tour or contact an agent.  For example,

3    in the MLS, agents must indicate if a house is under contract, and must indicate whether the sale is

4    contingent on certain conditions.  But Zillow does not disclose this information, because it wants

5    buyers to express an interest (and provide their contact information), even if a property is under

6    contract.  According to CA4, through the presentation of the homes, Zillow is creating "clickbait"

7    that Zillow monetizes at the expense of the buyer.

8    119.    According to CA4, most sellers will want to see the buyer use a local lender, and not

9    a Zillow Home Loan.  Zillow Home Loans sometimes does not run all the necessary credit checks,

10   and it does not offer competitive rates on its loans.

11   **5.    Confidential Real Estate Agent 5**

12   120.    Confidential Real Estate Agent 5 ("CA5") has been in real estate since 2021 in

13   California, and worked as a Zillow "Flex" agent for two years.  According to CA5, the Flex program

14   is presented to certain high-achieving agents without any real option to decline. He/she is no longer

15   in the Flex program, for reasons provided below.

16   121.    According to CA5, many home buyers are caught off guard when meeting with Zillow

17   Flex Agents in person, because they were unaware that the agents were a buyers' agent, and not the

18   listing agent.  According to CA5, in training Zillow teaches agents during the initial phone call to

19   avoid any conversation about whether the agents are buyers' agents, and – if customers do ask about

20   it – to brush it off as unimportant.

21   122.    According to CA5, Zillow's commission structure violates RESPA because, under

22   the law as CA5 understands it, a referral fee can only be paid to a licensed agent, and Zillow is not a

23   licensed agent.

24   123.    According to CA5, beginning in 2022, Zillow has been adamant that agents should

25   send leads to Zillow Home Loans.  CA5 believed that this also violated RESPA, but was told to not

26   worry about it because, if this was Zillow's policy (which had been vetted by lawyers), then it must

27   be fine.  But CA5 had his/her own loan officers that he/she liked to use, and did not think ZHL was

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

a good deal for his/her clients. In particular, CA5 stated that, in his/her experience, ZHL has higher fees and higher interest rates. ZHL would "cherry-pick" the clients to get the best and easiest clients, and disregard or drop clients that required more work. CA5 believed that the pressure to steer clients to ZHL violated CA5's fiduciary duties, and as a result CA5 quit the Flex program.

124. According to CA5, the net effect of Zillow's policies is to keep commissions inflated. Since Flex agents have to pay up to 40% of the agent's commission to Zillow, they are less willing to given up a quarter or half a point of their commission to close the deal.

**6. Confidential Real Estate Agent 6**

125. Confidential Real Estate Agent 6 ("CA6") has been a real estate agent for about 10 years in the Mountain West area of the United States. CA6 has been on a Flex team since the year 2020.

126. According to CA6, although Zillow does not put it in writing, Zillow's representatives tell agents in the Zillow Flex and Premier programs that they have to steer clients to Zillow Home Loans, and that the more clients agents steer to Zillow Home Loans, the better their leads will be. Zillow also has certain minimum quotas that the agents must meet, or they are kicked out of the program.

127. According to CA6, the net effect of the commissions agents must pay to Zillow is to keep commissions inflated. Typically, a buyer's agent might be willing to reduce his or her commission to help out the buyer with closing costs, but Zillow Flex agents have no real room or flexibility to do so given the payments of up to 40% to Zillow. According to CA6, Zillow also discourages agents from reducing their commissions; "why didn't you get more?," would be Zillow's response if CA6 reduced his/her commission. In addition, according to CA6, Flex agents must pay the referral fee to Zillow if the agent is involved in the future sale of the property at issue, for up to two years.

128. According to CA6, Zillow coaches agents on what to say, including not volunteering during the first phone call that the Zillow agent is the buyer's agent (and not the listing agent). Agents are also taught to tell clients that it is not in their best interest to contact the listing agent directly.

AMENDED CLASS ACTION COMPLAINT – 37
Case No. 2:25-CV-01818-JLR
- 37 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

129.    According to CA6, Zillow Home Loans sends out inaccurate and misleading closing schedules, which it does frequently.  For example, to secure the business, ZHL will release a closing schedule that doesn't include all the closing costs.  At closing, the buyer has the choice to either pay the costs that were not disclosed, or walk away from the deal.  CA6 had a buyer who got upset with CA6 when this occurred, even though the figures came from ZHL.  If CA6 complained, Zillow would reduce his/her leads.

### 7.    Confidential Real Estate Agent 7

130.    Confidential Real Estate Agent 7 ("CA7") has been a realtor for over 20 years in the Mountain West region of the United States, and is intimately familiar with the Zillow Flex program. According to CA7, after a buyer visits Zillow.com and expresses an interest in a property, a Zillow-affiliated agent will receive the referral and tell potential buyers that they are the listing agent, or that they work for the listing agent, or that it is "against the law" to work directly with the seller. According to CA7, if the agent does not proceed as if they are the listing agent, the agent's conversion rate (converting leads into deal) reduces greatly.  The Flex agent will not receive any more leads if he/she does not convert leads into deals.

131.    According to CA7, he/she has had several instances in which the buyer's agent (the Zillow-affiliated agent) told CA7's client (the seller) that the Zillow agent worked for CA7, because the Zillow agent showed the house to the buyer. In one example, a seller client told CA7 that a buyer was trying to reach CA7 to see the house, but instead was connected to a Zillow agent.  CA7 confirmed with the Zillow agent that the buyer was redirected on purpose to the Zillow Flex agent. The person who showed them the house (and eventually wrote the offer) falsely said that CA7 was busy and that he/she was one of CA7's associates.

132.    According to CA7, he/she knows several Zillow Flex agents who have been told, "do not ever discuss the referral with consumers and don't disclose it."

133.    According to CA7, the commissions paid to Zillow by the Zillow Flex agents are kept hidden from the consumers, and they are not included in the closing documents.  Sometimes the title company wires the money directly to Zillow, or pays the broker who then pays Zillow, without the

AMENDED CLASS ACTION COMPLAINT – 38
Case No. 2:25-CV-01818-JLR
- 38 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

consumers ever knowing. According to CA7, they are doing this on purpose, because if they disclosed the commissions paid to Zillow, consumers would say, "why are we paying this much money to this company that doesn't do anything? Why are we paying all this when we could use it to buy down the rate or pay for repairs?" CA7 knows this because, based on CA7's experience, when referral fees are included in the closing documents, the customers wanted to know why this company was getting paid, and often wanted to challenge it.

134. According to CA7, the large commissions paid to Zillow are hurting home buyers, because the agents have no flexibility to agree to a lower commission. The $5,000 to $15,000 that could be shaved off the purchase price can often make the difference between getting the house, or losing it to another buyer. According to CA7, none of these buyers would use these agents if they knew they were paying this referral—they would instead contact the seller agent directly, or use another agent. The large commissions paid to Zillow put the buyers at a distinct disadvantage when trying to buy a house.

135. According to CA7, if the consumer had the option of going directly to the seller or listing agent, the consumer would "absolutely" get a better deal and lower costs. And if the buyer's agent knew the buyer could access the listing agent, it would stop buyer's agents from charging "outrageous" commissions as they are doing now. According to CA7, Zillow's dominance of the market and deceptive practices is part of the reason why commissions remain high.

136. According to CA7, beginning at least as early as 2019, Zillow representatives were pressuring CA7 to push clients to use Zillow's products, including Zillow Mortgage. Zillow representatives told CA7 that CA7 needed to push these products, including Zillow Mortgage, and if not, CA7's leads would dry up. CA7 also knows that other agents were facing similar pressure during that time period.

137. According to CA7, Zillow agents now visit Flex Agents in person, so that they can talk about the performance metrics (including the rate at which agents steer clients to ZHL) without putting anything in writing.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1

### 8.    Confidential Real Estate Agent 8

2    138.    Confidential Real Estate Agent 8 ("CA8"), who is from the southeastern part of the

3    United States, was recently a Flex Agent, but was removed from the program because CA8 refused

4    to refer customers to ZHL based on CA8's belief that ZHL does not serve the interests of potential

5    buyers.  If an agent does not get 10% or more of his/her clients to obtain a pre-approval letter from

6    ZHL, the agent is dropped from the program.  But the 10% figure is hard to reach because a

7    substantial number of the clients did not see that the "Get financial information" box was pre-

8    checked.

9    139.    According to CA8, ZHL offers loans with higher interest rates compared to others on

10    the market.  CA8 has had the experience of seeing potential buyers get offers from ZHL that are

11    nearly one percent higher than what ZHL offered.

12    140.    CA8 believed that steering customers to ZHL in exchange for something of value

13    (leads on buyers) was a clear RESPA violation.  When CA8 refused to steer clients to ZHL, CA8

14    was told that he/she was not a "team player."

15    141.    CA8 was previously a very successful agent, with about $15 million in sales last year.

16    But CA8 was dropped from the program simply because CA8 refused to violate the law.

17    142.    CA8 provided the following screenshots that show how Zillow monitors and coerces

18    agents into referring clients to ZHL:

19

20

21

22

23

24

25

26

27

28



✅ **All your Flex contacts are up to date!**

You are eligible to receive new Flex connections. Keep up the great work!

❗ **Your connections are limited**
Get **1 more pre-approval** to move up to Fair and earn more connections.

143.    CA8 also shared screenshots demonstrating that, if asked directly about loan packages that ZHL does not offer, like down payment assistance (DPA), Zillow trains agents to avoid the question and refer them to ZHL anyway, despite the obvious conflict with the client's interests:

- #3. What if they need a DPA product, VA loan or jumbo product?
  - Inform them that Zillow Home Loans offers a variety of competitive products for all client needs. Let them know you will connect them with your dedicated loan officer who will walk them through their loan options and pre-approval steps.

AMENDED CLASS ACTION COMPLAINT – 41
Case No. 2:25-cv-01818-JLR
- 41 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**9.  Confidential Real Estate Agent 9**

144.  Confidential Real Estate Agent 9 ("CA9") has been in real estate for over 35 years in the New York/New Jersey area.  According to CA9, potential buyers are being duped into signing an agreement with a buyer's agent, before seeing the property, which means that the buyers are locked into using the first agent they signed up with—often thinking that the agent was the listing agent. The buyer's agent is often an agent who has paid Zillow to promote them as a "premier agent," with no verification of experience.  As a listing agent, CA9 often gets the chance to communicate and deal directly with the buyers.  But, according to CA9, Zillow deceives the public and deprives them of an opportunity to connect with the listing agents.

145.  According to CA9, as a result of the payments buyers' agents have to pay Zillow, the buyers pay more for the house because the agents' "hands are tied"; they have less room to maneuver in reducing their commissions to close the deal because of the large percentage they owe to Zillow.

**10.  Confidential Real Estate Agent 10**

146.  Confidential Real Estate Agent 10 ("CA10") is a real estate agent in the Midwest who worked on a Zillow Flex team for nearly two years.  According to CA10, nearly all of the customers who requested a tour or an agent on Zillow.com thought the Flex agents were the listing agent, based on the design of the app and website.

147.  According to CA10, Flex agents are pushed aggressively by Zillow to use ZHL, and—if agents do not steer clients to ZHL—they will receive fewer leads or be cut from the program. CA10 believes this clearly violates RESPA.  In addition, ZHL often failed to fully disclose fees. Partly for this reason, and consistent with an agent's fiduciary duties, CA10 would encourage his/her clients to use another lender.

148.  According to CA10, Zillow now avoids written or recorded communications as part of its training program.  Instead, Zillow flies their people out to Flex team offices to avoid putting anything in writing, which CA10 regards as "shady" and "just not right."

149.  According to CA10, the "blue badge" on agents' profiles was misleading to consumers and did not reflect experience or performance. The "blue badge" just meant the agent was

AMENDED CLASS ACTION COMPLAINT – 42
Case No. 2:25-cv-01818-JLR
- 42 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    part of the program. According to CA10, the problem was that average customers believe they are

2    getting a "superstar," but in reality it could be an agent that has never sold a house before.

3    **11.    Confidential Loan Officer 1**

4    150.    According to Confidential Loan Officer 1 ("LO1"), a licensed mortgage loan officer

5    in the Pacific Northwest with more than 30 years of experience in the real estate and mortgage

6    industry, the loan products and lending practices of Zillow Home Loans (ZHL) are consistently

7    substandard compared to those offered by traditional lenders and independent mortgage

8    professionals.

9    151.    *Limited Loan Programs and Misrepresentation of Options*. According to LO1,

10   Zillow Home Loans offers only a narrow range of loan products, which often prevents buyers from

11   obtaining the most advantageous financing available. For example, Zillow does not participate in or

12   disclose the existence of Down Payment Assistance (DPA) programs, which are critical for helping

13   many first-time and moderate-income buyers achieve homeownership. By failing to inform clients

14   about these options, Zillow effectively steers buyers into higher-cost loans or disqualifies them

15   altogether from purchasing.

16   152.    According to LO1, Zillow also does not offer USDA loans for eligible rural

17   borrowers, and the VA loan programs it does provide frequently carry higher interest rates and

18   additional fees than comparable VA products offered through other lenders. In several cases observed

19   by LO1, borrowers who initially began with Zillow were able to obtain significantly better terms

20   after transferring their loans to LO1's company.

21   153.    Additionally, according to LO1, Zillow does not provide non-conforming or

22   specialized loan products, which are often necessary for self-employed borrowers or those with

23   complex financial profiles. In today's market, this limitation excludes a large portion of qualified

24   buyers who would otherwise be able to obtain financing.

25   154.    *Lack of Transparency and Inaccurate Disclosures.* According to LO1, and based

26   on LO1's professional experience, Zillow loan officers frequently misrepresent or omit important

27   details regarding the borrower's true costs at closing. In one documented instance, a Zillow

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1   representative offered a rate that appeared lower than LO1's competing quote; however, the Zillow

2   quote understated the property tax obligations associated with the home purchase. The buyer later

3   discovered the true tax costs were substantially higher, leading to unexpected expenses and potential

4   risk of losing the transaction. According to LO1, the Zillow loan officer involved in that transaction

5   was not licensed in the same state where the property was located and was unfamiliar with that state's

6   tax structure and lending requirements—an issue that LO1 notes is common among Zillow's remote

7   lending staff.

8          155.    ***Targeting Only "Easy" Borrowers***.   According to LO1, Zillow's business model

9   appears focused on quickly closing loans for highly qualified borrowers while abandoning applicants

10  who present any complexity—such as moderate credit, higher debt-to-income ratios, or non-

11  traditional income sources. According to LO1, and based on LO1's experience and conversations

12  with industry colleagues, Zillow's system emphasizes speed and volume over borrower advocacy,

13  often leaving more challenging clients without proper guidance or access to suitable loan alternatives.

14         156.    ***Inexperienced Staff and Incentive-Driven Culture***.   According to LO1, Zillow

15  employs inexperienced loan officers, often paying them substantially below industry standards. Their

16  compensation is structured around loan volume, incentivizing them to process as many applications

17  as possible rather than ensuring that each client receives accurate, personalized, and compliant

18  guidance. This approach leads to poor communication, inaccurate disclosures, and inconsistent client

19  service.

20         157.    ***Coercive Steering Practices and Agent Mandates***.   According to LO1, Zillow is now

21  forcing its Premier Agents to convert into the Flex Program, under which Zillow mandates that at

22  least one out of every five buyer leads must close through Zillow Home Loans (ZHL). Agents who

23  fail to meet this quota or who decline to participate in the Flex program altogether are removed from

24  Zillow's lead distribution system and terminated from the program.

25         158.    According to LO1, this requirement effectively coerces agents to steer their clients

26  toward Zillow's inhouse lending arm, regardless of whether the loan is the most suitable or cost-

27  effective option for the buyer. In LO1's professional opinion, this practice creates a serious conflict

28

AMENDED CLASS ACTION COMPLAINT – 44
Case No. 2:25-cv-01818-JLR
- 44 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

of interest, undermines consumer choice, and violates fundamental ethical and fiduciary obligations owed by real estate professionals to their clients.

### 12.    Confidential Loan Officer 2

159.    Confidential Loan Officer 2 ("LO2") has been working in the mortgage loan industry for over 10 years in the American Southwest, and works extensively with Zillow-affiliated agents (including Zillow Flex Agents).  According to LO2, Zillow only provides loans to customers with "Grade A paper" —meaning those who have a top credit score and do not pose any substantive risk. Zillow does not loan to potential buyers with lower scores, nor does Zillow offer jumbo loans, assistance to first time home buyers, or loans for fabricated homes, among other things.

160.    According to LO2, since 2022, Zillow has been requiring agents to steer clients to Zillow loan officers, and steering customers away from loan officers (like LO2) with proven track records and a history of success in closing real estate sales.  According to LO2, Zillow loan officers are often less experienced and less knowledgeable than other officers, and less successful in closing deals, leading to many frustrated buyers who cannot close with a Zillow home loan.

161.    According to LO2, Zillow's steering efforts begin when a potential buyer is on Zillow's website and signs up for a tour (or selects "Contact Agent"), and the box indicating the buyer's interest in "financing" is pre-checked.  According to LO2, many times the buyer does not see the pre-checked box and has no interest in getting financing information from Zillow.  Other times, the buyers may have an interest in "financing," but not necessarily through Zillow Home Loans.  In either case, however, according to LO2, Flex agents tell these buyers that the agents have no choice but to refer them to Zillow Home Loans because the buyers did not uncheck the pre-checked box—a direct acknowledgement that the agents are steering potential buyers to Zillow Home Loans.

162.    According to LO2, the agents are measured and judged based on metrics created by Zillow that capture how many clients that supposedly expressed an interest in "financing" are pre-approved for a loan by Zillow Home Loans.  Zillow then threatens to remove, and does remove, Zillow Flex agents who fail to meet Zillow's 10% quota.  But the 10% quota is even harder to meet

1    because a great number of those buyers never had an interest in "financing," or Zillow Home Loans,

2    in the first place.  Nevertheless, according to LO2, even if the agents are otherwise high performers

3    and skilled at their jobs, they are terminated from the program if they do not steer enough clients to

4    Zillow Home Loans.

5    163.    According to LO2, Zillow also requires Zillow-affiliated agents to use its Customer

6    Relationship Management ("CRM") software called Follow-Up Boss.  Agents must pay to use this

7    software, which provides a phone number for the agents to use when they communicate with their

8    clients through a Follow-Up Boss app.  According to LO2, Zillow uses the Follow-Up Boss app and

9    software to actively monitor the Zillow Flex Agents, to make sure that they are following the scripts

10   and rules that Zillow imposes.  The Follow-Up Boss software captures agents' communications with

11   their clients, including phone calls and text messages.  According to LO2, this is a violation of an

12   agent's fiduciary duty to his/her clients to keep this information confidential.  Zillow is not the agent

13   and should not be privy to the clients' confidential information.  The Follow-Up Boss also only offers

14   Zillow Home Loans as an option for a buyer looking for financing.

15   164.    According to LO2, part of the effect of Zillow monitoring all communications is that

16   Zillow's loan officers can identify cases in which the Zillow Flex agents are recommending loan

17   officers who are not with Zillow.  In those cases, Zillow loan officers ask Zillow Flex agents why

18   the clients are not being referred to Zillow Home Loans.  According to LO2, much like the Zillow

19   Flex agents, the Zillow loan officers are not particularly skilled or experienced, are paid a small

20   salary, and earn only small commissions on each loan they close.  As a result, the incentive is for the

21   loan officers (just like the Zillow Flex agents) to churn through as many loans as possible, and only

22   take on clients that will be easy to get approved.

23   165.    However, according to LO2, the loan officers often tell the Zillow-affiliated agents to

24   not refer certain clients to them because they can see that the clients are either not interested in Zillow

25   Home Loans or pose too much of a credit risk.  Just like with the Zillow Flex agents, Zillow loan

26   officers have to close on a certain percentage of clients that are referred to them, and Zillow loan

27

28

AMENDED CLASS ACTION COMPLAINT – 46
Case No. 2:25-CV-01818-JLR
- 46 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    officers do not want "bad" leads that make it more difficult for the loan officers to make their

2    numbers.

3        166.    According to LO2, agents now fear Zillow, and Zillow is monetizing that fear and

4    violating RESPA in the process.  According to LO2, the purpose of RESPA was to create an open

5    and free market. Yet, according to LO2, the net effect of Zillow's policies is to force Zillow-affiliated

6    agents to steer clients to Zillow Home Loans, regardless of whether this is in the clients' interests.

7    According to LO2, the success of Zillow's program is evident in looking at Zillow's performance

8    compared with the market overall.

9        167.    According to LO2, the effect of Zillow's policies is to make it more difficult for

10   Zillow Flex agents to agree to a reduction in their commission in order to cover closing costs and

11   seal the deal.  Buyers no longer have wriggle room to seek a lower buyer agent commission because

12   the Zillow Flex agents have to pay up to 40% to Zillow.

13       168.    In the end, LO2 paid a great deal of money to Zillow for leads on mortgages for

14   several years, but—starting in 2022—Zillow turned on LO2 by steering clients away from him/her.

15   LO2 had great success with Zillow's referral program because LO2 was skilled at closing loans and

16   had developed a strong reputation in the industry.  But Zillow now steers clients away from LO2 and

17   toward loan officers that are not skilled or knowledgeable, and not able to effectively serve the

18   buyers' interests.

19   **F.    Defendants' Anti-Competitive Conduct**

20       169.    The harmful effects of Zillow's fraudulent conduct are exacerbated and amplified by

21   its abuse of its dominant position to monopolize as many listings as possible. On April 10, 2025,

22   Zillow announced that it would be implementing the Zillow Listing Access Standards (the "Zillow

23   LAS"). Under this program, agents must list any properties on MLS (which thereby get routed to

24   Zillow) within 24 hours of any effort by the seller's agent to sell the property. This includes, for

25   example, yard signs, virtual tours, or social media posts.[38]  If the agents do not list their properties

26   ───────────────

[38] *See* Zillow Premier Agent, *Zillow's Listing Access Standards:  What Agents Need to Know*, ZILLOW.COM (May
27   20, 2025), *available at* https://www.zillow.com/premier-agent/agents-know-listing-access-standards/ (last visited Aug.
22, 2025).  Zillow defines "public marketing" to mean (i) "promoting, marketing, or advertising a listing in any manner",
including without limitation, "flyers, yard signs, social media, public-facing websites or apps, emails, printed mailers,
28   newspapers, open houses, previews, showings, multi-brokerage listing sharing networks, virtual tours, and brokerage

011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1   within 24 hours, they are sent warnings of non-compliance. According to Zillow, "each non-

2   compliant listing will be logged as a single violation and the listing agent will be notified directly on

3   each violation." *Id.*

4     170. Critically, *every single post* is a violation, and "an agent's third non-compliant listing

5   – and any subsequent non-compliant listings—will be blocked from Zillow and Trulia for the life of

6   the listing agreement between that listing broker and seller." *Id*. The practical effect of this conduct

7   is that sellers and their agents are forced to list through Zillow via the MLS within 24 hours of putting

8   out any public information about the property for sale. The purpose and effect of this policy is to

9   ensure that all houses, throughout the country, will be listed on Zillow so that Zillow can maintain

10  and grow its monopoly and continue to unjustly earn profits through its fraudulent practices.

11    171. Zillow's efforts to capture the whole market are made more insidious because Zillow

12  slaps the homes for sale with a "Zestimate" (Zillow's estimate of the sale price of the home), which

13  is often inaccurate and is contrary to the seller's interest. Zillow acknowledges in fine print that "[t]he

14  amount of data we have for your home and homes in your area directly affects the Zestimate's

15  accuracy, including the amount of demand in your area for homes."[39]

16    172. Without the deceptive practices, more home buyers would connect directly with

17  listing agents and avoid the Hidden Zillow Fees. Due to Zillow's deceptive practices, more buyers

18  use buyer agents than they otherwise would, which results in higher buyer broker commissions and

19  correspondingly higher purchase prices. Neither Zillow nor the participating real estate agents

20  disclose to the buyer that Zillow collects up to 40% of the commissions that the seller pays to the

21  buyer broker.

22

23

24

25

---

26  private listing networks to the extent such listing network is publicly marketed and/or accessible to consumers, including
    those accessible only to a brokerage's clients behind a registration wall"; and/or (ii) sending and/or transmitting a Listing,

27  regardless of status, to an MLS, unless seller opts out of the display of the Listing everywhere on the internet due to
    privacy concerns, and executes a Seller Waiver (as defined below). *Id.*

    [39] What is a Zestimate?, ZILLOW.COM, https://www.zillow.com/z/zestimate/ (last visited Aug. 22, 2025).

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1

**G.      Zillow's Choice of Law Clause**

2

173.      According to Zillow's "Terms of Use," Washington State law applies to any disputes

3

between Zillow and its users.[40]

4

**V.      CLASS ACTION ALLEGATIONS**

5

174.      Plaintiffs bring this action on behalf of themselves, and as a class action under Federal

6

Rule of Civil Procedure 23, on behalf of the members of the following Class based on violations of

7

RICO, RESPA, the Washington Consumer Protection Act, and the law of unjust enrichment:

8
9

> All persons and entities in the United States who, from October 1,
> 2018, to the present, purchased a home listed on Zillow.com, and were
> represented by a Zillow agent.

10

175.      Plaintiffs also bring this action on behalf of the following Subclass (the "Steering

11

Subclass") based on violations of RESPA Section 8(a), 12, U.S.C. § 2607(a):

12
13
14

> All persons and entities in the United States who, from October 1,
> 2018, to the present, (i) purchased a home listed on Zillow.com, and
> were represented by a Zillow agent; and (ii) used Zillow Home Loans
> to finance the purchase.

15

176.      Excluded from the Class and Steering Subclass are Defendants, their officers,

16

directors and employees; any entity in which Defendants have a controlling interest; and any affiliate,

17

legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial

18

officers presiding over this action and the members of their immediate family and judicial staff,

19

jurors, and Plaintiffs' counsel and employees of their law firms.

20

177.      The Class and Steering Subclass are readily ascertainable because records of the

21

relevant property transactions should exist and are easily obtainable.

22

178.      The Class and Steering Subclass members are so numerous that individual joinder of

23

all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs

24

believe that the Class and Steering Subclass have at least tens of thousands of members, the exact

25

number and their identities being known to Defendants.

26
27

---

[40] *See Zillow Terms of Use*, ZILLOW.COM (May 20, 2025), https://www.zillow.com/z/corp/terms/ (last visited Sept. 18, 2025).

28

AMENDED CLASS ACTION COMPLAINT – 49
Case No. 2:25-CV-01818-JLR



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3353895 V1
011313-11/3353895 V1

1    179.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

2    and Steering Subclass. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other

3    members of the Class and Steering Subclass.

4    180.    Common questions of law and fact exist as to all members of the Class and Steering

5    Subclass and predominate over questions affecting only individual Class and Steering Subclass

6    members. These common legal and factual questions, each of which also may be certified under Rule

7    23(c)(4), include but are not limited to the following:

8    a.    Whether Defendants engaged in the alleged conduct;

9    b.    Whether Defendants' conduct violates RICO and RESPA, as alleged herein;

10    c.    Whether Defendants engaged in a pattern or practice of racketeering, as

11    alleged herein;

12    d.    Whether the conduct of Defendants caused injury to the business or property

13    of Plaintiffs and the other members of the Class and Steering Subclass;

14    e.    Whether the effect of Defendants' conduct was to inflate both total

15    commissions and buyer broker commissions that increased the buyer's

16    purchase price;

17    f.    Whether Plaintiffs and the other members of the Class and Steering Subclass

18    are entitled to, among other things, injunctive relief, and, if so, the nature and

19    extent of such injunctive relief;

20    g.    Whether Defendants' conduct is unlawful; and

21    h.    The appropriate class-wide measures of damages.

22    181.    Plaintiffs' claims are typical of the claims of the members of the Class and Steering

23    Subclass because their  claims arise from the same course of conduct by Defendants, and the relief

24    sought within the Class and Steering Subclass is common to each member. There are no defenses

25    available to Defendants that are unique to Plaintiffs or to any particular Class and Steering Subclass

26    members.

27

28

AMENDED CLASS ACTION COMPLAINT – 50
Case No. 2:25-cv-01818-JLR
- 50 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

182.    Plaintiffs will fairly and adequately represent and protect the interests of the Class and Steering Subclass, have no interest incompatible with the interests of the Class and Steering Subclass, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

183.    A class action is the superior method for the efficient adjudication of this litigation because individual litigation of Class and Steering Subclass members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Because of the size of the individual Class and Steering Subclass members' claims, no Class or Steering Subclass member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class and Steering Subclass would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

184.    Additionally, the Class and Steering Subclass may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.    The prosecution of separate actions by individual Class and Steering Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class and Steering Subclass members that would establish incompatible standards of conduct for Defendants;

b.    The prosecution of separate actions by individual Class and Steering Subclass members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class and Steering Subclass members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

c. Defendants have acted or refused to act on grounds generally applicable to the Class and Steering Subclass, thereby making appropriate final and injunctive relief with respect to the Class and Steering Subclass members as a whole.

## VI.   TOLLING OF THE STATUES OF LIMITATIONS

185. As of the date of this Complaint, Zillow still does not disclose on its website whether Zillow-affiliated real estate agents are Zillow "Flex" agents.  More importantly, Defendants and its affiliated agents at no point disclose the existence of the Hidden Zillow Fees to buyers or sellers during the property transaction.  There was no reasonable way for the public, including Plaintiffs, to know that Zillow Flex agents were involved in their transactions, and certainly no reasonable way for the public and Plaintiffs to know about the payment of the Hidden Zillow fees.   Indeed, Defendants concealed these facts from buyers and sellers.

186. Plaintiffs and Zillow.com users further had no way of knowing about Zillow deceptive conduct generally, including the deceptive design of Zillow's website.  As a result, Plaintiffs and other members of the public did not discover and reasonably could not have discovered Zillow's fraudulent conduct and receipt of hidden fees.  Any applicable statues of limitations or repose are accordingly tolled.

187. In addition, Defendants do not disclose to potential buyers that Zillow Flex agents are required to steer buyers to ZHL.  (Indeed, Defendants conceal the very identity of Zillow Flex agents). There was no reasonable way for the public, including Plaintiffs, to know that Zillow required Flex agents to steer buyers to ZHL, which offers a substandard product.  There was also no way for the public, and Plaintiffs, to know that Zillow agents were being trained by Zillow personnel, in person, without putting it in writing, on the requirements to meet certain steering benchmarks.  As a result, Plaintiffs and other members of the public did not discover and reasonably could not have discovered Zillow's RESPA violations.   And applicable statutes of limitations or response are accordingly tolled.

## VII.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1962(c)-(d)
### (On behalf of the Nationwide Class, against All Defendants)

188.    Plaintiffs incorporate and reallege the foregoing factual allegations by reference.

189.    All Plaintiffs bring this claim for themselves and on behalf of the Nationwide Class against Defendants.

190.    Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

191.    Plaintiffs are entitled to a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).

192.    Each Defendant is liable under 18 U.S.C. § 1962(c) because it conducted or participated in the conduct of the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity. Each Defendant is also liable under 18 U.S.C. § 1962(d) because it conspired to violation 18 U.S.C. § 1962(c).

193.    As a direct and proximate result of its fraudulent scheme and common course of conduct described throughout this Complaint, Defendants were able to extract hundreds of millions if not billions of dollars from Plaintiffs and Class Members.

### 1.    The Zillow Fraudulent Business Enterprise

194.    At all relevant times, each Defendant has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, a "legal or beneficial interest in property."

195.    Each Defendant conducted and participated in the conduct of an association-in-fact enterprise as defined in 18 U.S.C. § 1961(4) (hereinafter the "Zillow Fraudulent Business Enterprise."). Members of the Zillow Fraudulent Business Enterprise are Zillow, Inc., Zillow Group,

AMENDED CLASS ACTION COMPLAINT – 53
Case No. 2:25-CV-01818-JLR
- 53 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Inc., Zillow Homes, Inc., Zillow Listing Services, Inc., Zillow Home Loans, LLC, Works Industries, LLC, GK Properties, the Frano Team, and other individuals and entities, including unknown third parties, involved in fraudulently inducing home buyers into using Zillow Flex agents and illegally steering buyers into using Zillow Home Loans.

196.    The Zillow Fraudulent Business Enterprise was and continues to be characterized by a common purpose, maintaining relationships among the members of the Zillow Fraudulent Business Enterprise, and sufficient longevity to accomplish the common purpose thereof. Each Defendant and each member of the Zillow Fraudulent Business Enterprise conducted and participated in the conduct of the Zillow Fraudulent Business Enterprise through a pattern of racketeering activity.

197.    The Zillow Fraudulent Business Enterprise was formed for the common purpose of fraudulently inducing prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans.

198.    At all relevant times, the Zillow Fraudulent Business Enterprise: (a) had an existence separate and distinct from Zillow; (b) was separate and distinct from the pattern of racketeering in which Zillow engaged; and (c) was an ongoing organization consisting of legal entities.

199.    While Zillow participated in and is a member of the Zillow Fraudulent Business Enterprise, it has a separate existence that is distinct from the Zillow Fraudulent Business Enterprise, including distinct legal status, different offices and role, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

200.    The Zillow Fraudulent Business Enterprise is characterized by ongoing relationships among its members. Most notably, Zillow's personnel and executives worked with Zillow Flex agents, including the Zillow Flex agents who work for the Real Estate Defendants, to fraudulently induce prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans.

201.    Within the Zillow Fraudulent Business Enterprise, there was a common communication network through which Zillow and members of the Zillow Fraudulent Business

AMENDED CLASS ACTION COMPLAINT – 54
Case No. 2:25-cv-01818-JLR
- 54 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1  Enterprise shared information on a regular basis. The Zillow Fraudulent Business Enterprise used

2  this communication network for the purpose of furthering its common purpose and conducting its

3  pattern of racketeering activities.

4      202.    Zillow and each member of the Zillow Fraudulent Business Enterprise conducted and

5  participated in the conduct of the Zillow Fraudulent Business Enterprise by engaging in a pattern of

6  racketeering activity to further the common purpose of the Zillow Fraudulent Business Enterprise.

7  Zillow exercised control over, directed, and participated in the operation and management of the

8  Zillow Fraudulent Business Enterprise by directing its affairs and using members of the Zillow

9  Fraudulent Business Enterprise as instrumentalities to carry out the fraudulent scheme of the Zillow

10  Fraudulent Business Enterprise and further its common goals.

11      203.    In particular, members of the Zillow Fraudulent Business Enterprise worked to

12  fraudulently induce prospective home buyers into using Zillow Flex Agents by (a) falsely advertising

13  agents as "Top Agent on Zillow," even when a substantial number of the agents are experienced,

14  have no or little sales, and lack familiarity with the neighborhood of the homes; (b) falsely suggest

15  or expressly misled potential buyers into thinking that the buyers are contacting the listing agent

16  when they select "Contact Agent" or "Request a Tour" buttons on Zillow's website; (c) failing to

17  disclose to potential buyers that Zillow Flex agents must pay up to 40% of their commissions to

18  Zillow; and (d) illegally steering buyers into using Zillow Home Loans, without disclosing that ZHL

19  offers a substandard product, and without disclosing that the Zillow Flex agents are receiving

20  something of value in exchange for steering. For this Enterprise, Zillow trained, monitored, and

21  closely supervised the conduct of the Real Estate Defendants.

22      204.    Zillow and each of the Real Estate Defendants knew of, supported, and participated

23  in the Zillow Fraudulent Business Enterprise by coordinating their own conduct to further the

24  common purpose of the Zillow Fraudulent Business Enterprise. Moreover, Zillow and each of the

25  Real Estate Defendants knew that potential buyers were being defrauded, yet they stayed silent to

26  further the common purpose of the Zillow Fraudulent Business Enterprise.

27      205.    Each member of the Zillow Fraudulent Business Enterprise shared in the bounty

28

AMENDED CLASS ACTION COMPLAINT – 55
Case No. 2:25-CV-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

generated by the enterprise—*i.e.*, by sharing the benefit derived from commission payments by home buyers.

206.    The Zillow Fraudulent Business Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, advertisement, and purchase of the Zillow home listings, and the receipt of monies from the commissions of the sales of homes listed on Zillow.

### 2.    The Predicate Acts

207.    The Zillow Fraudulent Business Enterprise's common purpose of illegally profiting from the commissions paid by buyers for homes listed on Zillow's website was facilitated by a pattern of mail and wire fraud. The Zillow Fraudulent Business Enterprise's scheme constitutes racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), by using mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud).

208.    Specifically, each Defendant has committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 & 1343). The multiple acts of racketeering activity were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by each Defendant's regular and knowing use of the facilities, services, distribution channels, and employees of the Zillow Fraudulent Business Enterprise. Each Defendant knowingly and intentionally participated in the scheme to defraud by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

209.    Zillow and the Real Estate Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the Nationwide Class using materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

210.    Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not limited to:

AMENDED CLASS ACTION COMPLAINT – 56
Case No. 2:25-CV-01818-JLR
- 56 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

a. **Mail Fraud**: Each Defendant violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to defraud by marketing, communicating, servicing, and serving as the buyers' agents by means of false pretenses, misrepresentations, promises, and omissions.

b. **Wire Fraud:** Each Defendant violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire to execute the unlawful scheme to defraud by marketing, communicating, servicing, and serving as the buyers' agents by means of false pretenses, misrepresentations, promises, and omissions.

211.    Each Defendant's use of the mails and wires includes, but is not limited to, the following acts of the Zillow Fraudulent Business Enterprise in furtherance of their scheme to defraud:

a. Marketing homes online at Zillow.com;

b. Communicating with potential buyers through email, text, phone calls, and other means;

c. Engaging in communications between Zillow and each of the Real Estate Agents about how to fraudulently induce potential buyers into using Zillow Flex agents;

d. Sending and receiving documents related to the purchase of the homes advertised on Zillow.com;

e. Sending and receiving documents related to the financing of the homes advertised on Zillow.com;

f. Sending and receiving funds generated by commissions paid by Plaintiffs; and

g. emails, communications and correspondence related to all of the foregoing.

212.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to (a) fraudulently induce prospective home buyers into using Zillow Flex agents, and (b) illegally steer buyers into using Zillow Home Loans.

213.    Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

facilities are hidden from Plaintiffs and Class Members, and cannot be alleged without access to Defendants' books and records, and the books and records of members in the Zillow Fraudulent Business Enterprise, to fraudulently induce prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans. However, Plaintiffs have described the types of predicate acts of mail and/or wire fraud that occurred.

214. Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), each Defendant conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this complaint, have participated as co-conspirators with each Defendant in these offenses and have performed acts in furtherance of the conspiracy to fraudulently induce prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans.

215. Each Defendant aided and abetted others in violating the above laws, thereby rendering it indictable as a principal in the 18 U.S.C. §§ 1341 & 1343 offenses.

216. To achieve its common goals, Defendants actively and intentionally concealed from the general public the unlawfulness of the Zillow Fraudulent Business Enterprise.

217. Zillow, the Real Estate Defendants, and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud to fraudulently induce prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans.

218. Indeed, for the conspiracy to succeed Zillow, the Real Estate Defendants, and their co-conspirators had to agree to implement and use similar devices and fraudulent tactics including, but not limited to, complete secrecy about fraudulently inducing prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans.

219. Each Defendant knew and intended that Plaintiffs and Class Members would rely on the material misrepresentations and omissions made by them regarding the Zillow Fraudulent Business Enterprise. Defendants knew and intended that consumers would incur damages as a result.

AMENDED CLASS ACTION COMPLAINT – 58
Case No. 2:25-CV-01818-JLR
- 58 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

220.    Plaintiffs and millions of other consumers relied upon Defendants' misrepresentations, omissions, and concealment.

221.    As described herein, Defendants engaged in a pattern of related and continuous predicate acts. These predicate acts constituted various unlawful activities, each conducted with the common purpose of obtaining commission payments from Plaintiffs and Class Members based on their misrepresentations, omissions, and concealment. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

222.    All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Zillow Fraudulent Business Enterprise. The racketeering acts committed by the Zillow Fraudulent Business Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on Plaintiffs and Class Members.

223.    The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

224.    The predicate acts all generated significant revenue and profits for each Defendant at the expense of Plaintiffs and Class Members. The predicate acts were committed or caused to be committed by Defendants through its participation in the Zillow Fraudulent Business Enterprise and furtherance of its fraudulent schemes.

225.    By reason of and as a result of the conduct of Defendants, and in particular its pattern of racketeering activity, Plaintiffs and Class Members have been injured in multiple ways, including but not limited to:

a.    Plaintiffs have been wrongfully deprived of their property in that deliberate misrepresentations, omissions, and concealment artificially inflated the commissions that Plaintiffs paid in connection with the purchase of their homes.

b.    Plaintiffs have been wrongfully deprived of their property in that they were steered to use Zillow Home loans, and received inferior loan packages that were

1    more costly than they would have received if they used another lender.

2    226.    Defendants' violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately

3    caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members are

4    entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief,

5    costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

6    **COUNT II**

7    **VIOLATION OF THE REAL ESTATE SETTTLEMENT PROCEDURES ACT, 12
      US.C. 2607(a) (On behalf of a Nationwide Class, against the Zillow Defendants, and on**

8    **behalf of a Nationwide Steering Subclass )**

9    227.    Plaintiffs Liao and Silva repeat and incorporate by reference each paragraph above

10   and in any other count of this Complaint.

11   228.    RESPA Section 8(a), 12, U.S.C. § 2607(a), provides that "no person shall give and

12   no person shall accept any fee, kickback, or thing of value pursuant to any agreement or

13   understanding, oral or otherwise, that business incident to or part of a real estate settlement service

14   involving a federally related mortgage loan shall be referred to any person."

15   229.    A "thing of value" is "broadly defined" under RESPA's implementing regulation by

16   the CFPB under "Regulation X," and includes, among other things, "the opportunity to participate

17   in a money-making program." 12 C.F.R. § 1024.14(d).

18   230.    The real estate agents who receive referrals from Zillow treasure and rely on these

19   referrals, and  these agents consider Zillow referrals as a thing of value.  As a result, Zillow referrals

20   are a thing of value under RESPA.

21   231.    Regulation X defines a "referral" to include "any oral or written action directed to a

22   person which has the effect of affirmatively influencing the selection of any person of a provider of

23   a settlement service." 12 C.F.R. § 1024.14(f)(1). And "an agreement or understanding for the referral

24   of business incident to or part of a settlement service need not be written or verbalized but may be

25   established by a pattern, practice or course of conduct." 12 C.F.R. § 1024.14(e).

26

27

28

AMENDED CLASS ACTION COMPLAINT – 60
Case No. 2:25-cv-01818-JLR
- 60 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

232.    In addition "when a thing of value is received repeatedly and is connected in any way with the volume or value of business referred, the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business." 12 C.F.R. § 1024.14(e).

233.    Pursuant to 12 U.S.C. § 2602(3), "the term 'Settlement services' includes any service in connection with a real estate settlement including, but not limited to, the following: . . . the origination of a federally related mortgage loan."

234.    Pursuant to 12 C.F.R. § 1024.2(b), "Settlement Service means any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following: (1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans) . . . [or] (3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan."[41] Zillow is accordingly a person under Section 8 of RESPA pursuant to 12 U.S.C. §§ 2602(5), 2607.

235.    Under these definitions, the mortgage lending services provided by Zillow Home Loans for federally related loans were "settlement services" under RESPA.

236.    ZHL is a "creditor" pursuant to 15 U.S.C. § 1602(g), and as incorporated by reference into RESPA at 12 U.S.C. § 2602(1)(B)(iv).  ZHL makes or invests in residential real estate loans totaling more than one billion million dollars per year.  *See* 12 U.S.C. § 2602(1)(B)(iv).

237.    The vast majority of mortgages originated by ZHL during the relevant time period were "federally related mortgage loans" as that term is defined by 12 U.S.C. § 2602(1) and 12 C.F.R. 1024.2(b).[42]

238.    The real estate brokers and agents who received referrals from Zillow made the following referral to Zillow: they affirmatively influenced the Zillow-referred clients to use Zillow Home Loans for financing their home purchase in adherence with Zillow's referral rules and quotas.

---

[41] *See also* 12 U.S.C. § 2602(3) ("the term 'Settlement services' includes any service provided in connectioni with a real estate settlement, including, but not limited to, the following: [] services rendered by a real estate agent or broker.").

[42]    *See, e.g.,*  Zillow  Group,  Inc.  2024  10-K,  at  23  (available  at  chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://d18rn0p25nwr6d.cloudfront.net/CIK-0001617640/7204bf7d-e80a-4f24-8e69-5a1264c2df17.pdf).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

239.    Zillow therefore gave a "thing of value" to real estate brokers and agents—the ability to continue receiving referrals and obtaining priority for future referrals—under an agreement or understanding that the real estate brokers and agents would refer real estate settlement business involving federally related mortgage loans to Zillow Home Loans, in violation of RESPA Section 8(a), 12, U.S.C. § 2607(a).

## COUNT III

### VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. § 2607(b)
**(On Behalf of a Nationwide Class, against the Zillow Defendants)**

240.    Plaintiffs Taylor, Liao, Taylor, Cady, and Brucaliere repeat and incorporates by reference each paragraph above and in any other count of this Complaint.

241.    The Real Estate Settlement Procedures Act ("RESPA") (codified at 12 U.S.C. § 2601, *et seq.*) was enacted in 1974 to provide consumers with greater and timelier disclosure of the nature and costs of the real estate settlement process and to protect them from abusive practices.

242.    RESPA's premise was that complete disclosure of information would preclude illegal kickbacks, fee splits, unearned fees, and compensated referrals, and thereby empower the consumer to get the same or better services at a lower cost.

243.    Section 7 of RESPA (12 U.S.C. § 2607) provides: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b).

244.    RESPA confers on the Secretary of the U.S. Department of Housing and Urban Development ("HUD") authority to prescribe rules and regulations to achieve the purposes of RESPA. The regulation adopted by HUD to fulfill its mandate is known as Regulation X, 24 C.F.R. § 3500, *et seq*.

245.    RESPA achieves its goals in a twofold manner: by imposing disclosure requirements in connection with settlement services, and by prohibiting certain practices in connection with settlements.

AMENDED CLASS ACTION COMPLAINT – 62
Case No. 2:25-cv-01818-JLR
- 62 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

246.    The term "settlement services" includes any service provided in connection with a real estate settlement, including, but not limited to, providing brokerage services.

247.    HUD has determined in its regulations that kickbacks, fee splits, and referral fees in connection with residential real estate sales are anticompetitive, result in harm to consumers, and thus illegal.

248.    24 C.F.R. § 3500.14 further explains the prohibitions in 12 U.S.C. § 2607 as follows:

(b)    <u>No referral fees</u>. No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in Sec. 3500.14(g)(1). A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

(c)    <u>No split of charges except for actual services performed</u>. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

(d)    <u>Thing of value</u>. This term is broadly defined in section 3(2) of RESPA (12 U.S.C. 2602(2)). It includes, without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation. The term "payment" is used throughout Secs. 3500.14 and 3500.15 as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

AMENDED CLASS ACTION COMPLAINT – 63
Case No. 2:25-cv-01818-JLR
011313-11/3353895 V1
011313-11/3353895 V1

- 63 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

249.    The Plaintiffs' settlements of residential real estate purchases and sales were financed in whole or in part by federally related mortgage loans.  Specifically, Plaintiff Taylor used a lender which is regulated by an agency of the Federal Government.

250.    The Zillow Defendants ("Defendants," for purposes of this Count) are real estate settlement services providers that provided real estate settlement services involving federally related mortgage loans within the meaning of 12 U.S.C. § 2602(2) and § 2607(a) for the settlements at issue.

251.    In the alternative to the preceding allegation, Defendants are subject to RESPA because, by originating loans, it "provides business incident to or part of" a real estate settlement service and received settlement fees in connection therewith, within the meaning of 24 C.F.R. §§ 3500.2 and 3500.14, *et seq*.

252.    In the alternative to the preceding allegation, each Defendant is also a person who received a split of commissions (other than for services performed) that were paid for the rendering of a settlement service in transactions involving federally related mortgage loans, within the meaning of 12 U.S.C. § 2607(a) and (b).

253.    The  Hidden Zillow Fees were paid to Zillow by seller brokers as settlement service providers using settlement proceeds within the meaning of 12 U.S.C. §§ 2602(2) and 2607(a) and 24 C.F.R. §§ 3500.2 and 3500.14, *et seq*.

254.    The seller brokers paid the Hidden Zillow Fees from settlement proceeds in connection with real estate settlements involving federally related mortgage loans.

255.    The Zillow-affiliated agents who received real estate commissions from the subject settlements acquiesced in splitting those commissions with the Defendants by paying the Hidden Zillow Fees in connection with real estate settlements involving federally related mortgage loans.

256.    Defendants accepted the Hidden Zillow Fees either as a settlement services provider, a purported provider of services incident to or part of a real estate settlement service, or a person within the meaning of 12 U.S.C. § 2607, *et seq*.

AMENDED CLASS ACTION COMPLAINT – 64
Case No. 2:25-cv-01818-JLR
- 64 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

257.    Payment and receipt of the Hidden Zillow Fees violated 12 U.S.C. § 2607(b) in that it represents a split of commissions paid without rendering any settlement services in connection with a federally related mortgage loan.

258.    Defendants collect the unearned Hidden Zillow Fees from settlement proceeds *only* when a listed property sells.

259.    The Hidden Zillow Fees are paid from settlement proceeds after all real estate settlement services have been rendered. The Hidden Zillow Fees serve no legitimate purpose, and are an illegal fee for which Defendants perform no services.

260.    Each Defendant is jointly and severally liable to the Plaintiffs pursuant to 12 U.S.C. § 2607(d)(2) in an amount equal to three times the Hidden Zillow Fees.

## COUNT IV

### VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
(Wash. Rev. Code Ann. § 19.86.010, *et seq.*)
(On Behalf of a Nationwide Class, against the Zillow Defendants)

261.    Plaintiffs Taylor, Zheng, Liao, King, Knudson, Thurston, Silva, Koger, Cady, and Brucaliere (for purposes of all Washington Class Counts) incorporates by reference all paragraphs as though fully set forth herein.

262.    Plaintiffs bring this Count on behalf of the nationwide Class based on violations of Washington's Consumer Protection Act (the "Washington CPA").

263.    The Zillow Defendants ("Defendants," for purposes of this Count), Plaintiffs, and each member of the nationwide Class are "person[s]" under Wash. Rev. Code Ann. § 19.86.010(1) ("Washington CPA").

264.    At all relevant times, Defendants were and are engaged in "trade" or "commerce" under Wash. Rev. Code Ann. § 19.86.010(2).

265.    The Washington CPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.96.010. Defendants' conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or



1  unscrupulous; or (3) causes substantial injury to consumers. In short, Defendants' conduct has been
2  deceptive because they have the capacity or tendency to deceive.

3      266.    In the course of Defendants' business, Defendants crafted their website to deceive
4  buyers into believing that they were contacting the *seller*'s agent, when in fact potential buyers were
5  being routed to a Zillow-affiliated agent. When the agent was a Zillow Flex agent, the Flex agent
6  failed to disclose (and was prohibited from disclosing) the Hidden Zillow Fees to the buyer or seller.
7  The net effect of Defendants' conduct was to drive up the commission paid by sellers, to the
8  detriment of the sellers.

9      267.    Defendants knew or should have known that their conduct violated the Washington
10  CPA.

11      268.    Defendants owed Plaintiffs and the Class a duty to disclose the truth about the
12  deceptive website and the Hidden Zillow Fees because Defendants:

13          a.    Possessed exclusive knowledge of the deceptive website and the Hidden
14                Zillow Fees; and

15          b.    Intentionally concealed the foregoing from Plaintiffs and the Class.

16      269.    Defendants' conduct proximately caused injuries to Plaintiffs and the other Class
17  members.

18      270.    Plaintiffs and the other Class members were injured and suffered ascertainable loss,
19  injury in fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs
20  and the other Class members paid inflated commissions related to the sales of their homes. These
21  injuries are the direct and natural consequence of Defendants' misrepresentations, fraud, deceptive
22  practices, and omissions.

23      271.    Defendants' conduct also aided and abetted the buyer agent's fiduciary duties to
24  Plaintiffs in that the agent did not disclose the material fact of the Hidden Zillow Fees that their
25  respective  agents had to pay to Zillow.

26
27
28
AMENDED CLASS ACTION COMPLAINT – 66
Case No. 2:25-cv-01818-JLR

011313-11/3353895 V1
011313-11/3353895 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

272.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein impact the public interest, in that home sellers are paying inflated commissions as a result of Defendants' conduct.

273.    Defendants are liable to Plaintiffs and the Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages up to $25,000, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code. Ann. § 19.86.090.

## COUNT V

### UNJUST ENRICHMENT
### (On Behalf of a Nationwide Class, against the Zillow Defendants)

274.    Plaintiffs Taylor, Zheng, Liao, King, Knudson, Thurston, Silva, Koger, Cady, and Brucaliere repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

275.    As a result of the wrongful and deceptive conduct of Defendants as alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of Hidden Zillow Fees and referral fee payments by Premium Agents (the "Premium Fees").

276.    In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Class.

277.    As a result, each Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

278.    The unjust enrichment of Defendants is traceable to, and resulted directly and proximately from, the conduct alleged herein.

279.    Defendants either knew or should have known that the Hidden Zillow Fees and the Premium Fees were obtained by deception and were unearned. As such, it would be inequitable for Defendants to retain the benefit of the Hidden Zillow Fees and Premium Fees under these circumstances.

280.    The financial benefits derived by Defendants from collecting Hidden Zillow Fees and Premium Fees rightfully belong to Plaintiffs and Class members.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

281.    Defendants' acceptance and retention of the Hidden Zillow Fees and Premium Fees under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and Class members.

282.    Plaintiffs and Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully requests that the Court enter judgment in his favor and against Defendants, as follows:

A.    Determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the Class; and declare Plaintiffs as the representatives of the Class;

B.    Enter joint and several judgments against the Defendants and in favor of Plaintiffs and the Class;

C.    Award the Class and Steering Subclass damages in an amount to be determined at trial;

D.    Order disgorgement in the amount by which Defendants' ill-gotten gains exceed the treble damages awarded in this case;

E.    Permanently enjoin Defendants' ongoing anticompetitive and deceptive conduct;

F.    Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

G.    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

AMENDED CLASS ACTION COMPLAINT – 68
Case No. 2:25-cv-01818-JLR
- 68 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    DATED: November 19, 2025                Respectfully submitted,

2                                            HAGENS BERMAN SOBOL SHAPIRO LLP

3
                                             By: /s/ Steve W. Berman
4                                                 Steve W. Berman (WSBA No. 12536)
                                             By: /s/ Jerrod C. Patterson
5                                                 Jerrod C. Patterson (WSBA No. 43325)
                                             1301 Second Avenue, Suite 2000
6                                            Seattle, WA 98101
                                             Telephone: (206) 623-7292
7                                            Facsimile: (206) 623-0594
                                             Email: steve@hbsslaw.com
8                                                   jerrodp@hbsslaw.com

9
                                             Douglas J. McNamara*
10                                           COHEN MILSTEIN SELLERS & TOLL PLLC
                                             1100 New York Avenue NW, 8th Floor
11                                           Washington, DC 20005
                                             Telephone: (202) 408-4600
12                                           Email: dmcnamara@cohenmilstein.com

13
                                             Theodore J. Leopold*
14                                           COHEN MILSTEIN SELLERS & TOLL PLLC
                                             11780 U.S. Highway One
15                                           Suite N500
                                             Palm Beach Gardens, FL 33408
16                                           Telephone: (561) 515-1400
                                             Facsimile: (561) 515-1401
17                                           Email: tleopold@cohenmilstein.com

18
                                             *Attorneys for Plaintiffs and the Proposed Class*
19

20                                           *Pro hac vice application forthcoming*

21

22

23

24

25

26

27

28
AMENDED CLASS ACTION COMPLAINT – 69
Case No. 2:25-CV-01818-JLR
- 69 -
011313-11/3353895 V1
011313-11/3353895 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX