# Exhibit A

The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALUCARD TAYLOR, ARABA
ARMSTRONG, HAN ZHENG, DAVID LIAO,
KAREN KING, LISA KNUDSON, EYDALIA
THURSTON, KYLE SILVA, DALE KOGER,
JOHN CADY, ~~and~~ REBECCA BRUCALIERE,
and FURGUS WILSON, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

ZILLOW, INC., ZILLOW GROUP, INC.,
ZILLOW HOMES, INC., and ZILLOW
LISTING SERVICES, INC., Washington
Corporations, ZILLOW HOME LOANS, LLC,
a California Corporation, ~~WORKS
INDUSTRIES, LLC, an Oregon Corporation,~~
GK PROPERTIES, a Nevada Corporation,
REAL BROKER, LLC, a Florida Corporation,
~~and~~ FRANO TEAM, a Florida Organization,
and EXP Realty, LLC, a Washington
Corporation.

Defendants.

Case No. 2:25-cv-01818-JLR

**CONSOLIDATED SECOND AMENDED
CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR)

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................................. 1

II.     PARTIES ............................................................................................................... 7

        A.      Plaintiffs ..................................................................................................... 7

                1.      Alucard Taylor ............................................................................... 7

                2.      Araba Armstrong ........................................................................... 8

                3.      Han Zheng ...................................................................................... 8

                4.      David Liao ...................................................................................... 9

                5.      Karen King ..................................................................................... 9

                6.      Lisa Knudson ................................................................................. 9

                7.      Eydalia Thurston ......................................................................... 10

                8.      Kyle Silva ..................................................................................... 10

                9.      Dale Koger .................................................................................... 10

                10.     John Cady ..................................................................................... 11

                11.     Rebecca Brucaliere ...................................................................... 11

        B.      Defendants ............................................................................................... 12

                1.      The Zillow Defendants ................................................................ 12

                2.      The Real Estate Defendants ........................................................ 13

III.    JURISDICTION AND VENUE ......................................................................... 15

IV.     FACTUAL ALLEGATIONS ............................................................................. 16

        A.      Real Estate Industry Background ............................................................ 16

        B.      Zillow's Illegal Steering Practices and Conduct .................................... 19

        C.      The Harmful and Long-Lasting Economic Impacts of Zillow's
                Steering ................................................................................................... 32

        D.      Defendants' Fraudulent Conduct ............................................................ 34

        E.      Current and Former Flex Agents Confirm Zillow's RESPA
                Violations and Fraudulent Conduct ........................................................ 43

                1.      Confidential Real Estate Agent 1 ............................................... 43



2. Confidential Real Estate Agent 2 ............................................................. 45

3. Confidential Real Estate Agent 3 ............................................................. 46

4. Confidential Real Estate Agent 4 ............................................................. 46

5. Confidential Real Estate Agent 5 ............................................................. 47

6. Confidential Real Estate Agent 6 ............................................................. 48

7. Confidential Real Estate Agent 7 ............................................................. 49

8. Confidential Real Estate Agent 8 ............................................................. 51

9. Confidential Real Estate Agent 9 ............................................................. 52

10. Confidential Real Estate Agent 10 .......................................................... 53

11. Confidential Loan Officer 1 .................................................................... 53

12. Confidential Loan Officer 2 .................................................................... 55

F. Defendants' Anti-Competitive Conduct ........................................................ 58

G. Defendants Confirmed Their Partnership After This Lawsuit Was
Filed .................................................................................................................. 59

H. Zillow's Choice of Law Clause .................................................................... 61

V. CLASS ACTION ALLEGATIONS ...................................................................... 61

VI. TOLLING OF THE STATUES OF LIMITATIONS ............................................ 64

VII. CLAIMS FOR RELIEF ....................................................................................... 65

CLAIM I VIOLATIONS OF THE RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1962(C) (D) (ON
BEHALF OF THE NATIONWIDE CLASS, AGAINST ALL
DEFENDANTS) .......................................................................................................... 65

A. The Zillow Fraudulent Business Enterprise .................................................. 66

1. Common Purpose ................................................................................. 67

2. Relationships among enterprise members ........................................... 67

3. Ongoing Organization and Longevity ................................................. 67

4. Distinctness .......................................................................................... 69

5. Interstate Commerce ............................................................................ 70

B. Pattern of Racketeering Activity ................................................................... 70

1. Predicate Acts ...................................................................................... 71



C. Conspiracy ..................................................................................75

D. Resulting Injury to Property...................................................76

CLAIM II VIOLATION OF THE REAL ESTATE SETTTLEMENT
PROCEDURES ACT, 12 US.C. 2607(A) (ON BEHALF OF A
NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS, AND
ON BEHALF OF A NATIONWIDE STEERING SUBCLASS)...................77

CLAIM III VIOLATION OF THE REAL ESTATE SETTLEMENT
PROCEDURES ACT, 12 U.S.C. § 2607(B) (ON BEHALF OF A
NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS) .....................81

CLAIM IV VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION
ACT (WASH. REV. CODE ANN. § 19.86.010, *ET SEQ.*) (ON BEHALF
OF A NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS)................85

A. Failure to disclose steering.....................................................85

B. Unfair use of dominant position ............................................86

C. Deceptively inducing buyers to use Zillow agents .................86

D. *Per se* unfair practice .............................................................87

E. Injury to Plaintiffs ...................................................................88

CLAIM V BREACH OF FIDUCIARY DUTY (ON BEHALF OF A
NATIONWIDE CLASS, AGAINST THE REAL ESTATE DEFENDANTS) ...............88

CLAIM VI AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (ON
BEHALF OF A NATIONWIDE CLASS, AGAINST ALL DEFENDANTS)................91

CLAIM VII UNJUST ENRICHMENT (ON BEHALF OF A NATIONWIDE
CLASS, AGAINST THE ZILLOW DEFENDANTS)..........................................93

REQUEST FOR RELIEF ........................................................................94

DEMAND FOR JURY TRIAL ..................................................................95

I. INTRODUCTION ..........................................................................1

II. PARTIES ......................................................................................7

A. Plaintiffs....................................................................................7

1. Alucard Taylor .................................................................7

2. Araba Armstrong .............................................................8

3. Han Zheng........................................................................8

4. David Liao ........................................................................9

5. Karen King........................................................................9



6.      Lisa Knudson ................................................................9

7.      Eydalia Thurston ...........................................................10

8.      Kyle Silva....................................................................10

9.      Dale Koger ..................................................................10

10.     John Cady.....................................................................11

11.     Rebecca Brucaliere .......................................................11

12.     Furgus Wilson ..............................................................12

B.      Defendants ............................................................................13

1.      The Zillow Defendants .................................................13

2.      The Real Estate Defendants ..........................................14

III.    JURISDICTION AND VENUE ......................................................17

IV.     FACTUAL ALLEGATIONS ..........................................................18

A.      Real Estate Industry Background.............................................18

B.      Zillow's Illegal Steering Practices and Conduct.........................20

C.      The Harmful and Long-Lasting Economic Impacts of Zillow's
        Steering .................................................................................34

D.      Defendants' Fraudulent Conduct .............................................35

E.      Current and Former Flex Agents Confirm Zillow's RESPA
        Violations and Fraudulent Conduct ..........................................45

1.      Confidential Real Estate Agent 1....................................45

2.      Confidential Real Estate Agent 2....................................47

3.      Confidential Real Estate Agent 3....................................48

4.      Confidential Real Estate Agent 4....................................48

5.      Confidential Real Estate Agent 5....................................49

6.      Confidential Real Estate Agent 6....................................50

7.      Confidential Real Estate Agent 7....................................51

8.      Confidential Real Estate Agent 8....................................53

9.      Confidential Real Estate Agent 9....................................54

10.     Confidential Real Estate Agent 10..................................55

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – iv

11. Confidential Loan Officer 1 ...............................................................56

12. Confidential Loan Officer 2 ...............................................................58

F. Defendants' Anti-Competitive Conduct ...............................................60

G. Defendants Confirmed Their Partnership After This Lawsuit Was Filed ...........................................................................................................62

H. Zillow's Choice of Law Clause ...............................................................63

V. CLASS ACTION ALLEGATIONS ...................................................................63

VI. TOLLING OF THE STATUES OF LIMITATIONS ........................................66

VII. CLAIMS FOR RELIEF ......................................................................................67

CLAIM I VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1962(C)-(D) (ON BEHALF OF THE NATIONWIDE CLASS, AGAINST ALL DEFENDANTS) ................................................................................................67

A. The Zillow Fraudulent Business Enterprise ........................................68

1. Common Purpose ...............................................................69

2. Relationships among enterprise members ........................69

3. Ongoing Organization and Longevity ..............................69

4. Distinctness .........................................................................71

5. Interstate Commerce ..........................................................72

B. Pattern of Racketeering Activity ...........................................................72

1. Predicate Acts .....................................................................73

C. Conspiracy ...............................................................................................78

D. Resulting Injury to Property ..................................................................79

CLAIM II VIOLATION OF THE REAL ESTATE SETTTLEMENT PROCEDURES ACT, 12 US.C. 2607(A) (ON BEHALF OF A NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS, AND ON BEHALF OF A NATIONWIDE STEERING SUBCLASS) ...................80

CLAIM III VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. § 2607(B) (ON BEHALF OF A NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS) .......................84

CLAIM IV VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010, *ET SEQ.*) (ON BEHALF OF A NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS) ...............87

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – v

A.     Failure to disclose steering ................................................................88

B.     Unfair use of dominant position ...........................................................89

C.     Deceptively inducing buyers to use Zillow agents ...............................89

D.     *Per se* unfair practice ...........................................................................90

E.     Injury to Plaintiffs .................................................................................90

CLAIM V BREACH OF FIDUCIARY DUTY (ON BEHALF OF A NATIONWIDE CLASS, AGAINST THE REAL ESTATE DEFENDANTS) ...............91

CLAIM VI AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (ON BEHALF OF A NATIONWIDE CLASS, AGAINST ALL DEFENDANTS) ................93

CLAIM VII UNJUST ENRICHMENT (ON BEHALF OF A NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS) ......................................................96

REQUEST FOR RELIEF ................................................................................................97

DEMAND FOR JURY TRIAL ........................................................................................98

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

*"The term REALTOR® has come to connote competency, fairness, and high integrity resulting from adherence to a lofty ideal of moral conduct in business relations. No inducement of profit and no instruction from clients ever can justify departure from this ideal."*[1]

Plaintiffs Alucard Taylor, Araba Armstrong, Han Zheng, David Liao, Karen King, Lisa Knudson, Eydalia Thurston, Kyle Silva, Dale Koger, John Cady, ~~and~~ Rebecca Brucaliere, and Furgus Wilson bring this action on behalf of themselves and on behalf of a proposed class and subclass (the "Class") defined below, and allege upon information and belief and the investigation of counsel as follows:

## I.    INTRODUCTION

1.    Zillow recognizes that "[r]eal estate is incredibly personal—and for most people, it's the biggest transaction they'll ever make."[2] Home buyers in competitive markets need to make quick decisions to increase their offers or make other concessions to beat multiple bids for the house. The burden of this process is compounded by the opaque and byzantine rules of buying a home. Very few people truly understand the home buying process. Prospective buyers are uniquely vulnerable in this respect and usually have no choice but to rely on real estate agents, who are supposed to represent them and serve their best interests.

2.    Zillow is exploiting this vulnerability for profit. Zillow's practices and policies in the real estate industry are not merely indifferent to the agents' duties to protect their clients' interests; Zillow actively schemes to subvert them. Zillow's goal is simple: to monetize every step of the home buying process—even if illegally—and to encourage, incentivize, and ultimately coerce agents into violating their fiduciary duties by disregarding their clients' interests. The very success of Zillow's scheme *depends on* the agents' willingness to place Zillow's interests above their clients' interests.

---

[1] Code of Ethics and Standards of Practice of the National Association of REALTORS®, Preamble (eff. Jan. 1, 2025), https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/2025-code-of-ethics-standards-of-practice.

[2] *About*, Zillow, https://www.zillow.com/z/corp/about/ (last visited Oct. 23, 2025).

Defendants have modified their policies and their websites following the filing of the complaints in this case. Zillow's websites summarized herein have been changed since the filing of this lawsuit (apparently after the First Amended Complaint was filed on November 19, 2025), and these websites have apparently been removed or not archived at https://web.archive.org/. Unless otherwise indicated, this Complaint accordingly refers to language available as of November 19, 2025, or earlier.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 1

Zillow promotes itself as "transforming the way people buy, sell, rent and finance homes,"[3] but this "transformation" comes at a steep cost for home buyers.

3.     Zillow holds a dominant position in the American residential real estate market. It operates the most-visited residential real estate marketplace in the United States and controls roughly two-thirds of all online home-listing traffic—more than four times the daily active users of its nearest competitor. By virtue of that dominance, Zillow acts as the initial gatekeeper between millions of prospective homebuyers and real estate professionals, controlling the flow of the consumer leads that drive residential real estate transactions nationwide.

4.     Zillow's predatory practices begin as soon as consumers visit Zillow.com to look for a home. When potential buyers are on Zillow's website, Zillow frequently misleads them into signing up with a Zillow agent, as described below. If the agent is part of Zillow's "Flex" program, Zillow receives 40% of the agent's commission—a payment on the back end that is undisclosed to all parties involved.

5.     When a house is for sale on Zillow, the Zillow website has big colorful buttons in bright blue posted next to the house listing that say "Contact agent" and "Request a tour":



6.     After clicking either button, potential buyers are asked to provide their contact information, which Zillow provides to a Zillow-affiliated agent. Buyers, however, naturally believe they are contacting the *listing* agent. Instead, they are routed to a Zillow-affiliated *buyer*'s agent, who arranges a tour of the home by getting the buyer to sign a "Touring Agreement." The "Touring Agreement" promises the buyer that the agent's services are "free," but this is deceptive and not true: if the sale goes through, the buyer's agent still receives a commission. In addition, if the Zillow-affiliated agent is a "Flex" agent, he or she has to pay Zillow up to 40% of the agent's commission.

---

[3] *See Zillow Group Reports Fourth-Quarter and Full-Year 2024 Financial Results*, Zillow Group (Feb. 11, 2025), https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2025/Zillow-Group-Reports-Fourth-Quarter-and-Full-Year-2024-Financial-Results/default.aspx.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

This cut of commission paid to Zillow, for no services rendered related to the real estate sale, is never disclosed to the buyer or the seller (the "Hidden Zillow Fees").

7.      Zillow furthers its scheme to defraud buyers by effectively forcing home sellers and their agents to post on Zillow.com immediately after advertising the home for sale. If home sellers do not post on Zillow.com within 24 hours of going public, Zillow sends a violation notice to the seller's agent. If the selling agent violates this Zillow-imposed rule three times, the ad is banned on Zillow, effectively forcing the seller to fire her agent and find someone else who will acquiesce to Zillow's coercive tactics. This policy effectively requires sellers and their agents to forgo using other initial methods to advertise the home sale. The effect of this policy is to inflate the unjustly earned profits Zillow receives from its deceptive conduct because the policy helps Zillow increase its dominance in the market.

8.      The effect of Zillow's policies and conduct is to increase the purchase price of homes for the buyers. If buyers were directed to *sellers'* agents, they would be better positioned to negotiate a lower purchase price, because the seller would not have to pay commissions to *both* the seller's agent and the buyer's agent. It also incentivizes Zillow Flex agents to prioritize receiving their full commission at all costs, even if the buyer loses the bidding process. Since the Flex agents effectively receive a 1% commission from the purchase of a home (after paying the Hidden Zillow fees and commissions to their team leaders), they have no practical ability to negotiate a lower commission. Sellers are stuck with paying 6% commission (or more) because the buyer's Flex agent is receiving a paltry sum in return. This situation culminates in the buyer paying a higher purchase price for the home. Zillow's scheme has the intent and effect of unlawfully maintaining high and inflexible commissions that drive up the prices for home buyers.

9.      As the buying process continues, Zillow initiates another scheme to extract value at the customers' expense. Zillow compels Zillow Flex agents to steer home buyers to use Zillow Home Loans ("ZHL"), even though—as Zillow and the agents know—ZHL offers fewer loan packages compared to competitors, its loans come with undisclosed and hidden fees, it has higher interest rates, and it does not offer common assistance packages available to first time home buyers, who comprise

almost half of all buyers.[4] If agents do not comply and fail to meet Zillow's steering quotas, the agents are dropped from the Zillow Flex program, regardless of the agent's performance or the client's satisfaction. This steering policy has driven ZHL's loan origination growth to nearly a billion dollars last year, a 90% year-over-year increase.[5] Former Zillow Flex agents have reported being terminated from the program because they complied with their fiduciary duties by making loan recommendations that serve their clients' best interests, rather than steering them to ZHL, a product that does *not* serve the clients' best interests. Zillow rewarded these agents' ethical behavior by terminating them from the Flex program.

10.    Zillow's scheme, and the fraudulent enterprise it uses to effectuate that scheme, have been confirmed by current and former Zillow Flex agents. As set forth below, Confidential Witnesses, consisting of numerous current and former agents, detail the facts surrounding the scheme Zillow has implemented to capture the real estate market and take advantage of home buyers. Commentators online have also described concerns about Zillow's practices. Collectively, they assert that Zillow is illegally forcing agents to refer customers to Zillow Home Loans, in violation of their fiduciary duty as agents, and in violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq*. ("RESPA"), as detailed below. Twelve Confidential Witnesses, agents and loan officers, provide details that expose the deliberate and destructive nature of Zillow's policies, such as:

- To avoid putting anything in writing, Zillow personnel are now flying out from Seattle and elsewhere to real estate offices to instruct Zillow Flex agents in person about the need to meet ZHL quotas.

- Zillow loan officers frequently misrepresent or omit important details about the borrowers' true costs at closing, which leads to buyers either paying excessive costs or risk losing the house.

- Based on the Hidden Zillow Fees, Zillow Flex Agents are incentivized to "burn and churn" through clients, at the expense of their clients' interests.

[4] Manny Garcia, *Buyers: Results from the Zillow Consumer Housing Trends Report 2024*, Zillow (Oct. 1, 2024), https://www.zillow.com/research/buyers-housing-trends-report-2024-34383/.

[5] *See Zillow Group Reports Fourth-Quarter and Full-Year 2024 Financial Results*, Zillow Group (Feb. 11, 2025), https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2025/Zillow-Group-Reports-Fourth-Quarter-and-Full-Year-2024-Financial-Results/default.aspx.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

- Similarly, ZHL "cherry-picks" only the most qualified borrowers, because the ZHL loan officers are inexperienced, underpaid, and incentivized to churn as many borrowers as possible without regard for the clients' interests.

- Many Zillow Flex agents know virtually nothing about the real estate process, or the neighborhoods in which they are showing homes, yet these same agents are falsely promoted as a "Top Agent" on Zillow based solely on their participation in the Zillow Flex program.

- The Zillow Hidden Fees drive up commissions and the purchase price of homes.

- Zillow's requirement that Flex agents use Zillow's "Follow-Up Boss" allows Zillow to eavesdrop on communications between the agent and the buyer, violating the agent's duty of confidentiality.

- Zillow also uses the "Follow-Up Boss" to "catch" Flex agents who may recommend other loan providers to their clients and censure them appropriately.

11.     Zillow's scheme hinges on cooperation from the Zillow Flex agents, and their collective ability to work together to fraudulently induce prospective buyers into using Zillow Flex agents. Zillow no longer tries to hide this partnership. In response to this litigation, in a December 4, 2025 message from Zillow's Senior Vice President & General Manger, Zillow promised its "Zillow Preferred Partners"[6] that Zillow was "committed to navigating this moment and whatever comes next – together."[7] Zillow also stated that "we've already connected with the name partners [the Real Estate Defendants] *and will be supporting them through this process. And for any partner who is named in either of these suits, we plan to enter into a joint defense agreement*. We will vigorously defend against these claims."[8] Zillow further promised to "support and stand by our partners throughout this process."[9] Zillow is presenting a united front against the litigation to protect its business model, which relies on agents violating the law and their fiduciary duties. If Zillow's conduct did *not* violate

---

[6] In October 2025, Zillow announced "Zillow Preferred," describing it as the "next evolution of the Flex program," an "exclusive, invite-only program for agents and teams" that "combines the core Flex benefits"—including post-pay leads and performance-based incentives—"with new tools, recognition, and performance-based incentives." *See* Zillow Preferred, *Frequently Asked Questions*, https://www.zillow.com/preferred/faq/ (last visited Dec. 19, 2025).

Zillow has made clear that the conduct alleged herein will continue, and likely intensify, under the Zillow Preferred program. Zillow stated that "[a]ll agents and teams that are part of the Flex program on or before October 15, 2025 will automatically become Zillow Preferred partner agents," and that "[j]**ust like in Flex, strong performance will remain the foundation of the Zillow Preferred program, and you must meet clear standards to stay eligible**." *Id.* (emphasis added).

[7] *See* ZillowForAgents, *A message from Zuhairah Washington*, YouTube (Dec. 5, 2025), https://www.youtube.com/watch?v=IOH79YJ3YS0.

[8] *Id.*

[9] *Id.*

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 5

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

these duties, then there would be no need for Zillow to promote its partnership and enter into joint defense agreements.

12.    By working together as part of an enterprise, and using the mail in furtherance of their fraudulent scheme, Zillow, along with three real estate agencies and other unnamed co-conspirators, acted as brokers for three Plaintiffs' sales and violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"). The four Real Estate Defendants that were involved in the enterprise which directly harmed Plaintiffs are ~~Works Industries~~EXP Realty, LLC, GK Properties, Real Broker, LLC, and the Frano Team.

13.    Zillow's policy also violates RESPA (12 U.S.C. § 2607) in two ways. *First*, by requiring Flex agents to steer clients to ZHL, Zillow is illegally both giving and receiving a "thing of value" related to referrals. Zillow is providing leads to agents in exchange for compulsory referral of clients to ZHL. This is a clear RESPA violation. *See* 12 U.S.C. § 2607(a). In graphic form, it looks like this:



14.    *Second*, by requiring Flex agents to pay these hidden fees, Zillow is further violating RESPA because Zillow is receiving a payment that is not in exchange for completing the property transaction. RESPA prohibits receiving payments that are not "in connection with a transaction involving a federally related mortgage loan." 12 U.S.C. § 2607(b). The Zillow Hidden Fees are not in connection with the closing of the property sale, and Plaintiffs are entitled to treble damages under the statute. *See* 12 U.S.C. § 2607(d)(2).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

15.     Zillow's conduct also constitutes a violation of Washington State consumer protection laws, which prohibit "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.96.010. Zillow designs its website to trick potential buyers into connecting with a Zillow-affiliated agent instead of the seller's agent. Zillow also unfairly and deceptively does not disclose to the buyer or the seller that it is receiving the Hidden Zillow fees from the Flex agents at the end of the transaction—facts that both the buyer and the seller would want to know as they negotiate the close of the property.

16.     Plaintiffs further bring claims for breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, by virtue of its policy and practice of requiring real estate agents to violate their duties to their clients in order to stay in Zillow's program.

17.     Zillow has also unjustly enriched itself from this scheme. It engaged in patently unfair and deceptive behavior and obtained a windfall of ill-gotten gains as a result. Zillow is liable to Plaintiffs and the Class for all profits earned from its deceitful conduct.

18.     Plaintiffs on behalf of themselves and the proposed Class accordingly bring this lawsuit for Defendants' violations of RICO, RESPA, the Washington Consumer Protection Act, Wash. Rev. Code Ann. 19.86 (the "Washington CPA"), and common law unjust enrichment, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. Plaintiffs seek treble damages, single damages, injunctive relief, disgorgement, and the costs of this lawsuit, including reasonable attorneys' fees.

## II.     PARTIES

### A.     Plaintiffs

#### 1.     Alucard Taylor

19.     Plaintiff Alucard Taylor is a resident of Portland, Oregon. On July 1, 2022, Plaintiff Taylor purchased a home in Portland using a Zillow agent, R.H. (R.H. is identified as a "Top Agent on Zillow" on Zillow's website, which strongly suggests R.H. is a Zillow Flex agent.)[10] Prior to his purchase, Plaintiff Taylor was browsing Zillow.com to look for houses and identified a house that

---

[10] ~~In addition, R.H.'s real estate agency posts on Instagram that it is part of "Zillow Flex Partners," and the agents also post job listings for a "Zillow Flex Partner." *See* Real Estate Jobs in Seattle, Washington, search performed via Indeed, https://www.indeed.com/cmp/Works-Real-Estate/jobs/1 Seattle, WA (search last performed Dec. 18, 2025).~~

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

interested him. He clicked on the "Contact Agent" button, believing that he was contacting the listing agent; he did not know that he would be routed to a Zillow agent. In his dealings with R.H. prior to and during the purchase of his home, Plaintiff Taylor did not believe he had any other option than to use R.H. to make the purchase. R.H. did not disclose the Hidden Zillow Fees to Plaintiff Taylor, and these fees inflated the commissions and the cost of the property that Plaintiff Taylor had to pay. Plaintiff Taylor purchased the home using a lender, which is regulated by an agency of the Federal Government.

### 2.    Araba Armstrong

20.    Plaintiff Araba Armstrong is a resident of Anchorage, Alaska. On April 3, 2024, Plaintiff Armstrong purchased a home in Anchorage using a Zillow agent, D.M. (D.M. is identified as a "Top Agent on Zillow" on Zillow's website, which strongly suggests D.M. is a Zillow Flex agent). Prior to her purchase, Plaintiff Armstrong was browsing Zillow.com to look for houses and identified a house that interested her. At the agent's direction, after Plaintiff Armstrong obtained mortgage pre-approval, she subsequently obtained a mortgage loan from Zillow Home Loans. Plaintiff Armstrong was not informed of Zillow's quotas, incentives, or requirements linking the agent's access to Zillow leads to referrals or pre-approvals with ZHL. Her agent also did not disclose the Hidden Zillow Fees to Plaintiff Armstrong, and these fees inflated the commission and the cost of the property that Plaintiff Armstrong had to pay. At the time she obtained her mortgage loan, following her communications with her Zillow agent, she was led to believe that she was obligated to use ZHL for her mortgage. Plaintiff Armstrong subsequently realized that there were other options available to her as a first-time home buyer that her Zillow agent did not inform her about, including her qualification for several federal and state programs designed to reduce interest rates, down payments, and closing costs. As a result, she paid more for her loan than she would have absent the steering. This was the first residential property that Plaintiff had ever purchased.

### 3.    Han Zheng

21.    Plaintiff Han Zheng is a resident of Seattle, Washington. On March 20, 2025, Plaintiff Zheng purchased a home in Seattle using a Zillow agent, A.J. (A.J. is identified as a "Top Agent on

Zillow" on Zillow's website, which strongly suggests A.J. is a Zillow Flex agent). Prior to his purchase, Plaintiff Zheng was browsing Zillow.com to look for houses and identified a house that interested him. He clicked on the "Request a Tour" on the belief that he was contacting the seller's agent for a tour. H.Z. did not disclose the Hidden Zillow Fees to Plaintiff Zheng, and these fees inflated the commissions and the cost of the property that Plaintiff Zheng had to pay.

### 4. David Liao

22. Plaintiff Liao is a resident of Northridge, California. On February 12, 2021, Plaintiff Liao purchased a home in Las Vegas, Nevada, with agent V.P. (V.P. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggest V.P. is a Flex agent). Plaintiff Liao used Zillow Home Loans to finance and close on the purchase. V.P. did not disclose the Hidden Zillow Fees to Plaintiff Zheng, and these fees inflated the commissions and the cost of the property that Plaintiff Liao had to pay.

### 5. Karen King

23. Plaintiff Karen King is a resident of Frankenmuth, Michigan. On September 8, 2023, Plaintiff King purchased a home in Frankenmuth using a Zillow agent, J.K. Prior to her purchase, Plaintiff King was browsing Zillow.com to look for houses and identified a house that interested her. She clicked on the "Contact Agent" button, believing that she was contacting the listing agent; she did not know that she would be routed to a Zillow agent. J.K. did not disclose the Hidden Zillow Fees to Plaintiff King, and these fees inflated the commissions and the cost of the property that Plaintiff King had to pay.

### 6. Lisa Knudson

24. Lisa Knudson is a resident of Black Mountain, North Carolina. On April 25, 2025, Plaintiff Knudson purchased a home in Black Mountain using a Zillow agent, C.G. (C.G. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests C.G. is a Flex Agent). Prior to her purchase, Plaintiff Knudson was browsing Zillow to look for houses and identified a house that interested her. She clicked on the "Contact Agent" button, but did not understand what "agent" she was contacting. Plaintiff Knudson believed that she overpaid for the property because

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

she had to pay for an agent that she did not need. She also did not have the opportunity to negotiate directly with the sellers' agent. In addition, C.G. did not disclose the Hidden Zillow Fees to Plaintiff Knudson, and these fees inflated the commissions and the cost of the property that Plaintiff Knudson had to pay.

### 7. Eydalia Thurston

25.     Eydalia Thurston is a resident of Stevens City, Virginia. On December 27, 2024, Plaintiff purchased a home in Stevens City using a Zillow agent, C.S. (C.S. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests C.S. is a Flex Agent.). Prior to her purchase, Plaintiff Thurston was browsing Zillow.com to look for houses and identified a house that interested her. She clicked on the "Contact Agent" button, but did not understand what "agent" she was contacting. C.S. did not disclose the Hidden Zillow Fees to Plaintiff Thurston, and these fees inflated the commissions and the cost of the property that Plaintiff Thurston had to pay.

### 8. Kyle Silva

26.     Kyle Silva is a resident of Canton, Georgia. On February 21, 2025, Plaintiff Silva purchased a home in Canton, Georgia, using a Zillow agent, A.M. (A.M. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests A.M. is a Flex Agent). Prior to his purchase, Plaintiff Silva was browsing Zillow.com to look for houses and identified a house that interested him. He clicked on the "Contact Agent" button in the belief that he was contacting the buyer's agent. He was put in touch with A.M. and initially believed that A.M. was the seller's agent. (However, once they met in person, A.M. clarified that he/she was a buyer's agent.) Plaintiff Silva was referred to Zillow Home Loans and obtained a pre-approval letter from ZHL, but ultimately he did not use ZHL to purchase the property. A.M. did not disclose the Hidden Zillow Fees to Plaintiff Silva, and these fees inflated the commissions and the cost of the property that Plaintiff Silva had to pay.

### 9. Dale Koger

27.     Dale Koger is a resident of Henderson, Nevada. On August 12, 2024, Plaintiff Koger purchased a home in Henderson, Nevada, using a Zillow agent, S.Z. Prior to his purchase, Plaintiff

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 10

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Koger was browsing Zillow.com to look for houses and identified a house that interested him. He clicked on the "Contact Agent" button, believing that he was contacting the seller's agent. Thereafter, he felt compelled to stay with that person as his agent. Plaintiff Koger believes that he paid higher commissions because he had to pay his buyer's commission (as well as the seller agent's commission) as a result of not being able to connect with the seller's agent.

### 10. John Cady

28. John Cady is a resident of Melbourne, Florida. On September 19, 2025, Plaintiff Cady purchased a home in Melbourne, Florida, using a Zillow agent, E.L. ("E.L." is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests E.L. is a Flex Agent.). Prior to his purchase, Plaintiff Cady was browsing Zillow.com to look for houses and identified a house that interested him. He clicked on the "Contact Agent" button, with the intent of contacting the seller's agent directly. He wanted to contact the seller's agent directly to avoid paying buyer agent commissions, which would reduce the overall price he would pay. In addition, E.L. did not disclose the Hidden Zillow Fees to Plaintiff Cady, and these fees inflated the commissions and the cost of the property that Plaintiff Cady had to pay. Plaintiff Cady purchased the home using a lender, which is regulated by an agency of the Federal Government.

### 11. Rebecca Brucaliere

29. Rebecca Brucaliere is a resident of Norwalk, Connecticut. On December 13, 2023, Plaintiff Brucaliere purchased a home in Norwalk, Connecticut, using a Zillow agent, H.D. (H.D. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests H.D. is a Flex Agent). Prior to her purchase, Plaintiff Brucaliere and her husband were browsing Zillow.com to look for houses and identified a house that interested them. She clicked on the "Request a Tour" button, believing she was contacting the seller's agent. When she first met H.D. in person, H.D. did not initially disclose that H.D. was a buyer's agent and, instead, insisted that Plaintiff Brucaliere sign a touring agreement. After she signed, H.D. told her that Zillow assigned her to H.D., and that H.D. would represent her going forward. Plaintiff Brucaliere did not feel she had any other practical option but to use H.D. as the buyer's agent. During the buying process, H.D. urged her repeatedly to use

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 11

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Zillow Home Loans, but Plaintiff Brucaliere declined because she wanted to use USAA. Although Plaintiff Brucaliere was a first-time home buyer, H.D. never told her about first-time homebuyer assistance programs, which Plaintiff Brucaliere ultimately obtained through USAA. In addition, H.D. did not disclose the Hidden Zillow Fees to Plaintiff Brucaliere, and these fees inflated the commissions and the cost of the property that Plaintiff Brucaliere had to pay. USAA is regulated by an agency of the Federal Government.

### 12. Furgus Wilson

30. Furgus Wilson is a resident of Larkspur, California. On or about October 29, 2023, Plaintiff Wilson purchased a residential property in Weleetka, Oklahoma. Prior to his purchase, Plaintiff Wilson was browsing Zillow.com to look for houses and identified a property that interested him. He clicked on the "Contact Agent" button, believing that he was contacting the listing agent when in fact he was routed by Zillow to, upon information and belief, a Zillow Flex Agent with no connection to the home. Plaintiff Wilson was not informed that the agent was not the listing agent and was not given a meaningful opportunity to proceed without that agent. The agent represented that they would contact the owner and move forward with an offer and related paperwork, and Plaintiff Wilson did not believe he had any other option but to use that agent in order to purchase the property. The agent did not disclose the Hidden Zillow Fees to Plaintiff Wilson, and these fees inflated the commissions and the cost of the property that Plaintiff Wilson had to pay. Plaintiff Wilson would have used a different agent had that financial relationship been disclosed. At the agent's direction, and after applying online, Plaintiff Wilson obtained mortgage pre-approval and financing through ZHL. Both the agent and loan officer, D.W., directed Plaintiff Wilson to obtain pre-approval through ZHL, and D.W. represented that ZHL was the best possible option and discouraged Plaintiff Wilson from shopping for alternative lenders. No other lenders were meaningfully discussed, and Plaintiff Wilson felt pressured to proceed with ZHL. As a result, Plaintiff Wilson did not pursue other available financing options, for which he believes he would have qualified, and he believes he paid more for his loan than he would have absent the steering.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**B.    Defendants**

**1.    The Zillow Defendants**

30.31.  Zillow, Inc. is an online real estate marketplace. It is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington. Zillow maintains real estate brokerage licenses in several states.

31.32.  Zillow Group, Inc. offers online real estate services and is incorporated in the State of Washington with its principle executive offices located at 1301 Second Avenue, Floor 31, Seattle, Washington. Zillow Group is the publicly traded parent company that controls the Zillow online real estate marketplace and a range of related businesses and services. Zillow Group describes itself in its 2025 Form 10-K as "the most visited and trusted brand in the online real estate industry," reporting 241 million average monthly unique users and 9.3 billion visits in 2024.[11]

32.33.  As of February 2025, Zillow Group's "portfolio of affiliates, subsidiaries and brands" includes Zillow Premier Agent, Zillow Home Loans, Zillow Rentals, Trulia, StreetEasy, HotPads and Out East.[12] Zillow Group also provides a suite of marketing software and technology solutions, such as Follow Up Boss, for the real estate industry.[13] According to its subsidiary disclosures, Zillow Group's material incorporated subsidiaries include MFTB HoldCo, Inc., Zillow, Inc., Zillow Insurance Services, LLC, and Zillow Risk Solutions Inc.[14]

33.34.  Zillow Homes, Inc. is organized and existing under the laws of the State of Delaware, with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

34.35.  Zillow Listing Services, Inc. offers a variety of real estate services. It maintains real estate brokerage licenses in several states. It is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

---

[11] Zillow 10-K Annual Report (Feb. 11, 2025).

[12] *Id.*

[13] *Id.*

[14] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

35.36.  Zillow Home Loans, LLC ("ZHL") is a wholly-owned subsidiary of Zillow, Inc. It is a Kansas limited liability company with its principal place of business at 2600 Michelson Drive, Suite 834, Irvine, California. ZHL primarily originates mortgage loans and sells them to other mortgage companies. According to Zillow Group, ZHL "originates mortgage loans and then generally sells the loans on the secondary market," rather than servicing them.[15] This volume-driven model gives Zillow incentive to maximize loan originations through ZHL, regardless of whether those loans offer consumers the most favorable terms. Zillow Group reported that its mortgage-origination volume totaled over $3 billion in 2024, compared with $1.53 billion in 2023, and that its mortgage-segment revenue increased by 51 percent, from $96 million to $145 million.[16] Through its integration with the Zillow website and Zillow's Premier Agent and Flex programs, ZHL participates in the referral network and financing practices challenged in this Complaint.

36.37.  Collectively, the Zillow entities identified above are referred to herein as the "Zillow Defendants."

**2.      The Real Estate Defendants**

37.      Works Industries, LLC is an Oregon corporation that owns Works Real Estate, a real estate agency serving Portland, Oregon and Seattle, Washington.[17] Works Real Estate is registered in the State of Washington.[18] It advertises on Instagram that it is part of "Zillow Flex Partners," and it also posts job listings for a "Zillow Flex Partner."[19] According to its Zillow profile, it has sold a total of 3,745 properties, including 1,030 sales in the past 12 months, with an average sales price of $518,000.[20] As a result, its approximate total sales are $1.93 billion, including $533 million in sales in the past 12 months. Of the 208 real estate agents listed on Works Real Estate's Zillow profile, all but one of them have the "Top Agent on Zillow" badge, despite the fact that 61 of these agents have

[15] *Id.*

[16] *Id.*

[17] Works Real Estate, https://www.seattleworksrealestate.co/ (last visited Dec. 18, 2025).

[18] Based on a search with the Office of the Secretary of State, Corporations and Charities Division, *available at* https://ccfs.sos.wa.gov/.

[19] *See* Real Estate Jobs in Seattle, Washington, search performed via Indeed, https://www.indeed.com/cmp/Works-Real-Estate/jobs/l-Seattle,-WA (search last performed Dec. 18, 2025).

[20] Works Real Estate, Premier Agent, https://www.zillow.com/profile/Works%20RE (last visited Dec. 18, 2025).

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

had ~~*zero* sales in the past 12 months, and 29 of them have only had one. One of Work Real Estate's~~ ~~agents, "R.H.," acted as the buyer's agent for Plaintiff Alucard Taylor.~~

38.     EXP Realty, LLC is a Washington State corporation.  It is the largest independent real estate brokerage in the world.[21] It has brokerages in all 50 states.[22] EXP Realty, LLC, EXP Realty Holdings, Inc., EXP Realty International, Inc., and EXP World Holdings, Inc. are all headquartered in Bellingham, Washington. EXP's official YouTube channel (with 57,000 subscribers) has at least ten videos hosted by EXP's "Chief Learning Officer" Byron Ellington promoting Zillow Flex, including "32 Deals in 9 Months: Zillow Flex Conversion Mastery with Joey Oberdorfer,"[23] "Zillow Flex Lead Conversion: The Secret to a 40% Close Rate with Amber Welch,"[24] and "Building a High-Performance Zillow Flex Team: Nate Armstrong's Lead Systems and Coaching."[25]  According to a Zillow news release, EXP was the first real estate agency to join Zillow's policy banning listings that are previewed before being listed on MLS.[26] In September 2025, EXP Realty announced that K2 Omni Group, "ranked the #1 Zillow Seller Team in the Nation in June 2024," joined EXP Realty.[27] In 2022, one of EXP's agents, "R.H.," acted as the buyer's agent for Plaintiff Alucard Taylor.

~~38.~~39.  GK Properties is a Nevada organization that houses the George Kypreos Team, part of the Signature Real Estate Group. According to its website, it is part of the Zillow Flex program.[28] According to its Zillow profile, the George Kypreos Team has sold a total of 7,050 properties, including 397 in the past 12 months, with an average sales price of $453,000. As a result, its approximate total sales are $3.2 billion, with $180 million in the last 12 months alone. Of the 32 real

---

[21]  https://expworldholdings.com/press-releases/exp-realty-dominates-2025-realtrends-rankings-with-757-agents-and-teams-honored/.

[22]  https://wikirate-production-storage.fra1.cdn.digitaloceanspaces.com/files/22199490/51944334.pdf?utm_source=chatgpt.com

[23] https://www.youtube.com/watch?v=7Wt_ymzPGms

[24] https://www.youtube.com/watch?v=Qk3lb_UOsTk

[25]  https://www.youtube.com/watch?v=-qJ1KOnWsx8; *see also* https://www.youtube.com/results?search_query=EXP+Realty+Zillow+Flex; https://www.youtube.com/watch?v=uGLc-g5as6s; https://www.youtube.com/watch?v=jOHE-8bA-3Y; https://www.youtube.com/watch?v=KZNv3Op0rqA; https://www.youtube.com/results?search_query=EXP+Realty+Zillow+Flex; https://www.youtube.com/watch?v=U4wF1sVPoUI; https://www.youtube.com/watch?v=CHJALrwE4Wk; https://www.youtube.com/watch?v=RheQTy5tACU .

[26]  https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2025/Zillow-and-eXp-announce-consumer-first-commitment-to-real-estate-transparency/default.aspx

[27]  https://expworldholdings.com/press-releases/k2-omni-group-the-1-zillow-seller-team-in-the-nation-joins-exp-realty/.

[28] GK Properties Real Estate & Management, https://www.gkvegas.com/join-our-team/ (last visited Dec. 18, 2025).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 15

estate agents listed on the George Kypreos Team's Zillow profile, all of them have the "Top Agent on Zillow" badge, despite the fact that three of the agents had zero sales in the past 12 months, and another agent had only one sale. One of the George Kypreos Team's agents, V.P., acted as the buyer's agent for Plaintiff David Liao.

39.40.  Real Broker, LLC is a Florida corporation.[29] It is a subsidiary of Real LLC, a Canadian corporation that is registered to trade publicly in the United States as a foreign entity.[30] Peter Frano – the Team Leader of the Frano Team – is a Real Broker, LLC agent.[31]

40.41.  Frano Team is a Florida organization that is part of Real Broker, LLC. According to Instagram postings, Frano Team is part of Zillow Flex. For example, a member of the Frano Team recently posted on Instagram that the Frano Team was "looking to add about 8 more hungry realtors to our Iconic Group at REAL Broker who want the possibility of working some new buyers with our Zillow Flex lead system . . . . We have a hybrid team structure that allows us to receive Zillow Flex leads and still continue to build ur [sic] name and brand[.]"[32] In addition, every single one of the Frano Team's agents has the "Top Agent on Zillow" badge, even as nearly a third of them either have zero sales (14 agents) or only one sale (8 agents) in the past 12 months.[33] According to its website, the Frano Team has a total of 793 sales, including 491 in the past 12 months, at an average price of $344,000. As a result, its total sales are over $272 million, with nearly $169 million in the past 12 months. One of the Frano Team's agents, E.L., acted as the buyer's agent for Plaintiff John Cady.

41.42.  Collectively, the entities identified above are referred to herein as the "Real Estate Defendants."

---

[29] *See* Real Broker, LLC, Florida Department of State, https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=REALBROKER%20M150000053151&aggregateId=forl-m15000005315-5830d431-3e31-4bd0-9d26-93c09098e15f&searchTerm=Real%20Broker%2C%20LLC&listNameOrder=REALBROKER%20M150000053151 (last accessed Dec. 29, 2025).

[30] *See* Form 6-K, The Real Brokerage Inc. (Oct. 30, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001862461/000149315225020136/form6-k.htm.

[31] *See* https://onereal.com/peter-frano (Peter Frano's professional website) (last visited Dec. 29, 2025).

[32] https://www.instagram.com/p/DHbhrbLTL_K/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==.

[33] Peter Frano, Premier Agent, https://www.zillow.com/profile/peter%20frano (last visited Dec. 19, 2025).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 16

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## III.    JURISDICTION AND VENUE

42.43.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises from violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*

43.44.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 28 U.S.C. §§ 1331, 1337.

44.45.  This Court may also exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because they are so related to the RICO and RESPA claims (within the Court's original jurisdiction) that they form part of the same case or controversy under Article III of the United States Constitution. This case does not present novel or complex issues of state law that predominate over claims for which this Court has original jurisdiction, and there are no compelling reasons for declining supplemental jurisdiction over Plaintiffs' claims that do not arise under RICO or RESPA.

45.46.  This Court has personal jurisdiction over the Zillow Defendants and Defendant Works IndustriesEXP Realty, LLC because these Defendants have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

46.47.  This Court has personal jurisdiction over each of the Real Estate Defendants because the ends of justice require that they be brought before this court, pursuant to 18 U.S.C. § 1965. Specifically, all members of the RICO enterprise should be tried together in a single jurisdiction. *See Butcher's Union Local No. 498, UFCW v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).

47.48.  Venue is proper in this District because each Zillow Defendant and Defendant Works IndustriesEXP Realty, LLC transacts substantial business in this District, as alleged throughout this Complaint. These Defendants reside in this District or transact business in this District. These

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 17

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Defendants also market and sell products and services in this District, have maintained continuous and systematic contacts with this District, and engaged in anticompetitive, unfair, and deceptive business practices that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**IV.   FACTUAL ALLEGATIONS**

**A.   Real Estate Industry Background**

48.49.  State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm") and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

49.50.  Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. As a result, real estate brokerage contracts with sellers and buyers are required to be with brokers, not agents, and all payments to individual realtors or agents pass through the brokers.

50.51.  In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

51.52.  A seller broker's compensation is set forth in a listing agreement, which is a contract between the seller and the seller broker. The listing agreement specifies the total commission that a home seller will pay to the seller broker and also specifies the amount earmarked to be paid to the buyer broker (in the event the buyer has a broker).

52.53.  When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

53.54.  If the buyer has a broker, then the seller broker pays the buyer broker a commission out of the total commission paid by the seller.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 18

54.55.  As a result, the buyer brokers and agents—who are supposed to assist their clients in negotiating against the seller—receive their compensation from the total commission paid by the seller, not from the buyer they represent. According to industry insiders, there is "a lot of confusion around how commissions work," where even writers for real estate publications "never get[] a very clear cut answer from the industry or from anyone" on the subject.[34] And other market participants agreed that the practice is "confusing" and that most consumers "just don't understand how commission works."[35]

55.56.  A Multiple Listing Service ("MLS") is a database of properties listed for sale within a certain geographic region. Only registered agents and brokerages that pay for membership can access an MLS database. There are over 500 MLSs in the United States.[36]

56.57.  After a listing is registered with an MLS, companies like Zillow automatically obtain and display these listings through back-end technology feeds called the Internet Data Exchange ("IDX") or the Virtual Office Website ("VOW"). Zillow has obtained and maintained real estate brokerage licenses for the sole purpose of collecting listings—upon information and belief, Zillow itself does not provide any brokerage services. Zillow thereby exploits the listings at little cost to squeeze out profits from the listings, without any compensation to the MLSs, agents, or sellers who created the listings.

57.58.  Real estate agents are state-licensed professionals who are obligated by law and professional ethics to act in their clients' best interests. Licensed agents must complete required education, pass state examinations, and comply with state licensing laws that recognize their fiduciary duties of loyalty and full disclosure to their clients. For example, in Washington, real estate agents must go through the licensing process, which requires 90 hours of pre-licensing education, pass the state licensing exam, and then complete at least 30 hours of continuing education every two

---

[34] FTC-DOJ Joint Public Workshop, Segment 1 Tr., June 5, 2018, https://www.ftc.gov/system/files/ documents/videos/whats-new-residential-real-estate-brokerage-competition-part-1/ftc-doj_residential_re_brokerage _competition_workshop_transcript_segment_1.pdf.

[35] FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, https://www.ftc.gov/system/files/ documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage _competition_workshop_transcript_segment_2.pdf.

[36] *What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ*, reso.org, https://www.reso .org/mls-faq/ (last visited Aug. 22, 2025).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 19

years.[37] Agents may work independently or under the supervision of licensed brokers, but in all cases, their professional role is to advise clients impartially and to avoid conflicts of interest.

58.59.  Real estate agents owe fiduciary duties of loyalty, care, and full disclosure to the clients they represent. These duties require agents to act solely in their clients' best interests and to avoid or disclose any conflicts that could compromise impartial advice. Although Zillow is not a fiduciary, by designing and enforcing systems that pressure Participating Agents to favor Zillow Home Loans over independent lenders, it aids and abets breaches of those duties. All fifty states recognize a cause of action for holding non-fiduciaries liable when they knowingly and substantially assist another in breaching fiduciary obligations. Zillow's conduct, as alleged, falls squarely within those principles.

**B.     Zillow's Illegal Steering Practices and Conduct**

59.60.  Zillow is the undisputed market leader in online real estate listings. In investment presentations, it notes that it has 66% of the U.S. real estate audience share—twice as high as its nearest competitors.[38] It also promotes the fact that 80% of consumers come to Zillow directly, and that "Zillow revenue growth has meaningfully outperformed a challenged housing market."[39] According to Zillow, it has a "leading category traffic position" and "market-leading audience," with "4x the daily active app users of nearest competitors."[40]

---

[37] *See Get your license: Real estate brokers*, Washington State Dept. of Licensing, https://dol.wa.gov/professional-licenses/real-estate-brokers/get-your-license-real-estate-brokers (last visited Oct. 28, 2025).

[38] Zillow Group, *February 2025 Zillow Investor Presentation*, at 6, https://s24.q4cdn.com/723050407/files/doc_earnings/2024/q4/presentation/Zillow-4Q24-Investor-Presentation.pdf (last visited Aug. 22, 2025).

[39] *Id.* at 9.

[40] *Id.* at 3, 7.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 20

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX



60.61.  Through an integrated system, Zillow links its advertising, agent-referral, and lending operations so that the same consumer is captured and monetized at multiple stages of the transaction. In this unified transaction funnel, buyers and agents are guided through affordability tools, touring, and pre-approval services offered by Zillow. The funnel's default paths steer users toward ZHL and other Zillow-affiliated services:

61.62.  Since approximately 2019,[41] the company has invested hundreds of millions of dollars in its mortgage operation. Despite a cumulative loss of $283 million since 2017, Zillow has "doubled, tripled, and quadrupled down" on the division, maintaining high operating expenses even during industry downturns and declaring ZHL to be a "key part" of its long-term growth strategy.[42]

62.63.  Zillow's reason for continuing to fund an unprofitable mortgage business is to advance the company's broader "housing super app" strategy, through which it seeks to capture every stage of the home-buying journey on a single platform.[43] By integrating ZHL into the same consumer funnels that generate home-buyer leads and agent connections, Zillow seeks to capture additional revenue from the same scheme that it facilitated by linking consumers with an agent who then pushes the buyer to finance with ZHL.[44] Its objective was "to increase the number of purchase loans, loans per officer, and Zillow Home Loans customer adoption rate."[45] Internal disclosures and independent industry commentary consistently identify mortgage "attach" or adoption rates as a primary lever for ZHL scale and economics.[46]

---

[41] *See* Emma Newburger, *Real estate website Zillow expands into the mortgage business*, CNBC (Apr. 2, 2019), https://www.cnbc.com/2019/04/02/real-estate-website-zillow-expands-into-the-mortgage-business.html; *Zillow Home Loans FAQs*, Zillow, https://www.zillow.com/homeloans/zillow-home-loans-faqs/?msockid=120da737245263c312f7b24a 255562ed (last visited Oct. 24, 2025).

[42] *See* Mike DelPrete, *The Path Forward for Zillow Home Loans* (Mar. 1, 2023), https://www.mikedp.com/articles/2023/2/28/the-path-forward-for-zillow-home-loans. Mike DelPrete is an internationally recognized expert and thought leader in real-estate technology. He serves as a Scholar-in-Residence at the University of Colorado Boulder, where he leads the Real Estate Technology program and publishes widely cited analyses on trends in online real-estate platforms. His research and commentary are frequently featured in leading financial and industry publications—including The New York Times, The Wall Street Journal, The Financial Times, and The Economist—for their insight into the strategies of major real-estate technology firms, including Zillow. DelPrete advises and consults for leading property portals and real-estate technology businesses worldwide, invests in emerging ventures, and provides strategic guidance at the board and governance levels. DelPrete, *About Mike*, https://www.mikedp.com/mike-delprete (last visited Oct. 29, 2025).

[43] *See* Zillow 10-K Annual Report (Feb. 11, 2025) (describing the "housing super app" as "an ecosystem of connected solutions for the tasks and services related to moving").

[44] *See* Zillow Q3 2022 Shareholder Letter (Nov. 2, 2022), https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2022/Zillow-Group-Reports-Third-Quarter-2022-Financial-Results/default.aspx.

[45] *Id.*

[46] *Id.*; *Flex Program Standards*, Zillow Premier Agent, https://www.zillow.com/z/flex-performance-terms/performance-standards/ (last visited Oct. 23, 2025); DelPrete, *The Path Forward for Zillow Home Loans* (Mar. 1, 2023), https://www.mikedp.com/articles/2023/2/28/the-path-forward-for-zillow-home-loans; *See also* Program Standards, Zillow Preferred, https://www.zillow.com/preferred/program-standards/ (last visited Dec. 19, 2025) (describing Zillow Preferred standards, including pre-approval targets).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 22

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

63.64.  To accomplish that expansion, Zillow began explicitly leveraging its greatest asset—lead generation. This lead flow is the foundation of Zillow's business model and the primary source of its leverage and influence over real-estate professionals nationwide. Zillow's February 2025 Investor Presentation demonstrates how central the mortgage sector—and ZHL in particular—has become to the company's growth strategy, as it identified a "significant For Sale (Residential + Mortgages) revenue growth opportunity" and "a clear path to $1 billion incremental organic revenue" through conversion of "more customers already in [its] funnel[.]"[47]

## The Zillow Investment Opportunity

**Leading brand and engaged audience:**
"Zillow" is searched more than the term "real estate"[1] with 4x the daily active app users of nearest competitor

**Significant For Sale (Residential + Mortgages) revenue growth opportunity:**
$1.7B For Sale revenue in 2024 with clear path to $1B incremental organic revenue as we roll out existing products
Larger long-term opportunities to convert more customers already in funnel and expand product suite

**Clear Rentals revenue growth path:**
$453M Rentals revenue in 2024 with path to $1B+ revenue

**Executing on a strategy that is working:**
Continued geographic roll-out of existing products and services driving strong revenue growth by gaining share across For Sale and Rentals

**Disciplined cost and investment management expected to drive high incremental margins:**
Disciplined cost structure built to drive positive GAAP net income in 2025 and strong GAAP profitability over time

**U.S. housing industry at attractive cyclical entry point:**
Housing turnover currently near 40-year cyclical lows with 50%+ potential upside at 6M in normalized annual transactions

**Mid-cycle target for $5B revenue with 45% Adjusted EBITDA margin:[2]**
Clear path to attractive organic revenue growth across For Sale and Rentals, plus additional opportunity when housing market normalizes

64.65.  Zillow's 2025 Form 10-K reported $145 million in mortgage-segment revenue in 2024—a 51 percent increase year-over-year—and origination volume rising from $1.53 billion to $3.09 billion.[48] This rapid growth coincides with Zillow's increased and continuing integration of ZHL into its agent-referral programs. For example, in its Q2 2025 Shareholder Letter, Zillow reported "double-digit adoption rates across Enhanced Markets" and highlighted new in-app

---

[47] Zillow Group Investor Deck – February 2025, Zillow Group, (Feb. 11, 2025),
https://investors.zillowgroup.com/investors/news-and-events/events-and-presentations/presentations/presentation-details/2025/Zillow-Group-Investor-Deck---February-2025/default.aspx.

[48] Zillow 10-K Annual Report (Feb. 11, 2025).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 23

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

messaging that allows buyers to communicate directly with agents and ZHL loan officers—tools designed to increase pre-approvals and conversion rates.[49]

65.66. Zillow channels this lead-generation power through its Zillow Premier Agent program ("Zillow Premier"), a lead-distribution and advertising platform that serves as the centerpiece of its real-estate business. Through Zillow Premier, participating agents and brokerages ("Participating Agents") pay for or earn access to consumer inquiries generated on Zillow's website and mobile applications, allowing Zillow to control which agents receive buyer leads. By integrating its lead-generation system into Zillow Premier, Zillow created a closed network in which the company not only sells advertising to agents but also dictates the conditions for remaining in the program.

66.67. Beginning in or around 2022, Zillow extended this integrated system to ZHL through its Flex program. Zillow paired Premier Agent partners with ZHL loan officers, and, over time, incorporated ZHL-related metrics into agents' performance framework, requiring Participating Agents to meet specific ZHL pre-approval quotas as a condition for maintaining access to these high-value leads.[50]

67.68. Based on accounts from real estate agents, if an agent has the following "Top Agent on Zillow" marker on his or her Zillow profile, then the agent is most likely a "Flex" agent:

[49] Zillow Q3 2022 Shareholder Letter (Nov. 2, 2022), https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2022/Zillow-Group-Reports-Third-Quarter-2022-Financial-Results/default.aspx.

[50] *See id.*; *Flex Program Standards*, Zillow Premier Agent, https://www.zillow.com/z/flex-performance-terms/performance-standards/ (last visited Oct. 23, 2025); DelPrete, *The Path Forward for Zillow Home Loans* (Mar. 1, 2023), https://www.mikedp.com/articles/2023/2/28/the-path-forward-for-zillow-home-loans.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 24

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX



68.69.  Defendants have modified their policies and their websites following the filing of the complaints in this case. Zillow's websites summarized herein have been changed since the filing of this lawsuit (apparently after the First Amended Complaint was filed on November 19, 2025), and these websites have apparently been removed or not archived at https://web.archive.org/. Unless otherwise indicated, this Complaint accordingly refers to language available as of November 19, 2025 or earlier.

69.70.  The Flex Program requires Flex agents to pay Zillow up to 40% of the commissions the agents earn on a sale (the Hidden Zillow Fees). Zillow Flex agents are also required to steer buyers to Zillow Home Loans; if the agents fail to meet certain quotes, they are dropped from the program.[51]

70.71.  Zillow expressly ties ZHL referrals to continued leads on its "Flex Performance Terms – Compliance" website.[52] The website is entitled "Flex Compliance Policies & The Disengagement Process." The website states as follows:

---

[51] *See Flex Program Standards*, Zillow, https://www.zillow.com/z/flex-performance-terms/performance-standards/ (last visited Sept. 19, 2025).

[52] *See Compliance Policies & Disengagement Process*, Zillow, https://www.zillow.com/z/flex-performance-terms/compliance (screen capture taken on or before Nov. 16, 2025).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 25

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## Performance Standards

Flex Performance Standards are more than just benchmarks—they help you provide a consistent client experience and are your gateway to growth.

Meeting or exceeding standards means:

- Opportunity for more Flex connections
- Improved efficiency and team alignment
- Greater confidence in your client experience
- Continued eligibility and partnership with Zillow

Failing to meet the following minimum performance expectations may lead to disengagement and decreased connection volume for your team.

71.72.  The "Performance Standards" include referring customers to ZHL:

## Agent Performance Standards

The agent performance standards provide the metrics that help Zillow Preferred agent partners understand how to convert more home shoppers and streamline their home shopping process. These updates empower Zillow Preferred agent partners to stand out, grow faster, and earn access to more connections.

**Zillow Home Loans Pre-Approval Target:**

- **Definition:** Number of agent's customers who get pre-approved with Zillow Home Loans. This empowers consumers to navigate affordability during their home search by equipping them with Zillow Home Loans pre-approvals.
- **How it's calculated:** Approximately 10% of an agent's eligible Zillow Preferred connections that reached or passed "met with" status in the last 90 days. The pre-approvals do not need to solely be with Zillow Preferred delivered connections.
- **Standard:** 100% of target over the last three (3) month(s).

72.73.  Zillow's performance matrix to its Flex partners in 2023 vividly illustrates Zillow's carrot-and-stick approach to steering clients to ZHL:

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 26

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

73.74.  Zillow is not being coy about its policy, and agents are taking note—with many agents speaking out about their concerns about the legality of this policy. For example, in discussing the allegations in the previously filed Complaint in this case that Zillow requires agents to steer a certain percentage of its customers to ZHL, a real estate agent and commentator named Jared James on his podcast (posted on YouTube) stated:

> My DMs, guys, have been flooded and they are flooded by team leads and agents who are Zillow Flex teams who basically say, "**Yeah, 100% true and worse than you think it is**." And every single one of them says, "don't mention my name. Anonymous. Do not mention my name." But it's 100% happening. . . .
>
> The first thing I want to do is one of you actually sent me the new manual for the new flex program updates that go into effect August, I'm sorry, October 1st. . . . And there are key metrics, and some of these flex teams are irate about this, not just because of the metrics, but because of how they're being enforced and how it's happening. And, uh, **one of them is that Zillow Home Loans pre-approval target**. This is really interesting. It says the number of connections agents should help get preapproved with Zillow home loans. **Roughly 10% of Zillow eligible connections that reached or passed or uh met with status in 90 days. And it's SO interesting because you're like, well, that's a target; like that starts to smell of RESPA otherwise you will not get these leads. And that's a problem.**[53]

_____

[53] Jared James, *Zillow Had a Very Bad Week | Today with Jared James Ep. 134*, at 3:57, YouTube (Sept. 29, 2025), https://www.youtube.com/watch?v=p75ykIO_k4I.

~~74.~~75. Jared James then discussed the notion that the 10% requirement is only for pre-approval, but in reality "you hear from a lot of these team leaders and flex agents that **behind the scenes they're telling them no, if you – if they don't close with us—if a certain percent do not close with us then you're getting downgraded**. Like's there's a whole system, you know, green yellow red, like you will be downgraded green yellow red."[54]

~~75.~~76. James further stated, "Look, I'm used to people in our industry being angry toward Zillow, but **the messages people were sending me were, uh, pretty consistent**, all pretty much similar. And I mean, **evidence, like they were sending me copies, recordings of phone calls, um, with reps and what they were saying that completely break, you know, what they're allowed to be doing**[.]"[55]

~~76.~~77. James noted that the Zillow managers are *flying out in person* to deliver these messages directly to the teams and agents, to describe the program in ways that they did not want in writing: "Many of the big big teams that I talked to said that like the big ups, that **the bigger ups at Zillow flew out personally to tell them what was going to happen**. Um, and a lot of it, I got to be honest, was because **they were having conversations they couldn't put on the record**, they couldn't email, they couldn't put over the phone, like they're meeting with them so they can tell them the real deal."[56]

~~77.~~78. James stated that he was not taking a position on whether this is steering, but "I'm just reporting on my podcast what people are messaging me. Steering is a big one. You know, you're not allowed to steer people to certain places. They're supposed to have choice. They're supported to decide where they want to go based on who's the best rep. **And one of the biggest um complaints that I got from people was that most of the Zillow Home Loan reps were newer and not great and didn't have the same offerings as a lot of the other mortgage brokers**."[57]

~~78.~~79. James commented that the agents are telling him that ZHL loan officers are inferior and offer an inferior product, but the agents are forced to refer customers to ZHL anyway in violation

---

[54] *Id.* at 7:06.
[55] *Id.* at 10:54.
[56] *Id.* at 11:41.
[57] *Id.* at 12:06.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

of their fiduciary duties: "And so here you [the agent] are going, 'well, I don't want to give it to them because they number one don't do a great job. They're new. **They're not great at it. And they don't have the same offerings that my person's going to need in order to be able to close. And yet, if they don't send them there anyway, they're getting penalized**."[58]

79.80.    Although not expressing an opinion on RESPA, James was compelled to note that "[g]etting or not getting those leads **is a thing of value. Huge.** I have people in my DMs right now who are desperate, who 25 or 50% of their business is coming from these uh Zillow Flex deals that are now changing completely. **And the idea the they don't think it's best for their client to go talk to this [] loan officer through Zillow Home Loans, and if they don't they get downgraded, these lose leads, they lose their business. I don't know how that's not a thing of value**."[59]

80.81.    Regarding the requirement that 10% of those who express interest in financing get pre-approved, James stated that agents in his DMs "said the problem is that a buyer when they fill out the form to talk to the agent **doesn't even realize at the bottom of the form it is auto-defaulted, auto-checked as being 'yes, I want to a Zillow home agent[.]'** And the buyer doesn't even know they've done that."[60] Below is an illustration:

---

[58] *Id.* at 12:34.

[59] *Id.* at 16:16.

[60] *Id.* at 16:54.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

81.82.  According to James: "And then when the agent is talking to the buyer, they have no – like the buyer is not even ready yet to talk to a loan officer, has no interest in it, has no whatever, and then the agent's getting penalized because the Zillow rep is calling going, 'Hey, why aren't you having them talk to us? They're ready to talk to us. They check that they want to talk to us.' And the agent's going, 'no, they didn't. You auto-defaulted that to check and they didn't even see it. They're not ready to talk to a loan officer.' Like, **you tricked them into that**."[61]

82.83.  As a result, "You [Zillow] are going to turn these agents against you and you're almost holding them—not almost—**you're holding them hostage** because it's where most of their business is coming from."[62]

83.84.  James continues: "And now you take all of that, and **this is where this gets really dirty**, because they're telling me now how these people are coming into their offices, and this is what's crazy. I had more than one tell me that, hey, **I know that we have to put in writing, it's 10%. But I'm telling you now in this area, this is a competitive area, it needs to be 50%**. Or the leads are going to someone else.' . . . . And they're like, 'hey, we're not going to put it in writing

---

[61] *Id.* at 17:10.
[62] *Id.* at 20:43.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 30

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

because we're not allowed to put that in writing, but we're telling you, if it's not 50%, we're going to start moving your leads to other people.' **Now, that is clearly not allowed**."[63]

84.85.  "And now you have these Zillow reps that are [] **bypassing the team lead and going straight to the agents and chastising them and training them on how to not recommend other lender**s. I heard that from more than one, okay, many actually. They're training the agents. . . . And they're actually getting angry if they're [the agent] recommending other lenders, which again is not choice. Okay? They buyer is supposed to have choice."[64]

85.86.  "I had one guy tell me that he was fighting with the Zillow rep and he was telling them, 'you can't do that. That's not allowed. Like, we have to give people what they want. We have to let them use the lender that's going to close the loan and going to whatever.' And the Zillow rep told them, uh, that you are such a pain in the butt and I'm just telling you now [] that **if you do not do the things that we need you to do, we are going to be sending your leads elsewhere; like, stop it's going to be 50% or we're going to send your leads elsewhere . . . I can't put this in writing but like that's not how it's going to work now**.'"[65]

86.87.  In response, one commentator under the YouTube video stated:

> You have no idea the pressure they place on the team leaders the brokerages. Every week we have a mandatory meeting. Can you believe that a mandatory meeting when you're an independent contractor? And every week it's the exact same thing. You're not making your numbers. You need to make your numbers. If you don't make your numbers you are no longer going to be part of flex. **It is a constant threat every single week**. You thought you were becoming a real estate agent to run your own business your way. Well if you're working for Flex you are working for Zillow. They may as well pay us hourly, but that's the scam. **They treat you like an hourly employee they force competition amongst you and your peers and they make all the money just for supplying you a name and number, and sometimes you don['[t even get a name.**[66]

87.88.  In another example, on October 21, 2025, *The Capitol Forum* reported on agents' mounting concern and anxiety about Zillow's steering policies in an article entitled "Relators Are Required to Drive Business to Zillow's In-House Lending Arm, Potentially Raising Buyer Costs;

---

[63] *Id.* at 25:22.

[64] *Id.* at 26:24.

[65] *Id.* at 26:58.

[66] *Id.* at Comments (emphases added).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 31

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Agents Express Concern they are Violating RESPA."[67] One real estate agent, whose team signed up for Zillow Flex, told *The Capitol Form* that "the 'red flag' appeared when Zillow began coaching the team on how to refer buyers to ZHL products . . . . 'Our team felt like they were basically forcing us to connect (buyers) to ZHL, and they were forcing us to sell ZHL services . . . . **It just made us sick. We felt like we were working for Zillow**."[68]

88.89.  *The Capitol Forum* further describes the harmful economic impact on buyers from Zillow's policies: "Retail lenders like ZHL can have higher rates and may offer fewer mortgage products, which can lead to buyers missing out on discount programs targeting groups like veterans or first-time homebuyers. One Virginia real estate agent currently in the Flex program said one of her discomforts is it '**absolutely' raises costs to buyers to refer them to Zillow's lending business**."[69] The agent stated that, if she referred her first-time homebuyer clients to ZHL, they "would miss out on some really good first-time homebuyer programs that offer significant rebates." The Virgina agent further stated that Zillow is "holding leads hostage from agents that do not send clients to get preapproval from ZHL. I just don't understand how this could be legal."[70]

89.90.  The article further noted that "**Zillow keeps close tabs on Flex agents**."[71] According to the *Capitol Forum*, the Zillow platform "has immense ability to monitor how they do their jobs. Agents must take calls and manage their clients through the Zillow app or Zillow-owned Follow Up Boss, a customer relations management app. Agents said that through these apps **Zillow records their phone calls and rates them on metrics like how quickly they start reciting a script provided by Zillow**."[72]

90.91.  Pressure on Zillow agents to steer clients to Zillow Home Loans has been ongoing since at least 2018. Zillow announced on August 6, 2018 that it had acquired Mortgage Lenders of

---

[67] *Zillow: Realtors Are Required to Drive Business to Zillow's In-House Lending Arm, Potentially Raising Buyer Costs; Agents Express Concern They Are Violating RESPA*, 13 Capitol Forum 843 (Oct. 21, 2025).

[68] *Id.* (emphasis added).

[69] *Id.* (emphasis added).

[70] *Id.* (emphasis added).

[71] *Id.* (emphasis in original). This is corroborated by accounts of agents themselves, as summarized below.

[72] *Id.* (emphasis added).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 32

America.[73] Upon acquisition, Zillow immediately pivoted to pressuring agents to steer clients to Zillow Mortgage (the predecessor to Zillow Home Loans).

91.92.  One leading real estate trainer, Glennda Baker, recently appeared on Jared James's podcast (quoted above), and discussed steering allegations against Zillow.[74] According to Baker, she was a founding member of the Zillow Agent Advisory Board. Baker described how she "absolutely had a love affair with Zillow," and spent hundreds of thousands of dollars on leads with them. But she stopped using Zillow based on a meeting with Zillow and 200 agents on October 16, 2018 in Boston, Massachusetts. At that meeting, an agent confronted Greg Schwarz (the then-Zillow President of Media and Marketplace) about the fact that her leads dropped 70% "in a heartbeat," and she wanted to know why.[75] In response, Schwarz presented a slide deck on how Zillow is changing. According to Baker, Mr. Schwarz stated "we are going to send leads to . . . elite agents based on their integration of software and services provided by Zillow."[76] Ms. Baker further explained that "I've gotten hundreds of messages from agents . . . it all depended on how many, how many uh, deals we sent to Zillow Mortgage."[77]

92.93.  Confidential Real Estate Agent 7 ("CA7," more fully summarized below), a longtime Zillow agent, corroborates Baker's account. According to CA7, beginning at least as early as 2019, Zillow representatives were pressuring CA7 to push clients to use Zillow's products, including Zillow Mortgage. Zillow representatives told CA7 that CA7 needed to push these products, including Zillow Mortgage, and if not, CA7's leads would dry up. CA7 also knows that other agents were facing similar pressure.

93.94.  Another real estate agent ("CA11") confirmed that, as early as 2018, Zillow was pressing Zillow agents to use Zillow products, including Zillow Mortgage. CA11 worked as both a Flex and a Premier Zillow agent. CA11 stated that other teams were performing worse than CA11's

---

[73] *See Zillow Group to Acquire Mortgage Lenders of America*, Zillow Group (Aug. 6, 2018), https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2018/Zillow-Group-to-Acquire-Mortgage-Lenders-of-America/default.aspx.

[74] Jared James, *Live with Glennda Baker Talking Zillow Lawsuit and Making Videos | Today with Jared James Ep. 138* YouTube (Nov. 15, 2025), https://www.youtube.com/watch?v=GfY98eYRwHc.

[75] *Id.* at 11:46.

[76] *Id.* at 13:49.

[77] *Id.* at 14:24.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 33

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

team but were still getting rewarded with more leads because they were referring clients to Zillow Mortgage at a higher rate.

**C.     The Harmful and Long-Lasting Economic Impacts of Zillow's Steering**

~~94.~~95.  Zillow's steering practice can have long-lasting impacts on the housing market. Public reporting and empirical economic analysis further corroborate that borrowers who used ZHL paid more for mortgage credit than similarly situated borrowers who used other lenders.

~~95.~~96.  Industry reviews consistently rate ZHL average on affordability, with limited loan types and no rate transparency, and advise borrowers to comparison-shop multiple lenders.[78] It rated ZHL only three out of five overall, concluding that borrowers seeking specialized or lower-cost options will "need to work with a different lender."[79]

~~96.~~97.  Similarly, Forbes Advisor's 2025 review rated ZHL only three out of five stars, reflecting its limited product range and above-average borrowing costs.[80] The publication noted that Zillow's interest rates "aren't as competitive as other lenders" and that the company "doesn't offer USDA loans or home-equity products," nor does it "publish rates on its website," "consider alternative data for credit profiles," or "offer home equity loans or lines of credit."[81] Forbes emphasized that ZHL should *not* "be the only lender you [consumers] look to when shopping for a mortgage," and provided alternatives.[82]

~~97.~~98.  As one article described Zillow's steering practice, "experts warn this apparent efficiency [from steering] is masking a system designed to steer homebuyers to the platforms' own mortgage lenders, squeezing out competition and discouraging buyers from finding cheaper options. It's part of massive consolidation and restructuring efforts by Zillow and Redfin's corporate owners

---

[78] *See, e.g.*, Molly Grace, *Zillow Home Loans Review 2025: No-Frills Online Lender*, Business Insider, https://www.businessinsider.com/personal-finance/mortgages/zillow-home-loans-review (last updated Jan. 23, 2025); Andrea Riquier, *Zillow Home Loans Review 2025*, Forbes (Jan. 4, 2024), https://www.forbes.com/advisor/mortgages/zillow-home-loans-reviews/#what_zillow_home_loans_offers_section.

[79] Molly Grace, *Zillow Home Loans Review 2025: No-Frills Online Lender*, Business Insider, https://www.businessinsider.com/personal-finance/mortgages/zillow-home-loans-review (last updated Jan. 23, 2025).

[80] Andrea Riquier, *Zillow Home Loans Review 2025*, Forbes (Jan. 4, 2024), https://www.forbes.com/advisor/mortgages/zillow-home-loans-reviews/#what_zillow_home_loans_offers_section.

[81] *Id.*

[82] *Id.*

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 34

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

to corner the trillion-dollar mortgage market, **which is already driving up housing costs and could heighten the risk of a financial crisis**."[83]

98.99.   Zillow's illegal conduct can also have devastating impacts on buyers over the long run, particularly those saddled with a higher interest rate mortgage: "Unbeknownst to many consumers, shopping around for a home loan can save homebuyers an average of more than $80,000 over a thirty-year mortgage. In states like California, Hawaii, and Washington, lifetime savings can reach more than $100,000. Consumers who use real estate companies' in-house lenders may also be forced to pay higher fees and interest charges than those who use alternative options." [84] Zillow's own materials and independent industry analysis show that a 1% rate change can reduce interest payments by tens of thousands of dollars on a 30-year loan.[85]

99.100.       As a result of Zillow's conduct, Plaintiffs and Class Members paid more for mortgage credit than they otherwise would have, lost access to competing loan programs and favorable terms, and were deprived of the independent advice that state and federal law require in residential real estate transactions. These injuries are uniform across the Class and constitute the precise consumer harms RESPA and the Washington CPA were designed to prevent.

100.101.       At the same time, Zillow has profited handsomely from its steering policies. According to Zillow, as of October 31, 2025, loan origination volume grew 57% year-over-year to $1.3 billion. Mortgage revenue increased 36% to $53 million in the third quarter this year.[86] By that measure, its steering program has been a resounding success.

**D.    Defendants' Fraudulent Conduct**

101.102.       The overwhelming majority of houses for sale listed in an MLS are displayed on Zillow's home search platform, and most prospective buyers search for homes on Zillow.

---

[83] Helen Santoro, *Zillow and Redfin May Be Steering Homebuyers Into Bad Deals*, Jacobin (Sept. 16, 2025), https://jacobin.com/2025/09/zillow-redfin-mortgage-lending-competition (emphasis added).

[84] *Id.*

[85] *See, e.g.*, Susan Kelleher, *How Does a 1% Interest Rate Change Affect Your Buying Power?*, Zillow Learning Center (Nov. 6, 2024), https://www.zillow.com/learn/interest-rate-impact-mortgages/; Chris Muller, *How much does a 1% difference in mortgage rate matter?*, Money Under 30, https://www.moneyunder30.com/1-percent-difference-mortgage-rate/ (last visited Oct. 24, 2025).

[86] *Zillow Group Reports Third-Quarter 2025 Financial Results*, Zillow Group (Oct. 30, 2025), https://zillowgroup.mediaroom.com/2025-10-30-Zillow-Group-Reports-Third-Quarter-2025-Financial-Results.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 35

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

However, buyers and sellers are not aware that Zillow generates the majority of its revenues by engaging in deceptive business practices that inflate the purchase price of homes. Financial analysts have called Zillow the "clear leader" in the market and have stated that "Zillow's traffic share appears larger than that of its next three competitors combined, and it reports that about 80% of its traffic comes from organic or direct sources. This is a major competitive advantage for Zillow."[87]

102.103.    When prospective buyers identify homes they are interested in purchasing, Zillow presents them with the option to click a large button with bold type labeled "Request a Tour" or "Contact Agent" in close proximity to the home photos, sale price, and key property details—creating the appearance that the potential buyer can contact the listing agent to ask questions about the property, schedule a tour, or make an offer. Meanwhile, Zillow buries the listing agent in tiny print, barely visible to the average reader. Below is an example:

---

[87] *See Zillow Group, Inc.: Initiation of Research Coverage* (Apr. 21, 2025), https://www.williamblair.com/News/Zillow-Group-Inc-Initiation#:~:text=%E2%80%9CImportantly%2C%20Zillow's%.20traffic%20share%20appears,from%20organic%20or%20direct%20sources.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 36

104. Prospective buyers who click on the "Request a Tour/Contact Agent" buttons would be reasonable in believing that they are reaching out to the *listing* agent who was hired by the home seller to "list" the property. This is a ruse. In actuality, Zillow directs the buyer *away* from the listing agent and redirects the buyer to a buyer agent who is working on a Zillow team, a Zillow agent who lacks any specialized knowledge about the subject property. In addition, Zillow Flex agents have agreed to pay the Hidden Zillow fees. The Zillow agent who pays for the lead then attempts to contact the buyer and insert herself into the transaction between the buyer and the listing

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

agent so that she can extract a buyer agent commission—typically around 3% of the purchase price of the property.

104.105.    On Zillow's website (as shown in the screenshot above), if potential buyers select "Contact Agent" or "Request a Tour," the ultimate outcome is the same: they are prompted to provide their name, email, and phone number. Zillow then farms out these leads to Zillow-affiliated agents who are part of the Zillow Flex program. The agents contact the buyers, propose a tour, and ask the buyers to sign Zillow's "Touring Agreement."[88] The "Touring Agreement" emphasizes that the services are purportedly "free," as follows:

> **4. No Fee for the Touring Services.**
>     (a)   Buyer shall not owe or pay Broker any fee for the Touring Services.

105.106.    Although the touring services are technically "free," buyers are being tricked into believing that the agent's services are free. In reality, if the buyer purchases the home, the buyer agent will add a provision to the purchase offer agreement requiring the Seller to pay a commission to the buyer agent (with no disclosure of the Hidden Zillow Fees if a Flex Agent is involved). Listing agents have recently observed that approximately 80% of the prospective buyers they communicate with about their listings have already spoken with a Zillow Agent who used a Touring Agreement.[89]

106.107.    This is precisely what happened to Plaintiff Taylor. In 2022, when browsing Zillow.com to look for houses of interest to him, he clicked on the "Contact Agent" button, assuming that he would be contacting a *listing* agent. Instead, he was routed to a Zillow agent. During the touring and closing process, Plaintiff Taylor did not believe he had any other option other than to use the Zillow agent. If Plaintiff Taylor was able to contact the listing agent, the seller could have paid less commissions, and the purchase price could have been lower. The Hidden Zillow Fees were not disclosed to Plaintiff Taylor.

---

[88] Touring Agreement Oregon, Zillow Group, https://delivery.digitallibrary.zillowgroup.com/public/OR-FinalTouringAgreement_pdf_Original.pdf (last visited Sept. 19, 2025).

[89] *See, e.g.*, Jordan Teicher, *What Happens When a Buyer* Contacts *a Premier Agent Partner?*, Zillow (July 19, 2024), https://www.zillow.com/premier-agent/when-buyers-contact-premier-agent/ ("78% of buyers use Zillow has part of their home-buying journey.").

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 38

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

107.108.     As Forbes Magazine described it, this is a classic bait-and-switch scheme by Zillow:

> [The Premier Agent Program], for many years Zillow's primary source of revenue, is based on what appears to me to be a classic bait-and-switch. Each Zillow property page contains, in bold letters at the top, the name of an agent to contact. Ah, thinks the reader, this is the exclusive listing agent who handles the property and is the person most knowledgeable about it. But no, it's not. It's just the name of the agent who has PAID Zillow/StreetEasy for the privilege of being listed there.[90]

108.109.     Zillow acknowledges that the Touring Agreement is designated to "set[] up the expectation of representation."[91] Zillow further explains the Touring Agreement (described as a "buyer agreement" below) as follows:[92]

## Why buyer agreements are important

Buyer agreements typically lay out exactly what the agent will do for a client. However, requiring an exclusive commitment upfront before the buyer feels comfortable can negatively impact the consumer experience. To put it simply, most people want to date before becoming exclusive.

At the same time, agents deserve to be compensated for the value they provide to buyers. Since this is an introductory agreement, we still anticipate that buyers and agents will sign a longer-term agreement that outlines compensation terms, if they choose to work together throughout the buying process.

The reference to "compensation terms" relates to commissions, not the Hidden Zillow Fees, which are not disclosed to the buyer or the seller.

109.110.     Zillow describes its Touring Agreement as a "buyer agreement," even though it is not labeled as such. But the "buyer agreement" is "limited," as Zillow acknowledges. Again, from Zillow's website:[93]

---

[90] *See* Frederick Peters, *Buyers Beware of this Advertising Tactic by Zillow and StreetEasy*, Forbes (Dec. 9, 2020), https://www.forbes.com/sites/fredpeters/2020/12/09/buyers-beware-of-this-advertising-tactic-by-zillow-and-streeteasy/.

[91] *See* Zillow Premier Agent, *Zillow's New Touring Agreement Helps Agents Seamlessly Adjust to Industry Changes*, Zillow (Aug. 1, 2024), https://www.zillow.com/premier-agent/zillow-touring-agreement-nar-settlement/#state.

[92] *Id.*

[93] *Id.*

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 39

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

This could be someone's first introduction to buyer agreements, so this approach lets you and the buyer enter the first showing with a signed limited services agreement that satisfies requirements outlined in the NAR settlement.

~~110.~~111.    Notwithstanding this "buyer's agreement," Zillow fails to disclose to home buyers that if they work with a Zillow-affiliated Flex agent, Zillow will collect up to 40% of that agent's commission (the Hidden Zillow Fees). Zillow-affiliated Flex agents, who must pay up to half of their commission to Zillow, are driving up the commission amounts to cover their costs. And buyers are forced to pay more for homes based on the rising commission costs. Traditionally, when necessary, non-Zillow agents are often willing to make concessions on their commission rates to get a deal done. But Zillow-affiliated Flex agents, who operate on far tighter margins, are less willing to reduce their commission amount to satisfy the demands of a home seller.

~~111.~~112.    Zillow takes steps to hide the Hidden Zillow Fees from buyers and sellers. Zillow's webpage suggests that the Hidden Zillow Fees are paid out of escrow,[94] but this is not true. The Hidden Zillow Fees are actually paid by the buyer broker directly to Zillow, so that the buyer and seller are never made aware of it during the closing process.

~~112.~~113.    Zillow maintains recordings of all introductory calls between buyers and Zillow-affiliated agents who paid for their referrals. Upon information and belief, Zillow-affiliated agents on these calls do not readily disclose that they are not the listing agent.[95]

~~113.~~114.    Sales of referrals or "leads" to real estate agents are Zillow's primary source of revenues, which grew to over $2 billion last year. As sellers pay inflated commissions, and traditional real estate brokers experience declining revenues, Zillow revenues continue to grow. Real estate agent and commentator Jon Brooks further describes Zillow's deceptive business practices and referral fees as follows:

---

[94] *See Flex Compliance Policies & The Disengagement Process*, Zillow, https://www.zillow.com/z/flex-performance-terms/compliance/ (last visited Aug. 22, 2025). As previously noted, the website has since been changed.

[95] *See* Byron Lazine, *From Lead to Appointment: The Zillow Buyer Script that Works*, YouTube (Dec. 23, 2024), https://www.youtube.com/watch?v=Hcd2vROkyV0.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX





These referral fees are what make it so expensive for agents to operate in the market because there's 204 million unique active users on Zillow. . . .

Zillow continues to gobble up more and more and more of your money that you're paying in commissions, and you didn't even know about it when you clicked the button on Zillow. . . .

This is a ton of money—of your money—that you think is going to the real estate agent that's not going to the real estate agent or the

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

broker; it's going straight to Zillow off the top, and by the way, they have been raising these fees over time, as you can see that the top range actually increased it from 35% to 40%. . . .

Zillow is making just as much money as the agent is making and all Zillow is doing is selling your information to the real estate agent. . . .

Now where can you find the information of the agent who actually has the listing? So they are selling your information to the buyer agent; you're not getting in touch with the listing agent, the one who actually has the listing. The one who actually -- and this is where they hide it – it is the person right here. You need to call this number right there in order to get in touch with the real estate agent who actually has the listing and knows about the property. And this is one of the problems; it's hidden down a little bit on the page where you can barely find it.[96]



---

[96] *See* John Brooks, *Zillow's Hidden 40% Agent Fee is Costing You Big*, at 0:47, YouTube (June 4, 205), https://www.youtube.com/watch?v=QnDIi-JT1SA.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

~~114.~~115.       In truth, contrary to Jon Brooks's statement, the Zillow listings do not routinely even include the seller agent's phone numbers. Many times, it simply provides the agent's name, as excerpted below:



~~115.~~116.       Zillow charges Flex Agents up to 40% of their commission in exchange for the leads, and agents who are willing to pay this outsized fee are typically less skilled and experienced with real estate transactions. They are also less knowledgeable about the local residential real estate market than agents who are not willing to pay the fee. Thus, users are stuck with agents who offer inferior services for an inflated price.

~~116.~~117.       Ironically, Zillow promotes "independent representation" of buyers and sellers, while engineering a relationship such that the agents are entirely dependent on—and compromised by—Zillow. As the website states, "We strongly believe in the value of independent representation: Buyers and sellers deserve to work with an agent who is committed their best interests and only represents them."[97] This is plainly false; the agents effectively represent Zillow.

---

[97] *See* Zillow Premier Agent, *Zillow's New Touring Agreement Helps Agents Seamlessly Adjust to Industry Changes*, Zillow.com (Aug. 1, 2024), https://www.zillow.com/premier-agent/zillow-touring-agreement-nar-settlement/#state (last visited Aug. 22, 2025).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 43

117.118.      Through its Hidden Zillow Fees scheme, Zillow created a mechanism to aid and abet the breach of the agents' fiduciary duties to their clients. Under Oregon law, for example, a real estate agent representing a buyer has several duties, including an obligation to "act under a written representation agreement with the buyer. The representation agreement must (a) Be entered into before, or as soon as reasonably practicable after, the licensee has commenced efforts to assist the buyer in purchasing real property or in identifying real property for purchase[.]"[98] In addition:

(5) A buyer's agent owes the buyer, other principals and the principals' agents involved in a real estate transaction the following affirmative duties:

(a) To deal honestly and in good faith;

(b) To present all written offers, written notices and other written communications to and from the parties in a timely manner without regard to whether the property is subject to a contract for sale or the buyer is already a party to a contract to purchase; and

(c) To disclose material facts known by the buyer's agent and not apparent or readily ascertainable to a party.

(6) A buyer's agent owes the buyer involved in a real estate transaction the following affirmative duties:

(a) To exercise reasonable care and diligence;

(b) To account in a timely manner for money and property received from or on behalf of the buyer;

(c) To be loyal to the buyer by not taking action that is adverse or detrimental to the buyer's interest in a transaction;

(d) To disclose in a timely manner to the buyer any conflict of interest, existing or contemplated;

(e) To advise the buyer to seek expert advice on matters related to the transaction that are beyond the agent's expertise;

(f) To maintain confidential information from or about the buyer except under subpoena or court order, even after termination of the agency relationship; and

(g) Unless agreed otherwise in writing, to make a continuous, good faith effort to find property for the buyer, except that a buyer's agent is not required to seek additional properties for the buyer while the buyer is subject to a contract for purchase or to

---

[98] O.R.S. § 696.810(1).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 44

show properties for which there is no written agreement to pay compensation to the buyer's agent.[99]

118.119.    Zillow Flex Agents are violating their fiduciary duties in many respects, including by not disclosing their Hidden Zillow fees, and not exercising reasonable skill and care on behalf of the buyers.

**E.    Current and Former Flex Agents Confirm Zillow's RESPA Violations and Fraudulent Conduct**

119.120.    Current and former Flex agents, as well as bank loan officers, have confirmed that the allegations detailed in this Complaint are not isolated incidents, or the result of "rogue" agents. Instead, it is Zillow's deliberate policy to (1) trick potential buyers into believing that they are dealing with the seller's agent when they click the "Contact Agent" or "Request a Tour" button; (2) collect fees by charging Flex Agents up to 40% of their commission in exchange for the leads; and (3) steer clients to ZHL, even though Zillow knows—and the agents know—that the customers are receiving an inferior product at ZHL. The accounts of these agents are detailed below.

**1.    Confidential Real Estate Agent 1**

120.121.    Confidential Real Estate Agent 1 ("CA1") worked in the Zillow Premier Agent Flex program (as an agent and a team lead) from the Fall 2019 to Spring 2023 in the Southwest. CA1 was very successful in the program; during CA1's time in the Flex program, CA1 completed over $45 million in sales from Zillow referrals, resulting in over four hundred thousand dollars paid to Zillow in referral fees.

121.122.    According to CA1, Zillow tracked the performance of the agents participating in the Flex program through multiple metrics, including customer satisfaction, or "CSAT," and closed transactions (a/k/a "conversions").

122.123.    According to CA1, in 2023, Zillow introduced a new performance metric, "transfers to Zillow Home Loans," to its Flex agent partners. The new performance metric required Flex partners to refer buyers (who had been referred to the agent/team by Zillow) back to Zillow Home Loans during the home buying process, provided that the buyer in question had "opted-in" on

---

[99] O.R.S. § 696.810(5) & (6).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 45

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

the Zillow website to receive information from Zillow Home Loans. The requirement was for 25% of these leads to be referred to Zillow's lender through a "transfer" initiated by the agent through the Zillow Premier Agent app. The "opt-in" by the buyer was based on the pre-ticked box on the Zillow website, and was often unintentionally left there by buyers, who indicated that they had no interest in speaking with Zillow Home Loans.

123.124.    According to CA1, this performance metric (transferring buyers to Zillow Home Loans) became a central performance metric that was used to define which agents were allowed to continue participating in the Flex program (*i.e.*, who would continue to receive leads generating business income) and who would be dropped from the program.

124.125.    CA1 is and was familiar with RESPA and understands that RESPA prohibits giving anything "of value" in exchange for a referral of a settlement service, including residential mortgage loans. According to CA1, the ability to continue participating in the Flex program was undoubtedly something of substantial value.

125.126.    According to CA1, based on CA1's experience, including speaking with Zillow Home Loans loan officers, the rates offered by Zillow Home Loans were substantially higher than those of other lenders (often times by more than a full point). CA1 also knows this from the purchase of CA1's own house.

126.127.    CA1 was deeply uncomfortable with steering buyers to Zillow Home Loans, which CA1 believed were more expensive and not beneficial to the buyers. CA1 was dropped from the program because of CA1's "failure" to steer a sufficient number of buyers to ZHL.

127.128.    During CA1's participation in the Flex program, CA1 "failed" to comply with the performance requirement to transfer at least 25% of Zillow buyers who had "opted in" to Zillow Home Loans for a number of reasons. But the majority of the "opt in" buyers assigned to CA1 and CA1's team made it clear they had, in fact, not deliberately opted in to be contacted by Zillow Home Loans (but had rather failed to untick the pre-ticked box as an oversight). In addition, when CA1 discovered that the interest rates charged by ZHL greatly exceeded the interest rates offered by other

lenders (and thereby market rates), CA1 felt that it would be unethical and a violation of CA1's fiduciary duties to CA1's clients if CA1 encouraged his/her clients to use Zillow Home Loans.

128.129.    According to CA1, it was, and remains, Agent's 1's belief that Zillow is abusing the consumer trust that it has gained over the years to charge buyers excessive interest on its mortgage loans.

### 2.    Confidential Real Estate Agent 2

129.130.    According to a real estate broker in the mid-Atlantic region of the United States (Confidential Real Estate Agent 2, or "CA2") who has supervised a Zillow Flex Agent team as well as Premier Zillow agents, a prospective buyer on the Zillow website has "no idea" that they are not connecting with the listing agent. CA2 has had to access the Flex training program, and in training agents are encouraged not to reveal that they are buyer agents until they meet with the clients at the home. Agents are also encouraged to take buyers out to show them properties, even if the buyers are under contract with a different buyers' agent.

130.131.    According to CA2, buyers are completely unaware that many of the agents who receive a Zillow lead are new, newer, and/or completely inexperienced in the real estate market. Many of these agents are trained just to convert the Zillow referral (sometimes called a "lead") and get them in to show a property. According to CA2, these agents often know virtually nothing about the real estate process, have no understanding of the real estate contracts and addendum, and are woefully unequipped to properly represent these buyers. Their understanding of the real estate market often centers around converting as many leads as possible into home buyers, and converting home buyers into Zillow Home Loans customers, so they can keep the lead flow turned on. According to CA2, he/she has witnessed this "ineptitude" personally in his/her own transactions, as well as having to intervene as the Principal Broker in other transactions.

131.132.    According to CA2, Flex agents are facing increased pressure to steer buyers to ZHL; otherwise, they will lose their Flex status. As of now, they must meet a specific quota to retain their Flex status and lead flow. As a result, the buyers are receiving an inferior product, in that they are not being informed about loan programs that Zillow does not offer, including first time buyer

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 47

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

down payment assistance. As a whole, Zillow customers are receiving loans that could have higher costs and less benefits when compared to local lender products. This also affects buyers since it makes them less likely to win an offer when in a competitive bidding scenario.

### 3.    Confidential Real Estate Agent 3

132.133.    Confidential Real Estate Agent 3 ("CA3") has been in real estate and mortgage banking for over 25 years. CA3 is currently in the Zillow Flex program. According to CA3, Zillow is currently taking away leads provided via the Premier program and moving agents to the Flex program.

133.134.    According to CA3, Zillow only offers basic loans, and buyers need to have very good credit or they have difficulty getting pre-approved. Zillow also does not offer chattel loans (which are used, for example, for manufactured housing in trailer parks).

134.135.    According to CA3, Zillow is steering customers to Zillow Home Loans, with consistent threats to drop agents from the Flex program if they do not meet certain quotas. Through ZHL, buyers are paying more at the back end, at closing, than other loan programs.

### 4.    Confidential Real Estate Agent 4

135.136.    Confidential Real Estate Agent 4 ("CA4") has been a real estate agent for over six years in the mid-Atlantic region of the United States. CA4 is a team lead with over 10 agents on his/her team. CA4 has not participated in the Zillow Flex or Premier program but has seen and observed the impact of Zillow on the real estate industry.

136.137.    According to CA4, as a listing agent, CA4 spends considerable funds to prepare a listing, including staging the property and taking photos and videos of the property. Through MLS, and at CA4's expense, Zillow monetizes CA4's listing for free and diverts leads away from CA4 through its website to an agent that is often inexperienced and is incentivized to simply close the deal quickly, without real regard for the buyers' best interests. In contrast, CA4 follows the approach that "not every house has to close," and he/she doesn't push a buyer into buying a specific house.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

137.138.    According to CA4, buyers, to their detriment, trust the Zillow name and assume that they are getting connected with skilled and knowledgeable agents, which often is not true. Flex agents tend to be the least experienced because more established agents are not willing to pay up to 40% of their commissions to Zillow.

138.139.    According to CA4, Zillow's Flex program, which requires agents to pay up to 40% of their commissions to Zillow, makes it so that buyers' agents have no real flexibility to reduce their commissions to close a deal. Zillow Flex agents are incentivized to "turn and burn" leads, so that they can sell more houses to compensate for the high commissions paid to Zillow. The net effect is inflated commission. CA4, on the other hand, has more flexibility to shave off part of his/her commission to help soften the blow for clients.

139.140.    According to CA4, Zillow does not include all material information on its website, in order to encourage potential buyers to request a tour or contact an agent. For example, in the MLS, agents must indicate if a house is under contract and must indicate whether the sale is contingent on certain conditions. But Zillow does not disclose this information, because it wants buyers to express an interest (and provide their contact information), even if a property is under contract. According to CA4, through the presentation of the homes, Zillow is creating "clickbait" that Zillow monetizes at the expense of the buyer.

140.141.    According to CA4, most sellers will want to see the buyer use a local lender, and not a Zillow Home Loan. Zillow Home Loans sometimes does not run all the necessary credit checks, and it does not offer competitive rates on its loans.

### 5.    Confidential Real Estate Agent 5

141.142.    Confidential Real Estate Agent 5 ("CA5") has been in real estate since 2021 in California and worked as a Zillow "Flex" agent for two years. According to CA5, the Flex program is presented to certain high-achieving agents without any real option to decline. He/she is no longer in the Flex program, for reasons provided below.

142.143.    According to CA5, many home buyers are caught off guard when meeting with Zillow Flex Agents in person, because they were unaware that the agents are a buyers' agent

and not the listing agent. According to CA5, in training Zillow teaches agents during the initial phone call to avoid any conversation about whether the agents are buyers' agents, and—if customers do ask about it—to brush it off as unimportant.

143.144.      According to CA5, Zillow's commission structure violates RESPA because, under the law as CA5 understands it, a referral fee can only be paid to a licensed agent, and Zillow is not a licensed agent.

144.145.      According to CA5, beginning in 2022, Zillow has been adamant that agents should send leads to Zillow Home Loans. CA5 believed that this also violated RESPA, but was told to not worry about it because, if this was Zillow's policy (which had been vetted by lawyers), then it must be fine. But CA5 had his/her own loan officers that he/she liked to use and did not think ZHL was a good deal for his/her clients. In particular, CA5 stated that, in his/her experience, ZHL has higher fees and higher interest rates. ZHL would "cherry-pick" the clients to get the best and easiest clients, and disregard or drop clients that required more work. CA5 believed that the pressure to steer clients to ZHL violated CA5's fiduciary duties and, as a result, CA5 quit the Flex program.

145.146.      According to CA5, the net effect of Zillow's policies is to keep commissions inflated. Since Flex agents need to pay up to 40% of the agent's commission to Zillow, they are less willing to give up a quarter or half a point of their commission to close the deal.

**6.      Confidential Real Estate Agent 6**

146.147.      Confidential Real Estate Agent 6 ("CA6") has been a real estate agent for about 10 years in the Mountain West area of the United States. CA6 has been on a Flex team since the year 2020.

147.148.      According to CA6, although Zillow does not put it in writing, Zillow's representatives tell agents in the Zillow Flex and Premier programs that they need to steer clients to Zillow Home Loans, and that the more clients agents steer to Zillow Home Loans, the better their leads will be. Zillow also has certain minimum quotas that the agents must meet, or they are kicked out of the program.

148.149.    According to CA6, the net effect of the commissions agents must pay to Zillow is to keep commissions inflated. Typically, a buyer's agent might be willing to reduce his or her commission to help the buyer with closing costs, but Zillow Flex agents have no real room or flexibility to do so given the payments of up to 40% of commissions going to Zillow. According to CA6, Zillow also discourages agents from reducing their commissions; "why didn't you get more?" would be Zillow's response if CA6 reduced his/her commission. In addition, according to CA6, Flex agents must pay the referral fee to Zillow if the agent is involved in the future sale of the property at issue, for up to two years.

149.150.    According to CA6, Zillow coaches agents on what to say, including not volunteering during the first phone call that the Zillow agent is the buyer's agent (and not the listing agent). Agents are also taught to tell clients that it is not in their best interest to contact the listing agent directly.

150.151.    According to CA6, Zillow Home Loans sends out inaccurate and misleading closing schedules, which it does frequently. For example, to secure the business, ZHL will release a closing schedule that does not include all the closing costs. At closing, the buyer has the choice to either pay the costs that were not disclosed or walk away from the deal. CA6 had a buyer who got upset with CA6 when this occurred, even though the figures came from ZHL. If CA6 complained, Zillow would reduce his/her leads.

**7.    Confidential Real Estate Agent 7**

151.152.    Confidential Real Estate Agent 7 ("CA7") has been a realtor for over 20 years in the Mountain West region of the United States and is intimately familiar with the Zillow Flex program. According to CA7, after a buyer visits Zillow.com and expresses an interest in a property, a Zillow-affiliated agent will receive the referral and tell potential buyers that they are the listing agent, or that they work for the listing agent, or that it is "against the law" to work directly with the seller. According to CA7, if the agent does not proceed as if they are the listing agent, the agent's conversion rate (converting leads into deal) reduces greatly. The Flex agent will not receive any more leads if he/she does not convert leads into deals.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

152.153.    According to CA7, he/she has had several instances in which the buyer's agent (the Zillow-affiliated agent) told CA7's client (the seller) that the Zillow agent worked for CA7, because the Zillow agent showed the house to the buyer. In one example, a seller client told CA7 that a buyer was trying to reach CA7 to see the house but instead was connected to a Zillow agent. CA7 confirmed with the Zillow agent that the buyer was redirected on purpose to the Zillow Flex agent. The person who showed them the house (and eventually wrote the offer) falsely said that CA7 was busy and that he/she was one of CA7's associates.

153.154.    According to CA7, he/she knows several Zillow Flex agents who have been told, "do not ever discuss the referral with consumers and don't disclose it."

154.155.    According to CA7, the commissions paid to Zillow by the Zillow Flex agents are kept hidden from the consumers, and they are not included in the closing documents. Sometimes the title company wires the money directly to Zillow, or pays the broker who then pays Zillow, without the consumers ever knowing. According to CA7, they are doing this on purpose, because if they disclosed the commissions paid to Zillow, consumers would say, "why are we paying this much money to this company that doesn't do anything? Why are we paying all this when we could use it to buy down the rate or pay for repairs?" CA7 knows this because, based on CA7's experience, when referral fees are included in the closing documents, the customers wanted to know why this company was getting paid, and often wanted to challenge it.

155.156.    According to CA7, the large commissions paid to Zillow are hurting home buyers, because the agents have no flexibility to agree to a lower commission. The $5,000 to $15,000 that could be shaved off the purchase price can often make the difference between getting the house or losing it to another buyer. According to CA7, none of these buyers would use these agents if they knew they were paying this referral—they would instead contact the seller agent directly or use another agent. The large commissions paid to Zillow put the buyers at a distinct disadvantage when trying to buy a house.

156.157.    According to CA7, if the consumer had the option of going directly to the seller or listing agent, the consumer would "absolutely" get a better deal and lower costs. And if the

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

buyer's agent knew the buyer could access the listing agent, it would stop buyer's agents from charging "outrageous" commissions as they are doing now. According to CA7, Zillow's dominance of the market and deceptive practices is part of the reason why commissions remain high.

157.158.　　According to CA7, beginning at least as early as 2019, Zillow representatives were pressuring CA7 to push clients to use Zillow's products, including Zillow Mortgage. Zillow representatives told CA7 that CA7 needed to push these products, including Zillow Mortgage, and if not, CA7's leads would dry up. CA7 also knows that other agents were facing similar pressure during that time period.

158.159.　　According to CA7, Zillow agents now visit Flex Agents in person, so that they can talk about the performance metrics (including the rate at which agents steer clients to ZHL) without putting anything in writing.

### 8. Confidential Real Estate Agent 8

159.160.　　Confidential Real Estate Agent 8 ("CA8"), who is from the southeastern part of the United States, was recently a Flex Agent, but was removed from the program because CA8 refused to refer customers to ZHL based on CA8's belief that ZHL does not serve the best interests of potential buyers. If an agent does not get 10% or more of his/her clients to obtain a pre-approval letter from ZHL, the agent is dropped from the program. But the 10% figure is hard to reach because a substantial number of the clients did not see that the "Get financial information" box was pre-checked.

160.161.　　According to CA8, ZHL offers loans with higher interest rates compared to others on the market. CA8 has had the experience of seeing potential buyers get offers from ZHL that are nearly one percent higher than what other loans offered.

161.162.　　CA8 believed that steering customers to ZHL in exchange for something of value (leads on buyers) was a clear RESPA violation. When CA8 refused to steer clients to ZHL, CA8 was told that he/she was not a "team player."

162.163.　　CA8 was previously a very successful agent, with about $15 million in sales last year. But CA8 was dropped from the program simply because CA8 refused to violate the law.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 53

163.164.    CA8 provided the following screenshots that show how Zillow monitors and coerces agents into referring clients to ZHL:

✅ **All your Flex contacts are up to date!**

You are eligible to receive new Flex connections. Keep up the great work!

❗ **Your connections are limited**
Get **1 more pre-approval** to move up to Fair and earn more connections.

164.165.    CA8 also shared screenshots demonstrating that, if asked directly about loan packages that ZHL does not offer, like Down Payment Assistance programs, Zillow trains agents to avoid the question and refer them to ZHL anyway, despite the obvious conflict with the client's interests:

- #3. What if they need a DPA product, VA loan or jumbo product?
  - Inform them that Zillow Home Loans offers a variety of competitive products for all client needs. Let them know you will connect them with your dedicated loan officer who will walk them through their loan options and pre-approval steps.

### 9.    Confidential Real Estate Agent 9

165.166.    Confidential Real Estate Agent 9 ("CA9") has been in real estate for over 35 years in the New York/New Jersey area. According to CA9, potential buyers are being duped into

signing an agreement with a buyer's agent, before seeing the property, which means that the buyers are locked into using the first agent they signed up with—often thinking that the agent was the listing agent. The buyer's agent is often an agent who has paid Zillow to promote them as a "premier agent," with no verification of experience. As a listing agent, CA9 often gets the chance to communicate and deal directly with the buyers. But, according to CA9, Zillow deceives the public and deprives them of an opportunity to connect with the listing agents.

166.167.    According to CA9, as a result of the payments buyers' agents need to pay Zillow, the buyers pay more for the house because the agents' "hands are tied"; they have less room to maneuver in reducing their commissions to close the deal because of the large percentage they owe to Zillow.

### 10.    Confidential Real Estate Agent 10

167.168.    Confidential Real Estate Agent 10 ("CA10") is a real estate agent in the Midwest who worked on a Zillow Flex team for nearly two years. According to CA10, nearly all of the customers who requested a tour or an agent on Zillow.com thought the Flex agents were the listing agent, based on the design of the app and website.

168.169.    According to CA10, Flex agents are pushed aggressively by Zillow to use ZHL, and—if agents do not steer clients to ZHL—they will receive fewer leads or be cut from the program. CA10 believes this clearly violates RESPA. In addition, ZHL often failed to fully disclose fees. Partly for this reason, and consistent with an agent's fiduciary duties, CA10 would encourage his/her clients to use another lender.

169.170.    According to CA10, Zillow now avoids written or recorded communications as part of its training program. Instead, Zillow flies their people out to Flex team offices to avoid putting anything in writing, which CA10 regards as "shady" and "just not right."

170.171.    According to CA10, the "blue badge" on agents' profiles was misleading to consumers and did not reflect experience or performance. The "blue badge" only meant the agent was part of the program. According to CA10, the problem was that average customers believe they are getting a "superstar," but in reality they could get an agent that has never sold a house before.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 55

**11.    Confidential Loan Officer 1**

~~171.~~172.        According to Confidential Loan Officer 1 ("LO1"), a licensed mortgage loan officer in the Pacific Northwest with more than 30 years of experience in the real estate and mortgage industry, the loan products and lending practices of Zillow Home Loans are consistently substandard compared to those offered by traditional lenders and independent mortgage professionals.

~~172.~~173.        ***Limited Loan Programs and Misrepresentation of Options.*** According to LO1, Zillow Home Loans offers only a narrow range of loan products, which often prevents buyers from obtaining the most advantageous financing available. For example, Zillow does not participate in or disclose the existence of Down Payment Assistance programs, which are critical for helping many first-time and moderate-income buyers achieve homeownership. By failing to inform clients about these options, Zillow effectively steers buyers into higher-cost loans or disqualifies them altogether from purchasing.

~~173.~~174.        According to LO1, Zillow also does not offer USDA loans for eligible rural borrowers, and the VA loan programs, and it frequently carries higher interest rates and additional fees than comparable VA products offered through other lenders. In several cases observed by LO1, borrowers who initially began with Zillow were able to obtain significantly better terms after transferring their loans to LO1's company.

~~174.~~175.        Additionally, according to LO1, Zillow does not provide non-conforming or specialized loan products, which are often necessary for self-employed borrowers or those with complex financial profiles. In today's market, this limitation excludes a large portion of qualified buyers who would otherwise be able to obtain financing.

~~175.~~176.        ***Lack of Transparency and Inaccurate Disclosures.*** According to LO1, and based on LO1's professional experience, Zillow loan officers frequently misrepresent or omit important details regarding the borrower's true costs at closing. In one documented instance, a Zillow representative offered a rate that appeared lower than LO1's competing quote; however, the Zillow quote understated the property tax obligations associated with the home purchase. The buyer later discovered the true tax costs were substantially higher, leading to unexpected expenses and potential

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

risk of losing the transaction. According to LO1, the Zillow loan officer involved in that transaction was not licensed in the same state where the property was located and was unfamiliar with that state's tax structure and lending requirements—an issue that LO1 notes is common among Zillow's remote lending staff.

176.177.    ***Targeting Only "Easy" Borrowers.*** According to LO1, Zillow's business model appears focused on quickly closing loans for highly qualified borrowers while abandoning applicants who present any complexity—such as moderate credit, higher debt-to-income ratios, or non-traditional income sources. According to LO1, and based on LO1's experience and conversations with industry colleagues, Zillow's system emphasizes speed and volume over borrower advocacy, often leaving more challenging clients without proper guidance or access to suitable loan alternatives.

177.178.    ***Inexperienced Staff and Incentive-Driven Culture.*** According to LO1, Zillow employs inexperienced loan officers, often paying them substantially below industry standards. Their compensation is structured around loan volume, incentivizing them to process as many applications as possible rather than ensuring that each client receives accurate, personalized, and compliant guidance. This approach leads to poor communication, inaccurate disclosures, and inconsistent client service.

178.179.    ***Coercive Steering Practices and Agent Mandates.*** According to LO1, Zillow is now forcing its Premier Agents to convert into the Flex Program. Under the Flex Program, Zillow mandates that at least one out of every five buyer leads must close through Zillow Home Loans. Agents who fail to meet this quota or who decline to participate in the Flex program altogether are removed from Zillow's lead distribution system and terminated from the program.

179.180.    According to LO1, this requirement effectively coerces agents to steer their clients toward Zillow's inhouse lending arm, regardless of whether the loan is the most suitable or cost-effective option for the buyer. In LO1's professional opinion, this practice creates a serious conflict of interest, undermines consumer choice, and violates fundamental ethical and fiduciary obligations owed by real estate professionals to their clients.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 57

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

### 12.    Confidential Loan Officer 2

181.    Confidential Loan Officer 2 ("LO2") has been working in the mortgage loan industry for over 10 years in the American Southwest and works extensively with Zillow-affiliated agents (including Zillow Flex Agents). According to LO2, Zillow only provides loans to customers with "Grade A paper"—meaning those who have a top credit score and do not pose any substantive risk. Zillow does not loan to potential buyers with lower scores, nor does Zillow offer jumbo loans, assistance to first time home buyers, or loans for fabricated homes, among other things.

182.    According to LO2, since 2022, Zillow has been requiring agents to steer clients to Zillow loan officers, and steering customers away from loan officers (like LO2) with proven track records and a history of success in closing real estate sales. According to LO2, Zillow loan officers are often less experienced and less knowledgeable than other officers, and less successful in closing deals, leading to many frustrated buyers who cannot close with a Zillow Home Loan.

183.    According to LO2, Zillow's steering efforts begin when a potential buyer is on Zillow's website and signs up for a tour (or selects "Contact Agent"), and the box indicating the buyer's interest in "financing" is pre-checked. According to LO2, many times the buyer does not see the pre-checked box and has no interest in getting financing information from Zillow. Other times, the buyers may have an interest in "financing," but not necessarily through Zillow Home Loans. In either case, however, according to LO2, Flex agents tell these buyers that the agents have no choice but to refer them to Zillow Home Loans because the buyers did not uncheck the pre-checked box—a direct acknowledgement that the agents are steering potential buyers to Zillow Home Loans.

184.    According to LO2, the agents are measured and judged based on metrics created by Zillow that capture how many clients that supposedly expressed an interest in "financing" are pre-approved for a loan by Zillow Home Loans. Zillow then threatens to remove, and does remove, Zillow Flex agents who fail to meet Zillow's 10% quota. But the 10% quota is even harder to meet because a great number of those buyers never had an interest in "financing," or Zillow Home Loans, in the first place. Nevertheless, according to LO2, even if the agents are otherwise high

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

performers and skilled at their jobs, they are terminated from the program if they do not steer enough clients to Zillow Home Loans.

184.185.    According to LO2, Zillow also requires Zillow-affiliated agents to use its Customer Relationship Management ("CRM") software called Follow-Up Boss. Agents must pay to use this software, which provides a phone number for the agents to use when they communicate with their clients through a Follow-Up Boss app. According to LO2, Zillow uses the Follow-Up Boss app and software to actively monitor the Zillow Flex Agents, to make sure that they are following the scripts and rules that Zillow imposes. The Follow-Up Boss software captures agents' communications with their clients, including phone calls and text messages. According to LO2, this is a violation of an agent's fiduciary duty to his/her clients to keep this information confidential. Zillow is not the agent and should not be privy to the clients' confidential information. The Follow-Up Boss also only offers Zillow Home Loans as an option for a buyer looking for financing.

185.186.    According to LO2, part of the effect of Zillow monitoring all communications is that Zillow's loan officers can identify cases in which the Zillow Flex agents are recommending loan officers who are not with Zillow. In those cases, Zillow loan officers ask Zillow Flex agents why the clients are not being referred to Zillow Home Loans. According to LO2, much like the Zillow Flex agents, the Zillow loan officers are not particularly skilled or experienced, are paid a small salary, and earn only small commissions on each loan they close. As a result, the incentive is for the loan officers (just like the Zillow Flex agents) to churn through as many loans as possible and only take on clients that will be easy to get approved.

186.187.    However, according to LO2, the loan officers often tell the Zillow-affiliated agents to not refer certain clients to them because they can see that the clients are either not interested in Zillow Home Loans or pose too much of a credit risk. Just like with the Zillow Flex agents, Zillow loan officers need to close on a certain percentage of clients that are referred to them, and Zillow loan officers do not want "bad" leads that make it more difficult for the loan officers to make their numbers.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

187.188.     According to LO2, agents now fear Zillow, and Zillow is monetizing that fear and violating RESPA in the process. According to LO2, the purpose of RESPA was to create an open and free market. Yet, according to LO2, the net effect of Zillow's policies is to force Zillow-affiliated agents to steer clients to Zillow Home Loans, regardless of whether this is in the clients' interests. According to LO2, the success of Zillow's program is evident in looking at Zillow's performance compared with the market overall.

188.189.     According to LO2, the effect of Zillow's policies is to make it more difficult for Zillow Flex agents to agree to a reduction in their commission in order to cover closing costs and seal the deal. Buyers no longer have wriggle room to seek a lower buyer agent commission because the Zillow Flex agents have to pay up to 40% to Zillow.

189.190.     In the end, LO2 paid a great deal of money to Zillow for leads on mortgages for several years, but—starting in 2022—Zillow turned on LO2 by steering clients away from him/her. LO2 had great success with Zillow's referral program because LO2 was skilled at closing loans and had developed a strong reputation in the industry. But Zillow now steers clients away from LO2 and toward loan officers that are not skilled or knowledgeable, and not able to effectively serve the buyers' interests.

**F.     Defendants' Anti-Competitive Conduct**

190.191.     The harmful effects of Zillow's fraudulent conduct are exacerbated and amplified by its abuse of its dominant position to monopolize as many listings as possible. On April 10, 2025, Zillow announced that it would be implementing the Zillow Listing Access Standards (the "Zillow LAS"). Under this program, agents must list any properties on MLS (which thereby get routed to Zillow) within 24 hours of any effort by the seller's agent to sell the property. This includes, for example, yard signs, virtual tours, or social media posts.[100] If the agents do not list their properties

---

[100] *See Zillow's Listing Access Standards: What Agents Need to Know*, Zillow (May 20, 2025), https://www.zillow.com/premier-agent/agents-know-listing-access-standards/ (last visited Aug. 22, 2025). Zillow previously defined "public marketing" to mean: (i) "promoting, marketing, or advertising a listing in any manner," including without limitation, "flyers, yard signs, social media, public-facing websites or apps, emails, printed mailers, newspapers, open houses, previews, showings, multi-brokerage listing sharing networks, virtual tours, and brokerage private listing networks to the extent such listing network is publicly marketed and/or accessible to consumers, including those accessible only to a brokerage's clients behind a registration wall" and/or (ii) sending and/or transmitting a Listing, regardless of status, to an MLS, unless seller opts out of the display of the Listing everywhere on the internet due to privacy concerns, and executes a Seller Waiver (as defined below). *Id.*

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 60

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

within 24 hours, they are sent warnings of non-compliance. According to Zillow, "[e]ach non-compliant listing will be logged as a single violation and the listing agent will be notified directly on each violation."[101]

191.192.    Critically, *every single post* is a violation, and "an agent's third non-compliant listing—and any subsequent non-compliant listings—will be blocked from Zillow and Trulia for the life of the listing agreement between that listing broker and seller." *Id.* The practical effect of this conduct is that sellers and their agents are forced to list through Zillow via the MLS within 24 hours of putting out any public information about the property for sale. The purpose and effect of this policy is to ensure that all houses, throughout the country, will be listed on Zillow so that Zillow can maintain and grow its monopoly and continue to unjustly earn profits through its fraudulent practices.

192.193.    Zillow's efforts to capture the whole market are made more insidious because Zillow slaps the homes for sale with a "Zestimate" (Zillow's estimate of the sale price of the home), which is often inaccurate and is contrary to the seller's interest. Zillow acknowledges in fine print that "[t]he amount of data we have for your home and homes in your area directly affects the Zestimate's accuracy, including the amount of demand in your area for homes."[102]

193.194.    Without the deceptive practices, more home buyers would connect directly with listing agents and avoid the Hidden Zillow Fees. Due to Zillow's deceptive practices, more buyers use buyer agents than they otherwise would, which results in higher buyer broker commissions and correspondingly higher purchase prices. Neither Zillow nor the participating real estate agents disclose to the buyer that Zillow collects up to 40% of the commissions that the seller pays to the buyer broker.

---

Like other Zillow websites, this one has been changed since the filing of the litigation, although the changes did not materially narrow Zillow's definition of "public marketing." *See Zillow's Listing Access Standards: What Agents Need to Know*, Zillow (Sept. 24, 2025), https://www.zillow.com/premier-agent/agents-know-listing-access-standards/ (last visited Dec. 22, 2025).

[101] *Zillow's Listing Access Standards: What Agents Need to Know*, Zillow (Sept. 24, 2025), https://www.zillow.com/premier-agent/agents-know-listing-access-standards/ (last visited Dec. 22, 2025).

[102] *What is a Zestimate?*, Zillow, https://www.zillow.com/z/zestimate/ (last visited Aug. 22, 2025).

Zillow has since removed this acknowledgment from the cited webpage. The current version omits any reference to market demand or exposure affecting Zestimate accuracy, instead attributing accuracy primarily to data availability and modeling techniques. *See What is a Zestimate?*, Zillow, https://www.zillow.com/z/zestimate/ (last visited Dec. 19, 2025).

**G.      Defendants Confirmed Their Partnership After This Lawsuit Was Filed**

194.195.      Following the filing of the Amended Class Action Complaint on November 19, 2025, which included three named broker firms, Zillow sent out an urgent message to its real estate "partners" promising to enter into Joint Defense Agreements and protect them from any litigation. Zillow's announcement of a "partnership" relationship made explicit what had previously been implicit: the agents and brokerage firms work for Zillow. And Zillow, faced with a risk to its business model, took the legal risk to acknowledge the "partnership" (or enterprise) that has formed.

195.196.      On or about December 4, 2025, Zuhairah Washington, the Senior Vice President & General Manager of Zillow Preferred, sent a message to "Zillow Preferred Partners" that was blatantly inconsistent with Zillow's actual conduct, and that pleaded with real estate agents to stand with Zillow. It read as follows:

> I know there's been a lot of conversation about the recent lawsuits and headlines surrounding Zillow Preferred these last few weeks, and many of you have reached out with thoughtful questions about what it means for your teams and your business. I appreciate that, and I wanted to connect with you directly. I've recorded a short video that I hope brings clarity and reassurance. . . .
>
> We value your partnership deeply, and we're committed to navigating this moment and whatever comes next — together.

196.197.      The video referenced by Ms. Washington stated in part as follows:

> I wanted to take a moment to speak with you directly about the recent lawsuits and headlines surrounding Zillow Preferred and what they mean for you. I know this has created concern and uncertainty. I've also heard your questions about risk stability and how this moment might impact your teams and your business. . . .
>
> Everything we do starts and ends with the consumer. Buyers and sellers deserve choice and who they work with and transparency throughout the process. And that has been core to our model from day one. . . .
>
> What matters most is supporting you, protecting your business, and ensuring we continue to operate in a way that's compliant, transparent, and squarely centered on consumer choice. *We've already connected with the name partners and will be supporting them through this process. And for any partner who is named in either of these suits, we plan to enter into a joint defense agreement. We will vigorously defend against these claims*. . . .

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

> You rely on us not just to deliver high intent connections, but to do so in a way that protects you, your business, and your clients. And while I can't predict every twist and turn that comes with litigation, I can tell you this with confidence. ***Zillow will support and stand by our partners throughout this process***. . . .
>
> More than anything, I want you to know how much we value your partnership. Zillow only succeeds when you do and we are committed to standing by with you through moments of industry uncertainty and beyond. ***Thank you for your continued partnership***.[103]

This message is also available on Zillow's Agent Resources webpage.[104]

197.198.    Right on cue, in this litigation, the same counsel entered an appearance for all three real estate defendants, despite the potential conflict of interest among those defendants.

## H.    Zillow's Choice of Law Clause

198.199.    According to Zillow's "Terms of Use," Washington State law applies to any disputes between Zillow and its users.[105]

## V.    CLASS ACTION ALLEGATIONS

199.200.    Plaintiffs Alucard Taylor, Araba Armstrong, Han Zheng, David Liao, Karen King, Lisa Knudson, Eydalia Thurston, Kyle Silva, Dale Koger, John Cady, and Rebecca Brucaliere, and Furgus Wilson bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of the following nationwide Class based on violations of RICO, RESPA, the Washington CPA, and the law of unjust enrichment and fiduciary duty:

> All persons and entities in the United States who, since October 1, 2018, purchased a home listed on Zillow.com, and were represented by a Zillow agent.

200.201.    Plaintiffs also bring this action on behalf of the following Subclass (the "Steering Subclass") based on violations of RESPA Section 8(a), 12, U.S.C. § 2607(a):

> All persons and entities in the United States who, since October 1, 2018, (i) purchased a home listed on Zillow.com, and were

---

[103] *See* ZillowForAgents, *A message from Zuhairah Washington*, YouTube (Dec. 5, 2025), https://www.youtube.com/watch?v=IOH79YJ3YS0.

[104] *A message from Zillow Leadership*, Zillow (Dec. 5, 2025), https://www.zillow.com/agents/message-zillow-leadership/?msockid=1d7b21f294f76a382a0437bd95336b81 (last visited Dec. 23, 2025).

[105] *See Zillow Terms of Use*, Zillow (May 20, 2025), https://www.zillow.com/z/corp/terms/ (last visited Sept. 18, 2025).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 63

represented by a Zillow agent; and (ii) used Zillow Home Loans to finance the purchase.

201.202.    Excluded from the Class and Steering Subclass are Defendants, their officers, directors and employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officers presiding over this action and the members of their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

202.203.    The Class and Steering Subclass may be readily identified based upon publicly available property transactions and Zillow's business records.

203.204.    The Class and Steering Subclass members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class and Steering Subclass have at least tens of thousands of members, the exact number and their identities being known to Defendants.

204.205.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and Steering Subclass. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class and Steering Subclass.

205.206.    Common questions of law and fact exist as to all members of the Class and Steering Subclass and predominate over questions affecting only individual Class and Steering Subclass members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

 a. Whether Defendants engaged in the alleged conduct;

 b. Whether Defendants' conduct violated RICO and RESPA;

 c. Whether Defendants engaged in a pattern or practice of racketeering;

 d. Whether Defendants' acts or omissions were unfair or deceptive in violation of the Washington CPA, including whether they had a substantial capacity to mislead reasonable consumers regarding the independence of participating agents or the neutrality of Zillow's platform;

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 64

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

e.  Whether Defendants' failure to disclose the financial incentives, quotas, and conflicts inherent in their lead-distribution system constitutes an unfair or deceptive act or practice that offends established public policy;

f.  Whether Defendants aided and abetted breaches of fiduciary duty by real estate agents who, because of Defendants' incentive structures and monitoring systems, steered clients to Zillow Home Loans rather than acting solely in those clients' best interests;

g.  Whether the conduct of Defendants caused injury to the business or property of Plaintiffs and the other members of the Class and Steering Subclass;

h.  Whether the effect of Defendants' conduct was to inflate both total commissions and buyer broker commissions that increased the buyer's purchase price;

i.  Whether Plaintiffs and the other members of the Class and Steering Subclass are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

j.  Whether Defendants' conduct led to their unjust enrichment;

k.  Whether Defendants' conduct is unlawful; and

l.  The appropriate class-wide measures of damages.

206.207.    Plaintiffs' claims are typical of the claims of the members of the Class and Steering Subclass because their claims arise from the same course of conduct by Defendants, and the relief sought within the Class and Steering Subclass is common to each member. There are no defenses available to Defendants that are unique to Plaintiffs or to any particular Class and Steering Subclass members.

207.208.    Plaintiffs will fairly and adequately represent and protect the interests of the Class and Steering Subclass, have no interest incompatible with the interests of the Class and Steering Subclass, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

208.209.    A class action is the superior method for the efficient adjudication of this litigation because individual litigation of Class and Steering Subclass members' claims would be

impracticable and individual litigation would be unduly burdensome to the courts. Because of the size of the individual Class and Steering Subclass members' claims, no Class or Steering Subclass member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class and Steering Subclass would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

209.210.    Additionally, the Class and Steering Subclass may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.   The prosecution of separate actions by individual Class and Steering Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class and Steering Subclass members that would establish incompatible standards of conduct for Defendants;

    b.   The prosecution of separate actions by individual Class and Steering Subclass members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class and Steering Subclass members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

    c.   Defendants have acted or refused to act on grounds generally applicable to the Class and Steering Subclass, thereby making appropriate final and injunctive relief with respect to the Class and Steering Subclass members as a whole.

## VI.    TOLLING OF THE STATUES OF LIMITATIONS

210.211.    As of the date of this Complaint, Zillow still does not disclose on its website whether Zillow-affiliated real estate agents are Zillow "Flex" agents. More importantly, Defendants

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 66

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

and its affiliated agents at no point disclose the existence of the Hidden Zillow Fees to buyers or sellers during the property transaction. There was no reasonable way for the public, including Plaintiffs, to know that Zillow Flex agents were involved in their transactions, and certainly no reasonable way for the public and Plaintiffs to know about the payment of the Hidden Zillow fees. Indeed, Defendants concealed these facts from buyers and sellers.

211.212.    Plaintiffs and Zillow.com users further had no way of knowing about Zillow deceptive conduct generally, including the deceptive design of Zillow's website. As a result, Plaintiffs and other members of the public did not discover and reasonably could not have discovered Zillow's fraudulent conduct and receipt of hidden fees. Any applicable statues of limitations or repose are accordingly tolled.

212.213.    In addition, Defendants do not disclose to potential buyers that Zillow Flex agents are required to steer buyers to ZHL. (Indeed, Defendants conceal the very identity of Zillow Flex agents.) There was no reasonable way for the public, including Plaintiffs, to know that Zillow required Flex agents to steer buyers to ZHL, which offers a substandard product. There was also no way for the public, and Plaintiffs, to know that Zillow agents were being trained by Zillow personnel, in person, without putting it in writing, on the requirements to meet certain steering benchmarks. As a result, Plaintiffs and other members of the public did not discover and reasonably could not have discovered Zillow's RESPA violations. And applicable statutes of limitations or response are accordingly tolled.

## VII.    CLAIMS FOR RELIEF

### CLAIM I

**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
18 U.S.C. § 1962(c)-(d)
(On behalf of the Nationwide Class, against All Defendants)**

213.214.    All Plaintiffs (Plaintiffs Taylor, Armstrong, Zheng, Liao, King, Knudson, Thurston, Silva, Koger, Cady, and Brucaliere, and Wilson) incorporate and reallege the foregoing factual allegations by reference.

214.215.    All Plaintiffs bring this claim for themselves and on behalf of the Nationwide

Class against Defendants.

215.216.        Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

216.217.        Plaintiffs are entitled to a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his [or her] business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).

217.218.        Each Defendant is liable under 18 U.S.C. § 1962(c) because it conducted or participated in the conduct of the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity. Each Defendant is also liable under 18 U.S.C. § 1962(d) because it conspired to violate 18 U.S.C. § 1962(c).

218.219.        As a direct and proximate result of Defendants' fraudulent scheme and common course of conduct described throughout this Complaint, Defendants were able to extract hundreds of millions, if not billions, of dollars from Plaintiffs and Class Members, who suffered substantial injury to their business and property.

**A.      The Zillow Fraudulent Business Enterprise**

219.220.        At all relevant times, each Defendant has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, a "legal or beneficial interest in property."

220.221.        Each Defendant conducted and participated in the affairs of an association-in-fact enterprise as defined in 18 U.S.C. § 1961(4) (hereinafter the "Zillow Fraudulent Business Enterprise").

221.222.        The Zillow Fraudulent Business Enterprise has consisted of legally distinct entities and individuals, including Zillow, Inc., Zillow Group, Inc., Zillow Homes, Inc., Zillow Listing Services, Inc., Zillow Home Loans, LLC, Works IndustriesEXP Realty, LLC, GK Properties, Real Broker, LLC, the Frano Team, and other individuals and entities, including unknown third parties, who coordinated their conduct to fraudulently induce home buyers to use Zillow Flex agents and to illegally steer buyers to Zillow Home Loans, as alleged above.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

222.223. The Zillow Fraudulent Business Enterprise was and continues to be characterized by a common purpose, maintained relationships among the members of the Zillow Fraudulent Business Enterprise, and sufficient longevity to pursue and accomplish the common purpose thereof.

### 1. Common Purpose

223.224. The Zillow Fraudulent Business Enterprise was formed and operated for the shared and continuing purpose of monetizing buyer-side real estate transactions by (a) misleading prospective home buyers into believing they were contacting listing agents, (b) routing buyers to Zillow-affiliated Flex agents subject to commission-sharing obligations, and (c) steering buyers to Zillow Home Loans, all for the financial benefit of the members of the enterprise.

### 2. Relationships among enterprise members

224.225. Members of the Zillow Fraudulent Business Enterprise maintained ongoing, structured, and interdependent relationships, each performing a distinct but coordinated role in furtherance of the enterprise's common purpose.

225.226. The Zillow Defendants, acting collectively through their affiliated entities, designed, implemented, and enforced the enterprise's rules and incentives, including but not limited to website design and lead-routing mechanisms, agent participation and commission-sharing requirements, and mortgage referral and origination processes.

226.227. The Real Estate Defendants—licensed real estate brokerages and brokerage teams—integrally participated in the enterprise by enrolling in Zillow's Flex program; accepting and distributing Zillow-generated buyer leads to affiliated agents; requiring agents to comply with Zillow-mandated referral, steering, and commission-sharing practices; and supervising agent conduct within Zillow-controlled platforms and workflows. Through this participation, the Real Estate Defendants enabled and managed the scaled execution of Zillow's fraudulent scheme.

### 3. Ongoing Organization and Longevity

227.228. The Zillow Fraudulent Business Enterprise is characterized by ongoing relationships among its members. Most notably, Zillow's personnel and executives worked with

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 69

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Zillow Flex agents, including the Zillow Flex agents who work for the Real Estate Defendants, to fraudulently induce prospective home buyers into using Zillow Flex agents and illegally steer buyers into using Zillow Home Loans.

228.229.    These efforts to maintain and strengthen these ongoing relationships continue to this day. As summarized in § IV.G, *supra*, on December 4, 2025, Zillow sent a message to its "Zillow Preferred Partners" promising them that Zillow was "committed to navigating this moment and whatever comes next – together." Zillow also stated that "we've already connected with the name partners [the Real Estate Defendants] *and will be supporting them through this process*. *And for any partner who is named in either of these suits, we plan to enter into a joint defense agreement*. We will vigorously defend against these claims."[106] The message here was blunt and simple: Zillow would protect the members of the enterprise because those relationships were central to the enterprise's success.

229.230.    Within the Zillow Fraudulent Business Enterprise, there was a common communication network through which Zillow and members of the Zillow Fraudulent Business Enterprise shared information on a regular basis. The Zillow Fraudulent Business Enterprise used this communication network for the purpose of furthering its common purpose and conducting its pattern of racketeering activities.

230.231.    The Zillow Fraudulent Business Enterprise functions as a continued unit through repeated execution of the same fraudulent practices across thousands of transactions nationwide, demonstrating longevity sufficient to pursue and accomplish its common fraudulent purpose.

231.232.    Each Defendant and each member of the Zillow Fraudulent Business Enterprise conducted and participated in the conduct of the Zillow Fraudulent Business Enterprise by engaging in a pattern of racketeering activity to further the enterprise's common purpose. Zillow exercised control over, directed, and participated in the operation and management of the Zillow Fraudulent Business Enterprise by directing its affairs and using members of the Zillow Fraudulent

---

[106] *See* ZillowForAgents, *A message from Zuhairah Washington*, YouTube (Dec. 5, 2025), https://www.youtube.com/watch?v=IOH79YJ3YS0.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Business Enterprise as instrumentalities to carry out the fraudulent scheme of the Zillow Fraudulent Business Enterprise and further its common goals.

233. In particular, members of the Zillow Fraudulent Business Enterprise worked to fraudulently induce prospective home buyers into using Zillow Flex Agents by (a) falsely advertising agents as "Top Agent on Zillow," even when a substantial number of the agents are inexperienced, have no or little sales, and lack familiarity with the neighborhood of the homes; (b) falsely suggest or expressly misled potential buyers into thinking that the buyers are contacting the listing agent when they select "Contact Agent" or "Request a Tour" buttons on Zillow's website; (c) failing to disclose to potential buyers that Zillow Flex agents must pay up to 40% of their commissions to Zillow; and (d) illegally steering buyers into using Zillow Home Loans, without disclosing that ZHL offers a substandard product, and without disclosing that the Zillow Flex agents are receiving something of value in exchange for steering. For this Enterprise, Zillow trained, monitored, and closely supervised the conduct of the Real Estate Defendants.

234. The Zillow Defendants and each of the Real Estate Defendants knew of, supported, and participated in the fraudulent nature of the Zillow Fraudulent Business Enterprise's conduct, intentionally and knowingly coordinated their own conduct to further the common purpose of the Zillow Fraudulent Business Enterprise, and continued to participate despite knowledge that prospective buyers were being misled. Zillow and each of the Real Estate Defendants knew that potential buyers were being defrauded, yet they stayed silent to further the common purpose of the Zillow Fraudulent Business Enterprise.

235. Each member of the Zillow Fraudulent Business Enterprise shared in the bounty generated by the enterprise—*i.e.*, by sharing the benefit derived from commission payments by home buyers.

### 4.    Distinctness

236. The Zillow Fraudulent Business Enterprise was distinct from any single Defendant or culpable person. Although the Zillow Defendants and the Real Estate Defendants were members of the enterprise, the enterprise itself consisted of multiple independent legal entities,

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

including separately owned real estate brokerages and agents, each retaining its own legal status, regulatory obligations, and economic interests. The enterprise, therefore, was not merely the Zillow Defendants under another name, but a coordinated association-in-fact through which Defendants conducted racketeering activity, satisfying the distinctness requirement of 18 U.S.C. § 1962(c).

236.237.   At all relevant times, the Zillow Fraudulent Business Enterprise: (a) had an existence separate and distinct from Zillow; (b) was separate and distinct from the pattern of racketeering in which Zillow engaged; and (c) was an ongoing organization consisting of legal entities.

237.238.   While Zillow participated in and is a member of the Zillow Fraudulent Business Enterprise, it has a separate existence that is distinct from the Zillow Fraudulent Business Enterprise, including distinct legal status, different offices and role, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

### 5.   Interstate Commerce

238.239.   The Zillow Fraudulent Business Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, advertisement, and purchase of the Zillow home listings, and the receipt of monies from the commissions of the sales of homes listed on Zillow.

### B.   Pattern of Racketeering Activity

239.240.   The Zillow Fraudulent Business Enterprise's common purpose of illegally profiting from the commissions paid by buyers for homes listed on Zillow's website was facilitated by a pattern of mail and wire fraud. The Zillow Fraudulent Business Enterprise's scheme constitutes racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), by using mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud).

240.241.   Specifically, each Defendant has committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 & 1343).

241.242.   The multiple acts of racketeering activity were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

The racketeering activity was made possible by each Defendant's regular and knowing use of the facilities, services, distribution channels, and employees of the Zillow Fraudulent Business Enterprise. Each Defendant knowingly and intentionally participated in the scheme to defraud by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

242.243.    The pattern of racketeering activity exhibited continuity in that Defendants engaged in the same fraudulent conduct across thousands of transactions nationwide for multiple years, from at least 2018 to the present, and in that the scheme was Defendants' regular way of doing business and poses a continuing threat of repetition.

243.244.    The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

**1.    Predicate Acts**

244.245.    Zillow and the Real Estate Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the Nationwide Class using materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

245.246.    Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not limited to:

    a.  **Mail Fraud**: Each Defendant violated 18 U.S.C. § 1341 by sending and/or receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to defraud by marketing, communicating, servicing, and serving as the buyers' agents by means of false pretenses, misrepresentations, promises, and omissions.

    b.  **Wire Fraud:** Each Defendant violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire to execute the unlawful scheme to defraud by marketing, communicating, servicing, and serving as the buyers' agents by means of false pretenses, misrepresentations,

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

promises, and omissions.

246.247.        Each Defendant's use of the mails and wires includes, but is not limited to, the following acts of the Zillow Fraudulent Business Enterprise in furtherance of their scheme to defraud:

    a. Marketing homes online at Zillow.com;

    b. Communicating with potential buyers through email, text, phone calls, and other means;

    c. Engaging in communications between Zillow and each of the Real Estate Agents about how to fraudulently induce potential buyers into using Zillow Flex agents;

    d. Sending and receiving documents related to the purchase of the homes advertised on Zillow.com;

    e. Sending and receiving documents related to the financing of the homes advertised on Zillow.com;

    f. Sending and receiving funds generated by commissions paid by Plaintiffs; and

    g. Sending and receiving emails, communications and correspondence related to all of the foregoing.

247.248.        In furtherance of the fraudulent scheme described herein, Defendants use interstate wire and mail communications in connection with specific home purchase transactions involving Plaintiffs. Each of the foregoing communications was transmitted via interstate wires and constituted a step in Defendants' scheme to route buyers through Zillow-controlled agent channels and, where applicable, to steer buyers toward Zillow Home Loans. These communications were foreseeable, integral steps in the scheme to fraudulently induce Plaintiffs to transact through Zillow-controlled channels and to steer them toward Zillow Home Loans, and occurred shortly before Plaintiffs' home purchases, as follows:

    a. **Alucard Taylor.** Prior to purchasing a home on July 1, 2022, Plaintiff Taylor accessed Zillow.com, viewed a residential listing, and used Zillow's "Contact Agent" feature, believing he was contacting the listing agent. Zillow routed his inquiry to

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 74

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

R.H., identified on Zillow's website as a "Top Agent on Zillow." Plaintiff Taylor thereafter communicated with and worked exclusively with R.H. to complete the purchase.

b. **Araba Armstrong.** Prior to purchasing a home on April 3, 2024, Plaintiff Armstrong accessed Zillow.com, viewed a residential listing, and was routed by Zillow to D.M., identified on Zillow's website as a "Top Agent on Zillow." Through D.M., Plaintiff Armstrong thereafter completed the transaction using Zillow Home Loans to finance and close the purchase. Plaintiff Armstrong was led to believe that she was required to use ZHL to complete the purchase.

c. **Han Zheng.** Prior to purchasing a home on March 20, 2025, Plaintiff Zheng accessed Zillow.com, viewed a residential listing, and used Zillow's "Schedule a Tour" feature, believing he was contacting the seller's agent. Zillow routed his inquiry to A.J., identified on Zillow's website as a "Top Agent on Zillow," with whom Plaintiff Zheng thereafter communicated in connection with the transaction.

d. **David Liao.** Prior to purchasing a home on February 12, 2021, Plaintiff Liao accessed Zillow.com, viewed a residential listing, and was routed by Zillow to V.P., identified on Zillow's website as a "Top Agent on Zillow." Plaintiff Liao completed the transaction using Zillow Home Loans to finance and close the purchase.

e. **Karen King.** Prior to purchasing a home on September 8, 2023, Plaintiff King accessed Zillow.com, viewed a residential listing, and used Zillow's "Contact Agent" feature, believing she was contacting the listing agent. Zillow routed her inquiry to J.K., through whom the transaction was completed.

f. **Lisa Knudson.** Prior to purchasing a home on April 25, 2025, Plaintiff Knudson accessed Zillow.com, viewed a residential listing, and used Zillow's "Contact Agent" feature. Zillow routed her inquiry to C.G., identified on Zillow's website as a "Top Agent on Zillow," through whom Plaintiff Knudson completed the purchase.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

g. **Eydalia Thurston.** Prior to purchasing a home on December 27, 2024, Plaintiff Thurston accessed Zillow.com, viewed a residential listing, and used Zillow's "Contact Agent" feature. Zillow routed her inquiry to C.S., identified on Zillow's website as a "Top Agent on Zillow."

h. **Kyle Silva.** Prior to purchasing a home on February 21, 2025, Plaintiff Silva accessed Zillow.com, viewed a residential listing, and used Zillow's "Contact Agent" feature. Zillow routed his inquiry to A.M., identified on Zillow's website as a "Top Agent on Zillow." During the transaction, Plaintiff Silva was referred to Zillow Home Loans and obtained pre-approval through ZHL.

i. **Dale Koger.** Prior to purchasing a home on August 12, 2024, Plaintiff Koger accessed Zillow.com, viewed a residential listing, and used Zillow's "Contact Agent" feature, believing he was contacting the seller's agent. Zillow routed his inquiry to S.Z., through whom the transaction was completed.

j. **John Cady.** Prior to purchasing a home on September 19, 2025, Plaintiff Cady accessed Zillow.com, viewed a residential listing, and used Zillow's "Contact Agent" feature with the intent of contacting the seller's agent directly to avoid paying a buyer-agent commission. Zillow routed his inquiry to E.L., identified on Zillow's website as a "Top Agent on Zillow."

k. **Rebecca Brucaliere.** Prior to purchasing a home on December 13, 2023, Plaintiff Brucaliere accessed Zillow.com, viewed a residential listing, and used Zillow's "Request a Tour" feature, believing she was contacting the seller's agent. Zillow routed her inquiry to H.D., identified on Zillow's website as a "Top Agent on Zillow." At their first in-person meeting, H.D. required Plaintiff Brucaliere to sign a touring agreement and thereafter stated that Zillow had assigned Plaintiff Brucaliere to H.D. During the transaction, H.D. repeatedly urged Plaintiff Brucaliere to use Zillow Home Loans.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

l.  **Furgus Wilson.** Prior to purchasing a home on or about October 29, 2023, Plaintiff Wilson accessed Zillow.com, viewed a residential listing, and used Zillow's "Contact Agent" feature, believing he was contacting the listing agent. Zillow routed his inquiry to a different agent, with whom Plaintiff Wilson thereafter communicated and worked to complete the transaction. During the transaction, Plaintiff Wilson was directed by both his agent and loan officer, D.W., to obtain pre-approval through ZHL, and ultimately obtained financing through ZHL. He was led to believe he had no other practical option but to use ZHL to complete the purchase.

248.249.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to (a) fraudulently induce prospective home buyers into using Zillow Flex agents, and (b) illegally steer buyers into using Zillow Home Loans. These transmissions were not isolated or sporadic acts, but were part of a standardized pattern of conduct implemented by the Zillow Fraudulent Business Enterprise and common to the proposed Class.

249.250.    This scheme involved material misrepresentations and omissions, and Defendants acted with knowledge of their wrongdoing and/or with the specific intent to defraud. The use of the mail and wire transmissions described herein was a foreseeable and integral step in executing the scheme.

250.251.    Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are hidden from Plaintiffs and Class members, and cannot be alleged without access to Defendants' books and records, and the books and records of members in the Zillow Fraudulent Business Enterprise, to fraudulently induce prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans. However, Plaintiffs have described the types, purposes, and contexts of the predicate acts of mail and/or wire fraud that occurred.

251.252.    Each Defendant knew and intended that Plaintiffs and Class members would rely on the material misrepresentations and omissions made by them regarding the Zillow Fraudulent Business Enterprise. Defendants knew and intended that consumers would incur economic damages

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 77

as a result.

252.253.    Plaintiffs and millions of other consumers relied upon Defendants' misrepresentations, omissions, and concealment.

253.254.    As described herein, Defendants engaged in a pattern of related and continuous predicate acts. These predicate acts constituted various unlawful activities, each conducted with the common purpose of obtaining commission payments from Plaintiffs and Class members based on their misrepresentations, omissions, and concealment. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

254.255.    All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Zillow Fraudulent Business Enterprise. The racketeering acts committed by the Zillow Fraudulent Business Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on Plaintiffs and Class members.

**C.    Conspiracy**

255.256.    Defendants have not undertaken the practices described herein in isolation, but knowingly agreed and participated as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), each Defendant conspired to participate in an endeavor that, if completed, constituted a violation of 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this complaint, have participated as co-conspirators with each Defendant in these offenses and have performed acts in furtherance of the conspiracy to fraudulently induce prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans.

256.257.    Each Defendant aided and abetted others in violating the above laws, thereby rendering it indictable as a principal in the 18 U.S.C. §§ 1341 & 1343 offenses.

257.258.    In furtherance of the conspiratorial agreement, Defendants and members of the conspiracy committed overt acts constituting predicate acts of racketeering, including the mail and wire fraud acts described above.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

258.259.    To achieve its common goals, Defendants actively and intentionally concealed from the general public the unlawfulness of the Zillow Fraudulent Business Enterprise's conduct alleged herein.

259.260.    The Zillow Defendants, the Real Estate Defendants, and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy, adopted the goal of furthering and facilitating the enterprise's racketeering conduct, and participated in the common course of conduct to commit acts of fraud by fraudulently inducing prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans.

260.261.    Indeed, for the conspiracy to succeed, the Zillow Defendants, the Real Estate Defendants, and their co-conspirators had to agree to implement and use similar devices and fraudulent tactics including, but not limited to, complete secrecy about fraudulently inducing prospective home buyers into using Zillow Flex agents, and illegally steering buyers into using Zillow Home Loans.

**D.    Resulting Injury to Property**

261.262.    The predicate acts all generated significant revenue and profits for each Defendant at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by Defendants through their participation in the Zillow Fraudulent Business Enterprise and furtherance of its fraudulent schemes.

262.263.    By reason of and as a result of the conduct of Defendants, and in particular their pattern of racketeering activity, Plaintiffs and Class members have been injured in multiple ways, including but not limited to:

    a.    Plaintiffs have been wrongfully deprived of their property in that deliberate misrepresentations, omissions, and concealment artificially inflated the commissions that Plaintiffs paid in connection with the purchase of their homes.

    b.    Plaintiffs have been wrongfully deprived of their property in that they were steered to use Zillow Home loans and received inferior loan packages that were more costly than they would have received if they used another lender.

263.264.    Defendants' violations of 18 U.S.C. § 1962(c) & (d) have directly and

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**CLAIM II**

**VIOLATION OF THE REAL ESTATE SETTTLEMENT PROCEDURES ACT, 12 US.C. 2607(a)**
**(On behalf of a Nationwide Class, against the Zillow Defendants, and on behalf of a Nationwide Steering Subclass)**

264.265.    Plaintiffs Armstrong, Liao, and Silva, and Wilson bring this claim for themselves and on behalf of the Nationwide Class against Zillow Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

265.266.    RESPA Section 8(a), 12, U.S.C. § 2607(a), provides that "no person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

266.267.    A "thing of value" is "broadly defined" under RESPA's implementing regulation by the CFPB under "Regulation X," and includes, among other things, "the opportunity to participate in a money-making program." 12 C.F.R. § 1024.14(d).

267.268.    The real estate agents who receive referrals from Zillow treasure and rely on these referrals, and these agents consider Zillow referrals as a thing of value. As a result, Zillow referrals are a thing of value under RESPA.

268.269.    Regulation X defines a "referral" to include "any oral or written action directed to a person which has the effect of affirmatively influencing the selection of any person of a provider of a settlement service." 12 C.F.R. § 1024.14(f)(1). And "an agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a pattern, practice or course of conduct." 12 C.F.R. § 1024.14(e).

269.270.    In addition, "when a thing of value is received repeatedly and is connected in any way with the volume or value of business referred, the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business." 12 C.F.R. § 1024.14(e).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

270.271.    Pursuant to 12 U.S.C. § 2602(3), "the term 'Settlement services' includes any service in connection with a real estate settlement including, but not limited to, the following: . . . the origination of a federally related mortgage loan."

271.272.    Pursuant to 12 C.F.R. § 1024.2(b), "Settlement Service means any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following: (1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans) . . . [or] (3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan."[107] Zillow is accordingly a person under Section 8 of RESPA pursuant to 12 U.S.C. §§ 2602(5), 2607.

272.273.    Under these definitions, the mortgage lending services provided by Zillow Home Loans for federally related loans were "settlement services" under RESPA.

273.274.    ZHL is a "creditor" pursuant to 15 U.S.C. § 1602(g), and as incorporated by reference into RESPA at 12 U.S.C. § 2602(1)(B)(iv). ZHL makes or invests in residential real estate loans totaling more than one billion million dollars per year. *See* 12 U.S.C. § 2602(1)(B)(iv).

274.275.    The vast majority of mortgages originated by ZHL during the relevant time period were "federally related mortgage loans" as that term is defined by 12 U.S.C. § 2602(1) and 12 C.F.R. 1024.2(b).[108]

275.276.    ZHL originates residential mortgage loans secured by one-to-four-family dwellings, which are federally related mortgage loans. 12 U.S.C. § 2602(1); C.F.R. § 1024.2(b). The origination of those loans—and the services provided in connection with or incident to such settlements, including the marketing, lead-generation, referral, and coordination functions performed by Zillow Group, Inc. and Zillow, Inc.—are settlement services within the meaning of 12 U.S.C. § 2602(3). Accordingly, each Defendant participates in, benefits from, or provides services incident to real-estate settlement services covered by § 2607(a).

---

[107] *See also* 12 U.S.C. § 2602(3) ("the term 'Settlement services' includes any service provided in connection with a real estate settlement, including, but not limited to, the following: [] services rendered by a real estate agent or broker").

[108] *See, e.g.*, Zillow 10-K Annual Report (Feb. 11, 2025).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 81

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

276.277.    Defendants entered into and enforced agreements or understandings, express or implied, that agents receiving Zillow leads would refer homebuyers to ZHL for mortgage pre-approval and financing. These understandings were established by Defendants' pattern, practice, and course of conduct, including setting and monitoring ZHL pre-approval quotas, tying lead flow to ZHL adoption rates, and penalizing agents who failed to meet those targets. 12 C.F.R. § 1024.14(e). As further reflected in Regulation X, a "referral" includes any oral or written action directed to a person that has the effect of affirmatively influencing the selection of a settlement-service provider. 12 C.F.R. § 1024.14(f)(1).

277.278.    Through these arrangements, Defendants both gave and accepted "things of value." Defendants gave value to Participating Agents, such as participation in a money-making program, continued and priority access to leads, enhanced ad placement and visibility, and increased lead quality and volume, and accepted economic benefits, such as profits from Participating Agents' advertising expenditures, referral-based "success fees," and increased loan-origination revenue through Zillow Home Loans. *See* 12 U.S.C. § 2602(2); 12 C.F.R. § 1024.14(d).

278.279.    As alleged above, Defendants knowingly structured and operated their lead-distribution systems so that lead flow, placement, and quality were conditioned on ZHL referrals and pre-approvals, ensuring that business incident to settlement services would be referred to ZHL. Zillow thus gave things of value to induce referrals and accepted things of value in return for those referrals, conduct that violates both the plain text of § 2607(a) and its implementing regulation. As an operator of a "settlement services" digital comparison-shopping platform, Zillow violates RESPA when it receives a "thing of value" for this referral activity.[109]

279.280.    Defendants cannot invoke RESPA's safe harbors. 12 U.S.C. § 2607(c); 12 C.F.R. § 1024.14(g). The benefits Zillow provides are not "bona fide" payments because they are not fixed compensation for goods or services actually furnished, but conditional incentives and performance-based rewards tied to the number of ZHL referrals or pre-approvals achieved. *See* 12 U.S.C. § 2607(c)(1)-(2).

---

[109] *See* Real Estate Settlement Procedures Act (Regulation X); Digital Mortgage Comparison-Shopping Platforms and Related Payments to Operators, 88 Fed. Reg. 9162 (Feb. 13, 2023) (to be codified at 12 C.F.R pt. 1024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

280.281.    The broker-to-broker referral exemption likewise does not apply, as Zillow does not act as a real-estate broker or perform brokerage functions in these transactions. Its Premier program operates as a referral marketplace that sells and allocate consumer leads, collects contingent "success fees" tied to closed transactions, and performs no brokerage services in the purchase or sale of property. *See* 12 U.S.C. § 2607(c)(3).

281.282.    Nor can Defendants invoke the affiliated-business-arrangement safe harbor because participating agents are independent contractors, not affiliates; consumers are not provided compliant written disclosures; and Zillow's design effectively conditions agents' continued access to leads—and therefore their livelihood—on funneling buyers to ZHL, eliminating any genuine freedom of choice. *See* 12 U.S.C. § 2607(c)(4).

282.283.    Defendants' unlawful conduct deprived consumers of impartial advice, restricted competition among real estate agents and mortgage lenders, and increased the costs of mortgage credit and settlement services. Plaintiff and the Class suffered injury by paying higher rates and fees and by losing access to unbiased information and competing loan options.

283.284.    Plaintiff and Class Members seek all forms of relief available under the Real Estate Settlement Procedures Act, including treble damages equal to three times the amount of any charge paid for the settlement services involved in the unlawful referrals. Each Class Member paid charges for mortgage-origination services provided by Zillow Home Loans that were incident to or part of the settlement services unlawfully referred through Zillow's programs. Plaintiff and Class Members also seek reasonable attorneys' fees and costs, as well as any equitable or ancillary relief the Court finds appropriate to prevent ongoing violations, remedy unjust enrichment, and deter similar conduct in the future. 12 U.S.C. § 2607(d).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**CLAIM III**

**VIOLATION OF THE REAL ESTATE SETTLEMENT
PROCEDURES ACT, 12 U.S.C. § 2607(b)
(On Behalf of a Nationwide Class, against the Zillow Defendants)**

284.285.     Plaintiffs Taylor, Armstrong, Liao, Cady, and Brucaliere, and Wilson bring this claim for themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

285.286.     The Real Estate Settlement Procedures Act ("RESPA") (codified at 12 U.S.C. § 2601, *et seq.*) was enacted in 1974 to provide consumers with greater and timelier disclosure of the nature and costs of the real estate settlement process and to protect them from abusive practices.

286.287.     RESPA's premise was that complete disclosure of information would preclude illegal kickbacks, fee splits, unearned fees, and compensated referrals, and thereby empower the consumer to get the same or better services at a lower cost.

287.288.     Section 7 of RESPA (12 U.S.C. § 2607) provides: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b).

288.289.     RESPA confers on the Secretary of the U.S. Department of Housing and Urban Development ("HUD") authority to prescribe rules and regulations to achieve the purposes of RESPA. The regulation adopted by HUD to fulfill its mandate is known as Regulation X, 24 C.F.R. § 3500, *et seq.*

289.290.     RESPA achieves its goals in a twofold manner: by imposing disclosure requirements in connection with settlement services, and by prohibiting certain practices in connection with settlements.

290.291.     The term "settlement services" includes any service provided in connection with a real estate settlement, including, but not limited to, providing brokerage services.

291.292.     HUD has determined in its regulations that kickbacks, fee splits, and referral fees in connection with residential real estate sales are anticompetitive, result in harm to consumers, and thus illegal.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

292.293.        24 C.F.R. § 3500.14 further explains the prohibitions in 12 U.S.C. § 2607 as follows:

> (b) <u>No referral fees</u>. No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in Sec. 3500.14(g)(1). A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

> (c) <u>No split of charges except for actual services performed</u>. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

> (d) <u>Thing of value</u>. This term is broadly defined in section 3(2) of RESPA (12 U.S.C. 2602(2)). It includes, without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation. The term "payment" is used throughout Secs. 3500.14 and 3500.15 as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

293.294.        The Plaintiffs' settlements of residential real estate purchases and sales were financed in whole or in part by federally related mortgage loans. Specifically, Plaintiff Taylor used a lender which is regulated by an agency of the Federal Government.

294.295.        The Zillow Defendants ("Defendants," for purposes of this Count) are real estate settlement services providers that provided real estate settlement services involving federally

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

related mortgage loans within the meaning of 12 U.S.C. § 2602(2) and § 2607(a) for the settlements at issue.

295.296.    In the alternative to the preceding allegation, Defendants are subject to RESPA because, by originating loans, it "provides business incident to or part of" a real estate settlement service and received settlement fees in connection therewith, within the meaning of 24 C.F.R. §§ 3500.2 and 3500.14, *et seq.*

296.297.    In the alternative to the preceding allegation, each Defendant is also a person who received a split of commissions (other than for services performed) that were paid for the rendering of a settlement service in transactions involving federally related mortgage loans, within the meaning of 12 U.S.C. § 2607(a) and (b).

297.298.    The Hidden Zillow Fees were paid to Zillow by seller brokers as settlement service providers using settlement proceeds within the meaning of 12 U.S.C. §§ 2602(2) and 2607(a) and 24 C.F.R. §§ 3500.2 and 3500.14, *et seq.*

298.299.    The seller brokers paid the Hidden Zillow Fees from settlement proceeds in connection with real estate settlements involving federally related mortgage loans.

299.300.    The Zillow-affiliated agents who received real estate commissions from the subject settlements acquiesced in splitting those commissions with the Defendants by paying the Hidden Zillow Fees in connection with real estate settlements involving federally related mortgage loans.

300.301.    Defendants accepted the Hidden Zillow Fees either as a settlement services provider, a purported provider of services incident to or part of a real estate settlement service, or a person within the meaning of 12 U.S.C. § 2607, *et seq.*

301.302.    Payment and receipt of the Hidden Zillow Fees violated 12 U.S.C. § 2607(b) in that it represents a split of commissions paid without rendering any settlement services in connection with a federally related mortgage loan.

302.303.    Defendants collect the unearned Hidden Zillow Fees from settlement proceeds *only* when a listed property sells.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

303.304.    The Hidden Zillow Fees are paid from settlement proceeds after all real estate settlement services have been rendered. The Hidden Zillow Fees serve no legitimate purpose and are an illegal fee for which Defendants perform no services.

304.305.    Defendants' unlawful conduct deprived Plaintiffs and Class Members of impartial and independent advice in connection with their real estate transactions, restricted competition among real estate agents and mortgage lenders, and distorted the market for real estate settlement services. As a result, consumers were steered through conflicted referral arrangements and subjected to undisclosed financial incentives that undermined transparency, consumer choice, and inflated the purchase price of homes.

305.306.    As a direct and proximate result of Defendants' violations of the Real Estate Settlement Procedures Act, Plaintiffs and Class Members were charged, and paid, unlawful and unearned settlement fees, including the Hidden Zillow Fees, in connection with federally related mortgage loan transactions. Plaintiffs and Class Members were injured by the payment of these unlawful charges and are entitled to all relief available under RESPA.

306.307.    Each Defendant is jointly and severally liable to Plaintiffs pursuant to 12 U.S.C. § 2607(d)(2) in an amount equal to three times the Hidden Zillow Fees, together with reasonable attorneys' fees, costs, equitable or ancillary relief the Court finds appropriate to prevent ongoing violations, remedy unjust enrichment, and deter similar conduct in the future. 12 U.S.C. § 2607(d).

## CLAIM IV

### VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
#### (Wash. Rev. Code Ann. § 19.86.010, *et seq.*)
#### (On Behalf of a Nationwide Class, against the Zillow Defendants)

307.308.    All Plaintiffs (Plaintiffs Taylor, Armstrong, Zheng, Liao, King, Knudson, Thurston, Silva, Koger, Cady, and Brucaliere, and Wilson) bring this claim for themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs (for purposes of all Washington Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

308.309.    Plaintiffs bring this Count on behalf of the nationwide Class based on violations of the Washington Consumer Protection Act, Wash. Rev. Code Ann. 19.86.

309.310.    The Zillow Defendants ("Defendants," for purposes of this Count), Plaintiffs, and each member of the nationwide Class are "person[s]" under Wash. Rev. Code Ann. 19.86.010(1).

310.311.    At all relevant times, Defendants were and are engaged in "trade" or "commerce" under Wash. Rev. Code Ann. 19.86.010(2).

311.312.    The Washington CPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. 19.86.020. Defendants' conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. In short, Defendants' conduct has been deceptive because they have the capacity or tendency to deceive.

312.313.    Defendants' conduct violated the Washington CPA in four respects: (1) Defendants failed to disclose the unlawful steering; (2) Defendants unfairly used their dominate position to coerce agents into violating the agents' fiduciary duties; (3) Defendants deceptively induced consumers into signing up with agents by exaggerating the agents' success and failing to disclose they were acting as buyers' agents; and (4) Defendants' conduct violated RESPA, which is a *per se* unfair practice.

**A.    Failure to disclose steering**

313.314.    At all relevant times, Defendants' acts and practices were deceptive and unfair because they failed to disclose to consumers that Zillow required or incentivized Participating Agents to meet internal referral and pre-approval quotas with Zillow Home Loans. These undisclosed arrangements and steering requirements created conflicts of interest that deprived homebuyers of impartial advice, misrepresented the independence of Participating Agents, and caused consumers to be steered into higher-cost mortgage products, pay inflated interest rates and fees, and lose access to lower-cost or more suitable loan options.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## B.  Unfair use of dominant position

314.315.    Defendants' acts and practices were also unfair and deceptive because Defendants used their dominant position in the online real-estate market to coerce agents into steering clients toward ZHL and away from competing lenders, thereby undermining agents' fiduciary duties, restricting consumer choice, and distorting competition among lenders. This coercive scheme offends established public policy, is immoral and oppressive, and has caused substantial injury to consumers and the marketplace.

315.316.    Defendants' conduct affects the public interest because Zillow's real-estate marketplace serves millions of consumers nationwide, including at least thousands of Washington homebuyers, and these undisclosed acts and practices have a capacity to injure a substantial portion of the public.

## C.  Deceptively inducing buyers to use Zillow agents

316.317.    Defendants' acts and practices had the tendency and capacity to deceive substantial portions of the public. Defendants' marketing and referral programs created the false impression that consumers were being matched with independent, impartial agents, when in truth, Participating Agents were subject to undisclosed quotas and performance metrics that required them to channel clients to ZHL or risk losing future Zillow leads and revenue opportunities. This concealed incentive structure was likely to mislead a reasonable consumer—particularly first-time homebuyers—into believing that their agent's recommendations were based solely on the buyer's best interest rather than Zillow's internal referral requirements. Such misrepresentations and omissions are clearly capable, and indeed likely, to deceive reasonable consumers and the public at large, and therefore constitute deceptive acts under the Washington CPA.

317.318.    In addition, in the course of Defendants' business, Defendants crafted their website to deceive buyers into believing that they were contacting the *seller*'s agent, when in fact potential buyers were being routed to a Zillow-affiliated agent. When the agent was a Zillow Flex agent, the Flex agent failed to disclose (and was prohibited from disclosing) the Hidden Zillow Fees to the buyer or seller. The net effect of Defendants' conduct was to drive up the commission paid by sellers, to the detriment of the sellers.

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 89

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

318.319.      Defendants knew or should have known that their conduct violated the Washington CPA.

319.320.      Defendants owed Plaintiffs and the Class a duty to disclose the truth about the deceptive website and the Hidden Zillow Fees because Defendants:

    a.  Possessed exclusive knowledge of the deceptive website and the Hidden Zillow Fees; and

    b.  Intentionally concealed the foregoing from Plaintiffs and the Class.

**D.    *Per se* unfair practice**

320.321.      Defendants' conduct also constitutes a *per se* unfair practice because it violates the Section 8(a) of RESPA, 12 U.S.C. § 2607(a).

321.322.      Defendants' acts and practices also violate the public interest because they undermine the integrity of the home-buying process, interfere with consumers' ability to make informed choices among competing lenders, and erode public confidence in real-estate professionals who are legally obligated to act in the best interests of their clients. These practices are inherently capable of repetition and affect a substantial segment of the public.

322.323.      Defendants' conduct offends the strong public policy embodied in both RESPA and Washington law, which safeguard consumers from hidden financial conflicts and self-dealing in real-estate transactions. Zillow's undisclosed quota and incentive structure is immoral and unscrupulous because it exploits the trust consumers place in their agents' independence, manipulates the market through coercive lead control, and results in tangible financial harm to homebuyers in the form of higher loan costs and reduced access to competitive mortgage programs.

**E.    Injury to Plaintiffs**

323.324.      Defendants' conduct proximately caused injuries to Plaintiffs and the other Class members.

324.325.      Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Class members paid inflated commissions and related fees when purchasing

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

their homes. These injuries are the direct and natural consequence of Defendants' misrepresentations, fraud, deceptive practices, and omissions.

325.326.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein impact the public interest because they affect thousands of residential real estate transactions, systematically inflate commissions paid by home sellers, and undermine transparency in the real estate marketplace.

326.327.    Defendants are liable to Plaintiffs and the Class members for damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and treble damages up to $25,000 per Plaintiff or Class member, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code Ann. 19.86.090.

## CLAIM V

### BREACH OF FIDUCIARY DUTY
### (On Behalf of a Nationwide Class, against the Real Estate Defendants)

327.328.    All Plaintiffs (Plaintiffs Taylor, Armstrong, Zheng, Liao, King, Knudson, Thurston, Silva, Koger, Cady, and Brucaliere, and Wilson) repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

328.329.    Real estate brokers and brokerages, and licensed agents who act on their behalf, owe fiduciary duties of loyalty, care, good faith, and full disclosure to homebuyers they represent in Washington and throughout the United States. These duties arise from the agency relationship between the buyer and the broker, are carried out through the broker's licensed agents, and require both the brokerage and its agents to act solely in the client's best interests, to provide honest and impartial advice about available mortgage and transaction options, and to disclose and avoid conflicts of interest that could compromise the client's decision-making. These fiduciary duties do not materially differ among the states.

329.330.    Real estate agents are state-licensed professionals who are obligated by law and professional ethics to act in their clients' best interests. Licensed agents must complete required education, pass state examinations, and comply with state licensing laws that recognize their fiduciary duties of loyalty and full disclosure to their clients. For example, in Washington, real estate

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

agents must go through the licensing process, which requires 90 hours of pre-licensing education, pass the state licensing exam, and then complete at least 30 hours of continuing education every two years.[110] Agents may work independently or under the supervision of licensed brokers, but in all cases, their professional role is to advise clients impartially and to avoid conflicts of interest.

330.331.	The Real Estate Defendants—through their own conduct and by and through the Zillow-affiliated agents operating under their supervision and control—breached their fiduciary duties of loyalty, care, good faith, and full disclosure to Plaintiffs and the Class by authorizing, supervising, and profiting from conduct that exploited the unequal and trust-based relationship between homebuyers and their agents for the agents' own financial benefit and for Zillow's benefit, rather than acting solely in the buyers' best interests.

331.332.	The Real Estate Defendants knew that they and their agents were operating under undisclosed financial incentives imposed by Zillow, including the obligation to pay Hidden Zillow Fees and to meet Zillow Home Loans referral and pre-approval metrics, yet permitted, encouraged, and/or required those agents to continue representing homebuyers without disclosing these material conflicts.

332.333.	For example, the Real Estate Defendants and their agents:

 a.	Failed to disclose material conflicts of interest arising from Zillow's lead-distribution programs, including the Hidden Zillow Fees paid to Zillow out of the agents' commissions;

 b.	Misled buyers into believing they were contacting or working with listing agents, or that they had no practical alternative but to continue working with the Zillow-affiliated agent;

 c.	Discouraged or impeded buyers from communicating directly with listing agents, thereby depriving buyers of the opportunity to negotiate lower commissions and purchase prices;

---

[110] *See Get your license: Real estate brokers*, Washington State Dept. of Licensing, https://dol.wa.gov/professional-licenses/real-estate-brokers/get-your-license-real-estate-brokers (last visited Oct. 28, 2025).

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 92


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

    d.   Provided biased and conflicted advice by steering buyers toward Zillow Home Loans based on financial incentives and quota requirements, rather than the buyers' needs or best interests;

    e.   Failed to advise buyers of material financing alternatives, including more competitive lenders and available assistance programs; and

    f.   Permitted Zillow to monitor and influence communications with buyers through Zillow-mandated tools such as Follow-Up Boss, compromising confidentiality and independent professional judgment.

333.334.    In this manner, the Real Estate Defendants and their agents abused their position of trust and superior knowledge over homebuyers and departed from the fiduciary obligations they owed to Plaintiffs and the Class.

334.335.    As a direct and proximate result of the Real Estate Defendants' and their agents' breaches of fiduciary duty, Plaintiffs and Class members suffered damages, including but not limited to increased transaction and borrowing costs, loss of the opportunity to negotiate a lower purchase price and/or lower commissions by dealing directly with listing agents, receipt of biased and conflicted advice, undisclosed fees, and/or loss of access to more favorable mortgage products and assistance programs.

## CLAIM VI

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (On Behalf of a Nationwide Class, against all Defendants)

335.336.    All Plaintiffs (Plaintiffs Taylor, Armstrong, Zheng, Liao, King, Knudson, Thurston, Silva, Koger, Cady, and Brucaliere, and Wilson) repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

336.337.    The Zillow Defendants and the Real Estate Defendants have long known that real estate brokers and agents owe fiduciary duties of loyalty, care, good faith, and full disclosure to the homebuyers they represent.

337.338.    Zillow's internal policies, training materials, and public marketing repeatedly emphasize that buyers rely on their agents for professional guidance, and that agents owe duties of

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

care, loyalty, and advocacy to the buyers they represent. For example, in an article published through its online Learning Center, Zillow explains that a buyer's agent is expected to represent only the buyer's interests and to advise and advocate for the buyer throughout the transaction, noting that a buyer-agency agreement typically establishes an agency relationship between the consumer and the agent for the duration of that engagement.[111]

338.339.    The same article pays lip service to the obligation that agent compensation should be discussed upfront and clearly laid out;[112] yet, Zillow itself drafts and distributes the standardized buyer-agency form used through its platform, which does not disclose to consumers that its own lead-distribution programs tie Zillow-affiliated agents' continued access to leads—and therefore their income—to meeting internal performance targets linked to Zillow Home Loans referrals. Nor do Zillow's public materials explain that the company itself profits when Zillow-affiliated agents steer clients toward its affiliated lender. This lack of transparency stands in direct tension with Zillow's own public guidance that agents must disclose conflicts and act with undivided loyalty to their clients.

339.340.    As state-licensed real estate brokers and brokerages, the Real Estate Defendants are required to understand, train for, and supervise compliance with fiduciary obligations of loyalty, care, good faith, and full disclosure. Their principals and managing brokers are themselves licensed professionals who have completed mandatory pre-licensing and continuing education addressing fiduciary duties, conflicts of interest, disclosure obligations, and client advocacy. Through this licensing, training, and supervisory framework, the Real Estate Defendants knew that they and their agents owed fiduciary duties to homebuyers and knew that the conduct alleged herein constitutes breaches of those duties.

340.341.    Individual agents acting as Zillow-affiliated agents breached their fiduciary duties to Plaintiffs and the Class by engaging in the conduct alleged herein, including steering buyers based on undisclosed financial incentives, suppressing information about alternative financing

---

[111] Alycia Lucio, *The Buyer Agreement: What You Need to Know*, Zillow Learning Center (Apr. 29, 2024), https://www.zillow.com/learn/buyer-agreement/.

[112] *Id.*

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 94

options and assistance programs, permitting third-party interference with confidential client communications, and failing to disclose material conflicts of interest.

341.342. The Real Estate Defendants likewise breached fiduciary duties owed to Plaintiffs and the Class. As licensed brokers and brokerages responsible for supervising and controlling their agents, the Real Estate Defendants authorized, directed, and permitted their agents to operate within Zillow's lead-distribution and steering programs despite knowing that those programs imposed undisclosed conflicts of interest, interfered with agent independence, and incentivized conduct adverse to buyers' interests. By approving, supervising, and profiting from this conduct—and by failing to disclose or remediate the resulting conflicts—the Real Estate Defendants breached their own fiduciary obligations to homebuyers.

342.343. Defendants knew that at all relevant times that the practices alleged herein constituted breaches of fiduciary duty. Zillow knew that its incentive structures, referral quotas, monitoring systems, and concealment of financial conflicts would cause agents and brokerages to violate fiduciary duties owed to buyers. The Real Estate Defendants knew that allowing agents to steer clients based on undisclosed financial incentives, suppress alternatives, and permit third-party interference with client communications violated fiduciary obligations imposed by law and professional regulations.

343.344. Despite this knowledge, Defendants knowingly gave substantial assistance and encouragement to these breaches.

344.345. The Zillow Defendants provided the infrastructure, incentives, training, monitoring, and enforcement mechanisms that pressured agents and brokerages to prioritize Zillow's financial interests over buyers' best interests, including payment of Hidden Zillow Fees and compliance with Zillow Home Loans referral and pre-approval metrics. Zillow thereby substantially assisted both the agents' fiduciary breaches and the Real Estate Defendants' breaches of their supervisory and fiduciary duties.

345.346. The Real Estate Defendants also substantially assisted and encouraged their agents' fiduciary breaches by supervising, authorizing, and profiting from agents' participation in

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 95

Zillow's programs; by continuing to deploy agents despite knowing those programs compromised fiduciary loyalty; and by failing to disclose or remedy the resulting conflicts of interest. Through this conduct, the Real Estate Defendants aided and abetted their agents' breaches and independently breached duties owed to Plaintiffs and the Class.

As a direct and proximate result of the fiduciary breaches committed by agents and the Real Estate Defendants—and Defendants' knowing and substantial assistance in those breaches—Plaintiffs and members of the Class suffered damages, including increased borrowing and settlement costs, inflated commissions, and loss of access to more favorable financing options and assistance programs. Plaintiffs and the Class seek compensatory damages and equitable relief, including restitution and disgorgement, as permitted by law.

## CLAIM VII

### UNJUST ENRICHMENT
**(On Behalf of a Nationwide Class, against the Zillow Defendants)**

346.347.    All Plaintiffs (Plaintiffs Taylor, Armstrong, Zheng, Liao, King, Knudson, Thurston, Silva, Koger, Cady, and Brucaliere, and Wilson) bring this claim for themselves and on behalf of the nationwide Class against Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

347.348.    As a result of the wrongful and deceptive conduct of Defendants as alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of Hidden Zillow Fees and referral fee payments by Premium Agents (the "Premium Fees").

348.349.    In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Class.

349.350.    As a result, each Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

350.351.    The unjust enrichment of Defendants is traceable to, and resulted directly and proximately from, the conduct alleged herein.

351.352.    Defendants either knew or should have known that the Hidden Zillow Fees and the Premium Fees were obtained by deception and were unearned. As such, it would be

inequitable for Defendants to retain the benefit of the Hidden Zillow Fees and Premium Fees under these circumstances.

352.353.     The financial benefits derived by Defendants from collecting Hidden Zillow Fees and Premium Fees rightfully belong to Plaintiffs and Class members.

353.354.     Defendants' acceptance and retention of the Hidden Zillow Fees and Premium Fees under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and Class members.

354.355.     Plaintiffs and Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully requests that the Court enter judgment in his favor and against Defendants, as follows:

A.     Determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the Classes; and declare Plaintiffs as the representatives of the Classes;

B.     Enter joint and several judgments against the Defendants and in favor of Plaintiffs and the Class;

C.     Award the Class and Steering Subclass damages in an amount to be determined at trial;

D.     Order disgorgement in the amount by which Defendants' ill-gotten gains exceed the treble damages awarded in this case;

E.     Permanently enjoin Defendants' ongoing anticompetitive and deceptive conduct;

F.     Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

G.     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: ~~December 29, 2025~~ April 23, 2026  Respectfully submitted,

By: */s/ Steve W. Berman*
Steve W. Berman (WSBA No. 12536)
By: */s/ Jerrod C. Patterson*
Jerrod C. Patterson (WSBA No. 43325)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com
        jerrodp@hbsslaw.com

By: */s/ Adam J. Levitt*
Adam J. Levitt, *admitted pro hac vice*
Amy E. Keller, *admitted pro hac vice*
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
Email: alevitt@dicellolevitt.com
        akeller@dicellolevitt.com

Corban Rhodes, *admitted pro hac vice*
Emma Bruder, *admitted pro hac vice*
**DICELLO LEVITT LLP**
485 Lexington Avenue, Tenth Floor
New York, New York 10017
Telephone: (646) 933-1000
Facsimile: (646) 494-9648
Email: crhodes@dicellolevitt.com
        ebruder@dicellolevitt.com

*Plaintiffs' Interim Class Counsel*

2D CONSOL. AM. CLASS ACTION COMPL.
(Case No. 2:25-cv-01818-JLR) – 98



Douglas J. McNamara, *admitted pro hac vice*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Email: dmcnamara@cohenmilstein.com

Theodore J. Leopold*
COHEN MILSTEIN SELLERS & TOLL PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-1400
Email: tleopold@cohenmilstein.com

*Pro hac vice application forthcoming

*Attorneys for Plaintiffs and the Proposed Classes*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX