The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ARABA ARMSTRONG, DAVID LIAO, FURGUS WILSON, BRANDON DAUGHERTY, and REBECCA ROBBINS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZILLOW, INC., ZILLOW GROUP, INC., ZILLOW HOMES, INC., and ZILLOW LISTING SERVICES, INC., Washington Corporations, and ZILLOW HOME LOANS, LLC, a California Corporation,<br><br>Defendants. | Case No. 2:25-cv-01818-JLR<br><br>**CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. PARTIES ..... 5

A. Plaintiffs ..... 5

1. Araba Armstrong ..... 5

2. David Liao ..... 6

3. Furgus Wilson ..... 7

4. Brandon Daugherty ..... 8

5. Rebecca Robbins ..... 9

B. Defendants ..... 10

1. The Zillow Defendants ..... 10

III. JURISDICTION AND VENUE ..... 11

IV. FACTUAL ALLEGATIONS ..... 12

A. Zillow's Illegal Steering ..... 12

B. Zillow's Financial Incentive to Steer ..... 17

C. The Harmful and Long-Lasting Economic Impacts of Zillow's Steering ..... 18

D. Georgetown Professor Salop's Empirical Study of Zillow's Costs and Interest Rates ..... 19

E. Current and Former Preferred Agents Confirm Zillow's RESPA Violations ..... 21

1. Confidential Real Estate Agent 1 ..... 22

2. Confidential Real Estate Agent 2 ..... 23

3. Confidential Real Estate Agent 3 ..... 24

4. Confidential Real Estate Agent 4 ..... 24

5. Confidential Real Estate Agent 5 ..... 24

6. Confidential Real Estate Agent 6 ..... 25

7. Confidential Real Estate Agent 7 ..... 25




HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

8. Confidential Real Estate Agent 8 ... 26

9. Confidential Real Estate Agent 9 ... 27

10. Confidential Loan Officer 1 ... 28

11. Confidential Loan Officer 2 ... 30

F. Real Estate Agents Owe a Duty of Candor and Loyalty to their Clients ... 32

G. Zillow's Choice of Law Clause ... 35

V. CLASS ACTION ALLEGATIONS ... 35

VI. TOLLING OF THE STATUES OF LIMITATIONS ... 38

VII. CLAIMS FOR RELIEF ... 40

CLAIM I VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 US.C. 2607(A) (ON BEHALF OF A NATIONWIDE CLASS, AGAINST THE ZILLOW DEFENDANTS) ... 40

CLAIM II VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010, *ET SEQ*.) (ON BEHALF OF A NATIONWIDE CLASS) ... 44

A. Failure to Disclose Steering ... 45

B. *Per se* Unfair Practice ... 45

C. Injury to Plaintiffs ... 46

REQUEST FOR RELIEF ... 47

DEMAND FOR JURY TRIAL ... 47




HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Plaintiffs Araba Armstrong, David Liao, Furgus Wilson, Brandon Daughtery, and Rebecca Robbins bring this action on behalf of themselves and on behalf of a proposed Class (defined below), and allege upon information and belief and the investigation of counsel as follows:

## I. INTRODUCTION

1. In response to this Court's Order on Defendants' Motion to Dismiss,[1] Plaintiffs have substantially narrowed the claims, allegations, plaintiffs, and defendants to comport with the Court's ruling. At its core, this case is about Zillow requiring "Zillow Preferred"[2] real estate agents to steer homebuyers to use Zillow Home Loans ("ZHL") in exchange for homebuyer leads. This conduct violates the Real Estate Procedures Act, 12 U.S.C. § 2607(a) ("RESPA"). To allege a RESPA claim, Plaintiffs need to show that Defendants "(1) exchanged a payment or thing of value (2) pursuant to an agreement to refer real estate settlement services; and (3) an actual referral."[3] Plaintiffs meet all three of these elements.

2. A "thing of value" is "broadly defined," and includes "commissions" and the "opportunity to participate in a money-making program."[4] Defendants and Zillow Preferred agents exchanged opportunities to participate in a money-making program when they agreed that (1) Defendants would provide leads to clients looking for homes, in exchange for (2) Zillow Preferred agents referring their clients to Zillow Home Loans. As documented throughout this Complaint (*see infra* Part IV.A & IV.E), Zillow conditioned leads (a thing of value) on a Zillow Preferred agent's success in referring clients to close with Zillow Home Loans (a thing of value). If they did not comply, their leads dwindled, or they were cut from the program. Zillow both *gave* and *received* a thing of value pursuant to this agreement. Plaintiffs satisfy the first two elements.

3. An "actual referral" means conduct that "affirmatively influenc[es]" a customer's decision to use a "settlement service."[5] Zillow Preferred agents affirmatively influenced their clients to use Zillow Home Loans by urging them to use ZHL to close on the property. *See infra* ¶¶ 47-60.

---

[1] *See* July 27, 2026 Order, ECF No. 102 ("Order").

[2] *See* Zillow Preferred, *Welcome to Zillow Preferred*, Zillow.com/preferred/ (last visited Aug. 14, 2026).

[3] *See* Order at 17 (citing *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178-79 (9th Cir. 2015)).

[4] 12 C.F.R. 1024.14(d).

[5] 12 C.F.R. 1024.14(f)(1).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Indeed, Zillow *trains* Zillow Preferred agents to affirmatively influence their clients to use ZHL. Below is an excerpt of a training Zillow conducted with Zillow Preferred agents, instructing these agents to refer clients to ZHL, even when they are looking for a loan product that Zillow does not offer, like a Down Payment Assistance ("DPA") loan:

> - #3. What if they need a DPA product, VA loan or jumbo product?
>   - Inform them that Zillow Home Loans offers a variety of competitive products for all client needs. Let them know you will connect them with your dedicated loan officer who will walk them through their loan options and pre-approval steps.

4. This training has been effective in influencing homebuyers' decisions to use ZHL, as Plaintiffs can attest. As detailed below:

- Plaintiff Armstrong alleges that "at the time she obtained her mortgage loan, following her communications with her Zillow agent, her agent led her to believe that she was obligated to use ZHL for her mortgage. Plaintiff Armstrong subsequently realized that there were other options available to her as a first-time home buyer that her Zillow agent did not inform her about, including her qualification for several federal and state programs designed to reduce interest rates, down payments, and closing costs." *See infra* ¶ 13.
- Plaintiff Liao alleges that his real estate agent "encouraged Liao to use Zillow Home Loans because of its really good interest rates." *See infra* ¶ 15.
- Plaintiff Wilson alleges that "both the agent (J.M.) and loan officer directed Plaintiff Wilson to obtain pre-approval through ZHL, and J.M. represented that ZHL was the best possible option and discouraged Plaintiff Wilson from shopping for alternative lenders. No other lenders were meaningfully discussed, and Plaintiff Wilson felt pressured to proceed with ZHL. As a result, Plaintiff Wilson

did not pursue other available financing options, for which he believes he would have qualified, and he believes he paid more for his loan than he would have absent the steering." *See infra* ¶ 22.

- Plaintiff Daugherty alleges that his real estate agent "pressured him into using Zillow Home Loans by telling him that ZHL will be able to close faster on the property, and that he would lose the property if he tried to use someone else because that would delay his closing. Plaintiff Daughterty relied on these statements in using ZHL because N.D. led him to believe that he did not have any other choice. As a result of N.D.'s comments, Plaintiff Daugherty did not research alternate lenders." *See infra* ¶ 27.
- Plaintiff Robbins alleges that her real estate agent "pressured her into using Zillow Home Loans by telling her that Zillow had less fees because K.M.'s brokerage and Zillow were all part of the same company. K.M. never told Robbins that there were other options, or that she could use other lenders . . . . Plaintiff Robbins did not research other lending options because she felt like she did not have any other choice, as they were almost at closing, they had already paid a down payment on the property, and they did not want to risk losing the house." *See infra* ¶ 32.

Plaintiffs satisfy this third element as well.

5. Plaintiffs also have standing to bring this claim pursuant to 12 U.S.C. 2607(d)(2) because they directly paid Zillow for the settlement service involving in the RESPA violation.[6] Under RESPA, loan originations are settlement services.[7] In its Order, the Court stated that Plaintiffs previously made "no allegations that they paid out-of-pocket for any settlement services." Order at 18. Plaintiffs in *this* Complaint have so pled:

[6] *See* Order at 17 (citing *Blaylock v. First Am. Title Ins. Co.*, 2008 WL 8741396, at *9 (W.D. Wash. Nov. 7, 2008)).

[7] 12 U.S.C.S.§ 2602(3) ("the term 'settlement services' includes any service provided in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing of settlement").


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

- Plaintiff Araba Armstrong paid out-of-pocket $205.86 in points and $1,500 in loan origination fees directly to Zillow Home Loans, LLC for settlement services. *See infra* ¶ 11.
- Plaintiff David Liao paid out-of-pocket $1,526.40 in points, $850 in loan origination fees, $189.49 in prepaid interest, $159.51 in homeowner's insurance, and $589.11 in property taxes directly to Zillow Home Loans, LLC for settlement services. *See infra* ¶ 16.
- New Plaintiff Furgus Wilson paid out-of-pocket $1,500 in loan origination fees directly to Zillow Home Loans, LLC for settlement services. *See infra* ¶ 20.
- New Plaintiff Brandon Daugherty paid out-of-pocket $1,500 in loan origination fees, and $102.34 in mortgage points, directly to Zillow Home Loans, LLC for settlement services. *See infra* ¶ 25.
- New Plaintiff Rebecca Robbins paid out-of-pocket $1,500 in loan origination fees, and $2,242.43 in mortgage points, directly to Zillow Home Loans for settlement services. *See infra* ¶ 30.

6. As a result of these settlement service payments, Plaintiffs have incurred damages. RESPA provides that defendants are "liable to persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service." 12 U.S.C. § 2607(d)(2). Defendants are liable to Plaintiffs for three times the amounts listed above.

7. Plaintiffs were also injured from the higher costs, fees, and interest rates that Defendants charge. A December 2025 empirical study by Georgetown Professor Steven Salop confirms that ZHL borrowers incurred an injury by overpaying for their loans.[8] According to his study, "ZHL borrowers pay significantly higher mortgage costs than they would pay to other lenders, which are referred to as ZHL 'overcharges.'"[9] Prof. Salop concludes that these findings are indicative

---

[8] *See* Steven C. Salop, *Empirical Analysis of Zillow Home Loans Pricing* ("Salop Study") (Dec. 21, 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5951355 (last visited Aug. 14, 2026).

[9] *Id.* at 1.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

of steering by Zillow.[10] Salop further correctly noted that Zillow's loan business has been growing rapidly, which "may substantially increase the total overcharges paid by all ZHL borrowers."[11]

8. Zillow's conduct also constitutes a violation of Washington State's Consumer Protection Act ("Washington CPA"), which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.86.020. Zillow has violated this statute in two respects. First, a violation of RESPA constitutes a per se violation of the Washington CPA,[12] particularly given the substantial public interest that this Complaint seeks to address. Zillow's conduct is also, at the very least, "unfair," because it has pushed homebuyers into loans that are more expensive simply for Zillow's own profit. Zillow never disclosed its steering campaign to homebuyers, furthering the deception of its conduct.

9. Plaintiffs, on behalf of themselves and the proposed Class, accordingly bring this lawsuit for Defendants' violations of RESPA and the Washington CPA.[13] Plaintiffs seek treble damages, single damages, injunctive relief, disgorgement, and the costs of this lawsuit, including reasonable attorneys' fees.

## II. PARTIES

### A. Plaintiffs

#### 1. Araba Armstrong

10. Plaintiff Araba Armstrong is a resident of Anchorage, Alaska. On April 3, 2024, Plaintiff Armstrong purchased a home in Anchorage using a Zillow agent, D.M. (D.M. is identified as a "Top Agent on Zillow" on Zillow's website, which strongly suggests D.M. is a Zillow Preferred agent). Prior to her purchase, Plaintiff Armstrong was browsing Zillow.com to look for houses and identified a house that interested her. At the agent's direction, after Plaintiff Armstrong obtained mortgage pre-approval, she subsequently obtained a mortgage loan from Zillow Home Loans.

---

[10] *Id.* at 29.

[11] *Id.*

[12] *See Tierney v. Carrington Morg. Svcs.*, 2021 WL 5280022, at *6 (W.D. Wash. Nov. 12, 2021).

[13] In its Order, the Court dismissed Plaintiffs' RICO, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment claims, as well as Plaintiffs' RESPA claim under 12 U.S.C. § 2607(b). Plaintiffs reincorporate those claims by reference solely for purposes of preserving Plaintiffs' appeal.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Plaintiff Armstrong was not informed of Zillow's quotas, incentives, or requirements linking the agent's access to Zillow leads to referrals or pre-approvals with ZHL.

11. Plaintiff Armstrong used Zillow Home Loans to purchase her property, and paid the following amounts to Zillow Home Loans at closing:

| Loan Costs | | | Borrower-Paid | |
|---|---|---|---|---|
| | | | At Closing | Before Closing |
| A. Origination Charges | | | $1,705.86 | |
| 01 | 0.178% of Loan Amount (Points) | to ZILLOW HOME LOANS, LLC | $205.86 | |
| 02 | LOAN ORIGINATION FEE | to ZILLOW HOME LOANS, LLC | $1,500.00 | |

12. Plaintiff Armstrong accordingly paid out-of-pocket loan origination fees to Zillow for settlement services in connection with her property purchase.

13. At the time she obtained her mortgage loan, following her communications with her Zillow agent, her agent led her to believe that she was obligated to use ZHL for her mortgage. Plaintiff Armstrong subsequently realized that there were other options available to her as a first-time home buyer that her Zillow agent did not inform her about, including her qualification for several federal and state programs designed to reduce interest rates, down payments, and closing costs. As a result, she paid more for her loan than she would have absent the steering. This was the first residential property that Plaintiff had ever purchased.

14. For reasons detailed herein (*see infra* Part IV.A-E.), by virtue of using ZHL, Plaintiff Armstrong overpaid for her home loan.

**2. David Liao**

15. Plaintiff Liao is a resident of Northridge, California. On February 12, 2021, Plaintiff Liao purchased a home in Las Vegas, Nevada, with agent V.P. (V.P. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggests V.P. is a Zillow Preferred agent). Plaintiff Liao used Zillow Home Loans to finance and close on the purchase; V.P. encouraged Liao to use Zillow Home Loans because of its really good interest rates.

16. Plaintiff Liao used Zillow Home Loans to purchase his property, and paid the following accounts to Zillow Home Loans at closing:



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

| LENDER'S AND LOAN RELATED CHARGES: - Zillow Hor | |
|---|---|
| 1.44% of Loan Amount (Points) to Zillow Home Loans, LLC ISAOA | 1,526.40 |
| Origination Fee to Zillow Home Loans, LLC ISAOA | 850.00 |
| Appraisal Fee to United States Appraisals $425.00 POC - Buyer | |
| Credit Report to Settlement One Credit Corp. | 39.54 |
| Homeowner's Insurance Premium, OA4833080 to RL Thomas Insurance Service 12 mos. | 638.00 |
| Prepaid Interest to Zillow Home Loans, LLC ISAOA @ $10.5274 per day from 2/11/2021 to 3/1/2021 | 189.49 |
| Homeowner's Insurance to Zillow Home Loans, LLC ISAOA 3 mos. @ $53.1700/month | 159.51 |
| Property Taxes to Zillow Home Loans, LLC ISAOA 3 mos. @ $196.3700/month | 589.11 |

17. Plaintiff Liao accordingly paid out-of-pocket loan origination fees (and other fees) to Zillow for settlement services in connection with his property purchase.

18. For reasons detailed herein (*see infra* Part IV.A-E.), by virtue of using ZHL, Plaintiff Liao overpaid for his home loan.

**3. Furgus Wilson**

19. Furgus Wilson is a resident of Larkspur, California. On or about November 29, 2023, Plaintiff Wilson purchased a residential property in Weleetka, Oklahoma, using agent J.M., who, upon information and belief, is a Zillow Preferred agent. Prior to his purchase, Plaintiff Wilson was browsing Zillow.com to look for houses and identified a property that interested him. He clicked on the "Contact Agent" button, believing that he was contacting the listing agent when in fact he was routed by Zillow to, upon information and belief, J.M., a Zillow Preferred Agent with no connection to the home.

20. At the agent's direction, and after applying online, Plaintiff Wilson obtained mortgage pre-approval and financing through ZHL. Plaintiff Wilson used Zillow Home Loans to purchase his property, and paid the following amount to Zillow Home Loans at closing:


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

| Origination Fee | Paid To: Zillow Home Loans, LLC | | | | $1,500.00 |
|---|---|---|---|---|---|
| | Financed | PTC | PAC | POC | |
| Borrower | | * $1,500.00 | * $1,500.00 | | |

21. Plaintiff Wilson accordingly paid out-of-pocket loan origination fees to Zillow for settlement services in connection with his property purchase.

22. Both the agent (J.M.) and loan officer directed Plaintiff Wilson to obtain pre-approval through ZHL, and J.M. represented that ZHL was the best possible option and discouraged Plaintiff Wilson from shopping for alternative lenders. No other lenders were meaningfully discussed, and Plaintiff Wilson felt pressured to proceed with ZHL. As a result, Plaintiff Wilson did not pursue other available financing options, for which he believes he would have qualified, and he believes he paid more for his loan than he would have absent the steering.

23. For reasons detailed herein (*see infra* Part IV.A-E.), by virtue of using ZHL, Plaintiff Wilson overpaid for his home loan.

**4. Brandon Daugherty**

24. Brandon Daugherty is a resident of Zionsville, Pennsylvania, using agent N.D. (N.D. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggest N.D. is a Zillow Preferred agent). On or about March 31, 2026, Plaintiff Daugherty purchased a residential property in Zionsville. Prior to his purchase, he was browsing Zillow.com and identified a property that interested him. He clicked on the "Contact Agent" button, and a loan officer from Zillow called him. The loan officer urged him to first get pre-approval, and then the loan officer would put him in touch with a Zillow Preferred agent. A Zillow Preferred agent, N.D., subsequently called him.

25. Plaintiff Daughterty used Zillow Home Loans to purchase the property, and paid the following amount to Zillow Home Loans at closing:

**Closing Cost Details**

| Loan Costs | | Borrower-Paid | | Seller-Paid | | Paid By Others |
|---|---|---|---|---|---|---|
| | | At Closing | Before Closing | At Closing | Before Closing | |
| A. Origination Charges | | $1,602.34 | | | | |
| 01 0.043% of Loan Amount (Points) | to ZILLOW HOME LOANS, LLC | $102.34 | | | | |
| 02 LOAN ORIGINATION FEE | to ZILLOW HOME LOANS, LLC | $1,500.00 | | | | |

26. Plaintiff Daugherty accordingly paid out-of-pocket loan origination fees to Zillow for settlement services in connection with his property purchase.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

27. N.D. pressured him into using Zillow Home Loans by telling him that ZHL will be able to close faster on the property, and that he would lose the property if he tried to use someone else because that would delay his closing. Plaintiff Daughterty relied on these statements in using ZHL because N.D. led him to believe that he did not have any other choice. As a result of N.D.'s comments, Plaintiff Daugherty did not research alternate lenders.

28. For reasons detailed herein (*see infra* Part IV.A-E.), by virtue of using ZHL, Plaintiff Daugherty overpaid for his home loan.

**5. Rebecca Robbins**

29. Rebecca Robbins is a resident of Flint, Michigan. On or about June 13, 2026, Plaintiff Robbins purchased a residential property in Flint with real estate agent K.M. (K.M. is identified as a "Top Agent on Zillow" on the Zillow website, which strongly suggest K.M. is a Zillow Preferred agent). Prior to her purchase, she was browsing Zillow.com and identified a property that was of interest to her. She clicked on the Request a Tour button, and was eventually put in touch with a Zillow Preferred agent, K.M.

30. Plaintiff Robbins used Zillow Home Loans to purchase the property, and paid the following amount to Zillow Home Loans at closing:

**Closing Cost Details**

| Loan Costs | | Borrower-Paid | | Seller-Paid | | Paid By Others |
|---|---|---|---|---|---|---|
| | | At Closing | Before Closing | At Closing | Before Closing | |
| A. Origination Charges | | $3,742.43 | | | | |
| 01 2.404% of Loan Amount (Points) | to ZILLOW HOME LOANS, LLC | $2,242.43 | | | | |
| 02 LOAN ORIGINATION FEE | to ZILLOW HOME LOANS, LLC | $1,500.00 | | | | |

31. Plaintiff Robbins accordingly paid out-of-pocket loan origination fees to Zillow for settlement services in connection with her property purchase.

32. K.M. pressured her into using Zillow Home Loans by telling her that Zillow had less fees because K.M.'s brokerage and Zillow were all part of the same company. K.M. never told Robbins that there were other options, or that she could use other lenders. Despite K.M.'s claims, in fact the fees that Zillow Home Loans was going to charge her kept increasing as they got closer to closing. Plaintiff Robbins and her husband had to contact the loan officer to push back against the excessive fees. Plaintiff Robbins did not research other lending options because she felt like she did



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

not have any other choice, as they were almost at closing, they had already paid a down payment on the property, and they did not want to risk losing the house.

33. For reasons detailed herein (*see infra* Part IV.A-E.), by virtue of using ZHL, Plaintiff Robbins overpaid for her home loan.

**B. Defendants[14]**

**1. The Zillow Defendants**

34. Zillow, Inc. is an online real estate marketplace. It is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington. Zillow maintains real estate brokerage licenses in several states.

35. Zillow Group, Inc. offers online real estate services and is incorporated in the State of Washington with its principle executive offices located at 1301 Second Avenue, Floor 31, Seattle, Washington. Zillow Group is the publicly traded parent company that controls the Zillow online real estate marketplace and a range of related businesses and services. Zillow Group describes itself in its 2026 Form 10-K as "the most visited and trusted brand in the online real estate industry."[15] Zillow Group reported 2025 revenue of $2.6 billion, up 16% year over year.[16]

36. Zillow Homes, Inc. is organized and existing under the laws of the State of Delaware, with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

37. Zillow Listing Services, Inc. offers a variety of real estate services. It maintains real estate brokerage licenses in several states. It is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

38. Zillow Home Loans, LLC ("ZHL") is a wholly-owned subsidiary of Zillow, Inc. It is a Kansas limited liability company with its principal place of business at 2600 Michelson Drive,

[14] The Defendants are collectively referred to as herein as "Zillow."

[15] Zillow 10-K for FY 2025 at 6 (Feb. 10, 2026), https://s25.q4cdn.com/975009107/files/doc_financials/2025/ar/Form-10-K.pdf (last visited Aug. 14, 2026).

[16] *Id.* at 42.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Suite 834, Irvine, California. ZHL primarily originates mortgage loans and sells them to other mortgage companies.

39. According to Zillow's SEC filings, "loan origination volume is an important metric as it is a measure of how successful we are at the origination of mortgage loan products through our Zillow Home Loans mortgage origination operations, which directly impacts our Mortgages revenue."[17]

40. Through its integration with the Zillow website and Zillow's Preferred program, ZHL participates in the referral network and financing practices challenged in this Complaint.

## III. JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises from violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq*.

42. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 28 U.S.C. §§ 1331.

43. This Court may also exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because they are so related to the RESPA claim (within the Court's original jurisdiction) that they form part of the same case or controversy under Article III of the United States Constitution. This case does not present novel or complex issues of state law that predominate over claims for which this Court has original jurisdiction, and there are no compelling reasons for declining supplemental jurisdiction over Plaintiffs' claims that do not arise under RESPA.

44. This Court has personal jurisdiction over the Zillow Defendants because these Defendants have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this

[17] *Id.* at 44.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

45. Venue is proper in this District because each Zillow Defendant transacts substantial business in this District, as alleged throughout this Complaint. These Defendants reside in this District or transact business in this District. These Defendants also market and sell products and services in this District and have maintained continuous and systematic contacts with this District.

## IV. FACTUAL ALLEGATIONS

### A. Zillow's Illegal Steering

46. When a house is for sale on Zillow, the Zillow website has big colorful buttons in bright blue posted next to the house listing that say "Contact agent" and "Request a tour":




47. After clicking either button, potential buyers are asked to provide their contact information, which Zillow provides to an agent participating in Zillow's leads program (a "Zillow Preferred agent"). As the buying process continues, Zillow compels Zillow Preferred agents to steer home buyers to use Zillow Home Loans ("ZHL"), even though—as Zillow and the agents know—ZHL offers fewer loan packages compared to competitors, its loans come with undisclosed and hidden fees, it has higher interest rates, and it does not offer common assistance packages available to first time home buyers, who comprise almost half of all buyers.[18] If agents do not comply and fail to meet Zillow's steering quotas, the agents are dropped from the Zillow Preferred program (previously known as the "Flex" program), regardless of the agent's performance or the client's satisfaction. But if they do comply, they are rewarded with more leads. In graphic form, the exchange of leads for referrals looks like this:

---

[18] Manny Garcia, *Buyers: Results from the Zillow Consumer Housing Trends Report 2024*, Zillow (Oct. 1, 2024), https://www.zillow.com/research/buyers-housing-trends-report-2024-34383/ (last visited Aug. 14, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX




48. Based on accounts from real estate agents, if an agent has the following "Top Agent on Zillow" marker on his or her Zillow profile, then the agent is most likely a "Zillow Preferred" agent:




49. Many agents are speaking out about their concerns about the legality of this policy. For example, in discussing the allegations in the previously filed Complaint in this case that Zillow requires agents to steer a certain percentage of its customers to ZHL, a real estate agent and commentator named Jared James on his podcast (posted on YouTube) confirmed that "a lot of these team leaders and flex agents" are stating that if agents do not close with Zillow Home Loans, "then


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

you're getting downgraded. Like's there's a whole system, you know, green yellow red, like you will be downgraded green yellow red."[19]

50. James noted that Zillow managers are *flying out in person* (presumably from Seattle, Washington) to deliver these messages directly to the teams and agents, to describe the program in ways that they did not want in writing: "Many of the big big teams that I talked to said that like the big ups, that **the bigger ups at Zillow flew out personally to tell them what was going to happen**. Um, and a lot of it, I got to be honest, was because **they were having conversations they couldn't put on the record**, they couldn't email, they couldn't put over the phone, like they're meeting with them so they can tell them the real deal."[20]

51. James commented that the agents are telling him that ZHL loan officers are inferior and offer an inferior product, but the agents are forced to refer customers to ZHL anyway in violation of their fiduciary duties: "And so here you [the agent] are going, 'well, I don't want to give it to them because they number one don't do a great job. They're new. They're not great at it. And they don't have the same offerings that my person's going to need in order to be able to close. And yet, if they don't send them there anyway, they're getting penalized.'"[21]

52. Although not expressing an opinion on RESPA, James noted that "[g]etting or not getting those leads **is a thing of value. Huge.** I have people in my DMs right now who are desperate, who 25 or 50% of their business is coming from these uh Zillow Flex deals that are now changing completely. **And [] they don't think it's best for their client to go talk to this [] loan officer through Zillow Home Loans, and if they don't they get downgraded, these lose leads, they lose their business. I don't know how that's not a thing of value**."[22]

53. In response, one commentator under the YouTube video stated: "You have no idea the pressure they place on the team leaders the brokerages. Every week we have a mandatory meeting. . . . And every week it's the exact same thing. You're not making your numbers. You need

---

[19] *See* Jared James, *Zillow Had a Very Bad Week | Today with Jared James Ep. 134*, YouTube (Sept. 29, 2025), at 7:06, https://www.youtube.com/watch?v=p75ykIO_k4I (last visited Aug. 14, 2026).

[20] *Id.* at 11:41.

[21] *Id.* at 12:34.

[22] *Id.* at 16:16.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

to make your numbers. If you don't make your numbers you are no longer going to be part of flex. **It is a constant threat every single week.**"[23]

54. In another example, on October 21, 2025, *The Capitol Forum* reported on agents' mounting concern and anxiety about Zillow's steering policies in an article entitled "Relators Are Required to Drive Business to Zillow's In-House Lending Arm, Potentially Raising Buyer Costs; Agents Express Concern they are Violating RESPA."[24] One real estate agent, whose team signed up for Zillow Flex, told *The Capitol Form* that "the 'red flag' appeared when Zillow began coaching the team on how to refer buyers to ZHL products . . . . 'Our team felt like they were basically forcing us to connect (buyers) to ZHL, and they were forcing us to sell ZHL services . . . . **It just made us sick.**."[25]

55. *The Capitol Forum* further describes the harmful economic impact on buyers from Zillow's policies: "Retail lenders like ZHL can have higher rates and may offer fewer mortgage products, which can lead to buyers missing out on discount programs targeting groups like veterans or first-time homebuyers. One Virginia real estate agent currently in the Flex[/Preferred] program said one of her discomforts is it '**absolutely' raises costs to buyers to refer them to Zillow's lending business**."[26] The agent stated that, if she referred her first-time homebuyer clients to ZHL, they "would miss out on some really good first-time homebuyer programs that offer significant rebates."[27] The Virgina agent further stated that Zillow is "holding leads hostage from agents that do not send clients to get preapproval from ZHL. I just don't understand how this could be legal."[28]

56. The article further noted that "**Zillow keeps close tabs on Flex agents**."[29] According to the *Capitol Forum*, the Zillow platform "has immense ability to monitor how they do their jobs.

---

[23] *Id.* at Comments (emphases added).

[24] *Zillow: Realtors Are Required to Drive Business to Zillow's In-House Lending Arm, Potentially Raising Buyer Costs; Agents Express Concern They Are Violating RESPA*, 13 Capitol Forum 843 (Oct. 21, 2025), https://thecapitolforum.com/zillow-realtors-are-required-to-drive-business-to-zillows-in-house-lending-arm/ (last visited Aug. 14, 2026).

[25] *Id.* (emphasis added).

[26] *Id.* (emphasis added).

[27] *Id.*

[28] *Id.* (emphasis added).

[29] *Id.* (emphasis in original). This is corroborated by accounts of agents themselves, as summarized below.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Agents must take calls and manage their clients through the Zillow app or Zillow-owned Follow Up Boss, a customer relations management app. Agents said that through these apps **Zillow records their phone calls and rates them on metrics like how quickly they start reciting a script provided by Zillow**."[30]

57. Former Zillow Preferred agents have reported being terminated from the program because they complied with their fiduciary duties by making loan recommendations that serve their clients' best interests, rather than steering them to ZHL, who offers a product that does *not* serve the clients' best interests. *See infra* Part IV.E. Zillow rewarded these agents' ethical behavior by terminating them from the Zillow Preferred program.

58. Pressure on Zillow agents to steer clients to Zillow Home Loans has been ongoing since at least 2018. Zillow announced on August 6, 2018 that it had acquired Mortgage Lenders of America.[31] Upon acquisition, Zillow immediately pivoted to pressuring agents to steer clients to Zillow Mortgage (the predecessor to Zillow Home Loans).

59. One leading real estate trainer, Glennda Baker, appeared on Jared James's podcast (quoted above), and discussed steering allegations against Zillow.[32] According to Baker, she was a founding member of the Zillow Agent Advisory Board. Baker described how she "absolutely had a love affair with Zillow," and spent hundreds of thousands of dollars on leads with them. But she stopped using Zillow based on a meeting with Zillow and 200 agents on October 16, 2018 in Boston, Massachusetts. At that meeting, an agent confronted Greg Schwarz (the then-Zillow President of Media and Marketplace) about the fact that her leads dropped 70% "in a heartbeat," and she wanted to know why.[33] In response, Schwarz presented a slide deck on how Zillow is changing. According to Baker, Mr. Schwarz stated "we are going to send leads to . . . elite agents based on their integration

---

[30] *Id.* (emphasis added).

[31] *See Zillow Group to Acquire Mortgage Lenders of America*, Zillow Group (Aug. 6, 2018), https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2018/Zillow-Group-to-Acquire-Mortgage-Lenders-of-America/default.aspx (last visited Aug. 14, 2026).

[32] Jared James, *Live with Glennda Baker Talking Zillow Lawsuit and Making Videos | Today with Jared James Ep. 138*, YouTube (Nov. 15, 2025), https://www.youtube.com/watch?v=GfY98eYRwHc (last visited Aug. 14, 2026).

[33] *Id.* at 11:46.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

of software and services provided by Zillow."[34] Ms. Baker further explained that "I've gotten hundreds of messages from agents . . . it all depended on how many [] deals we sent to Zillow Mortgage."[35]

60. Confidential Real Estate Agent 7 ("CA7," more fully summarized below), a longtime Zillow agent, corroborates Baker's account. According to CA7, beginning at least as early as 2019, Zillow representatives were pressuring CA7 to push clients to use Zillow's products, including Zillow Mortgage. Zillow representatives told CA7 that CA7 needed to push these products, including Zillow Mortgage, and if not, CA7's leads would dry up. CA7 also knows that other agents were facing similar pressure.

**B. Zillow's Financial Incentive to Steer**

61. This steering campaign has been financially lucrative for the Defendants: Zillow reports that its loan origination volume for the six-month period ending on June 30, 2026 has increased ***95%***, to $3.75 billion, compared to the same six-month period in 2025.[36] According to Zillow, "[t]his increase was primarily driven by the continued growth in Zillow Home Loans purchase loan originations in line with our strategic priorities." *Id.* Their "strategic priorities" are to train agents how to illegally steer clients to ZHL.

62. According to Zillow, its objective was to "increase the number of purchase loans, loans per officer, and Zillow Home Loans customer adoption rate."[37] Internal disclosures and independent industry commentary consistently identify mortgage "attach" or adoption rates as a primary lever for ZHL expansion.[38]

---

[34] *Id.* at 13:49.

[35] *Id.* at 14:24.

[36] Zillow 10-Q for QP ended June 30, 2026, at 28, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001617640/27f74749-a219-4630-a67c-96c81013dd7a.pdf (last visited Aug. 14, 2026).

[37] Zillow Group, *Q3 2022 Shareholder Letter* (Nov. 2, 2022), at 4, https://www.sec.gov/Archives/edgar/data/1617640/000161764022000104/exhibit993.htm (last visited Aug. 14, 2026).

[38] *Id.*; *Flex Program Standards*, Zillow Premier Agent, https://www.zillow.com/z/flex-performance-terms/performance-standards/ (last visited Oct. 23, 2025); DelPrete, *The Path Forward for Zillow Home Loans* (Mar. 1, 2023), https://www.mikedp.com/articles/2023/2/28/the-path-forward-for-zillow-home-loans (last visited Dec. 19, 2025); *see also* Program Standards, Zillow Preferred, https://www.zillow.com/preferred/program-standards/ (last visited Dec. 19, 2025) (describing Zillow Preferred standards, including pre-approval targets).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

63. According to Zillow Group, ZHL "originates mortgage loans and then generally sells the loans on the secondary market," rather than servicing them.[39] This volume-driven model gives Zillow incentive to maximize loan originations through ZHL, regardless of whether those loans offer consumers the most favorable terms. By all accounts, its steering has been successful: Zillow Group reported that its mortgage-origination volume totaled over $4.75 billion in 2025, compared with $3.1 billion in 2024, representing a 52% increase.[40] It noted its loan origination growth was "due to continued growth in Zillow Home Loans purchase loan originations in line with our strategic priorities."[41] Their "priorities" are compelling Zillow Preferred agents to steer clients to ZHL. Its mortgage revenue similarly increased to $199 million, up 54% from the previous year.[42]

## C. The Harmful and Long-Lasting Economic Impacts of Zillow's Steering

64. Zillow's steering practice can have long-lasting impacts on the housing market. Public reporting and empirical economic analysis further corroborate that borrowers who used ZHL paid more for mortgage credit than similarly situated borrowers who used other lenders.

65. As one article described Zillow's steering practice, "experts warn this apparent efficiency [from steering] is masking a system designed to steer homebuyers to the platforms' own mortgage lenders, squeezing out competition and discouraging buyers from finding cheaper options. It's part of massive consolidation and restructuring efforts by Zillow and Redfin's corporate owners to corner the trillion-dollar mortgage market, **which is already driving up housing costs and could heighten the risk of a financial crisis**."[43]

66. Zillow's illegal conduct can also have devastating impacts on buyers over the long run, particularly those saddled with a higher interest rate mortgage: "Unbeknownst to many consumers, shopping around for a home loan can save homebuyers an average of more than $80,000 over a thirty-year mortgage. In states like California, Hawaii, and Washington, lifetime savings can reach more than $100,000. Consumers who use real estate companies' in-house lenders may also be

---

[39] *Id.* at 5.

[40] *Id.* at 46.

[41] *Id.*

[42] *Id.*

[43] Helen Santoro, *Zillow and Redfin May Be Steering Homebuyers Into Bad Deals*, Jacobin (Sept. 16, 2025), https://jacobin.com/2025/09/zillow-redfin-mortgage-lending-competition (emphasis added) (last visited Aug, 14, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

forced to pay higher fees and interest charges than those who use alternative options."[44] Zillow's own materials and independent industry analysis show that a 1% rate change can reduce interest payments by tens of thousands of dollars on a 30-year loan.[45]

67. As a result of Zillow's conduct, Plaintiffs and Class Members paid more for mortgage origination than they otherwise would have, lost access to competing loan programs and favorable terms, and were deprived of the independent advice that state and federal law require in residential real estate transactions. These injuries are uniform across the Class and constitute the precise consumer harms RESPA and the Washington CPA were designed to prevent.

**D. Georgetown Professor Salop's Empirical Study of Zillow's Costs and Interest Rates**

68. Right before the filing of the last complaint, an empirical study affirmed that Zillow's illegal steering increases costs for consumers. On December 21, 2025, Georgetown Professor Steven C. Salop released a working draft report entitled "Empirical Analysis of Zillow Home Loans Pricing."[46] Prof. Salop earned his M. Phil. and Ph.D from Yale University.[47] He has been on the faculty at Georgetown since 1981; his current title is Professor of Economics and Law Emeritus. *Id.* He has served as an Economist at the Federal Trade Commission, the Civil Aeronautics Board, and the Federal Reserve Board. *Id.* He is the recipient of the Association of American Law Schools ("AALS") Antitrust Section Lifetime Achievement Award (2019). *Id.* His CV lists over 100 scholarly publications in leading law reviews and economic journals on economic and antitrust topics, including in *Yale Law Journal*, *American Economic Review*, and *Antitrust Law Journal*. *Id.* He received financial support for his Zillow report from CoStar.

69. Broadly, Prof. Salop, citing recent scholarship, discovered that "lack of consumer information and effective shopping can lead to higher prices and price dispersion even in unconcentrated markets. Empirical research involving the market for mortgages has shown that

---

[44] *Id.*

[45] *See, e.g.*, Susan Kelleher, *How Does a 1% Interest Rate Change Affect Your Buying Power?*, Zillow Learning Center (Nov. 6, 2024), https://www.zillow.com/learn/interest-rate-impact-mortgages/ (last visited Oct. 24, 2025); Chris Muller, *How much does a 1% difference in mortgage rate matter?*, Money Under 30, https://www.moneyunder30.com/1-percent-difference-mortgage-rate/ (last visited Oct. 24, 2025).

[46] *See* Salop Study, *supra* note 8.

[47] *See* Curriculum Vitae of Steven C. Salop (Dec. 2025), https://www.law.georgetown.edu/wp-content/uploads/2025/12/Steven-Salop-CV-December-2025.pdf (last visited Aug. 14, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

***borrowers who consider the terms of more than one lender realize substantial savings***." Salop Study at 3 (emphasis added). According to Prof. Salop, Zillow "reported that its recent research showed that almost 70% of buyers submit only one mortgage application rather than shopping around despite the fact that shopping can lead to substantially lower monthly costs." *Id.* at 5.

70. To conduct his analysis, Prof. Salop relied on the public versions of the Home Mortgage Disclosure Act ("HMDA") database. *Id.* at 5. The HMDA "requires most mortgage lenders to report detailed information about their mortgage lending activity. These data include loan-level information on interest rates, fees, borrower financial characteristics and demographics, loan amounts, and property characteristics." *Id.* Prof. Salop reports that the "HMDA data have been widely used in academic research to study mortgage market outcomes, lending discrimination, and the effects of regulatory interventions." *Id.* The HMDA data is collected and published by the Consumer Financial Protection Bureau ("CFPB"), and "includes loan-level information for tens of millions of mortgage applications and originations each year." *Id.* at 9.

71. Professor Salop's analysis focuses on the Consumer Financial Protection Bureau's "rate spread" variable, which measures the difference in the annual percentage rate ("APR") between a particular mortgage loan and the average prime offer rate ("APOR") of a mortgage loan with the same characteristics issued during the same week. *Id.* at 15. The rate spread variable accounts for differences in discount points, closing costs, and interest rates, and controls for weekly macroeconomic factors and seasonal variations. *Id.* at 6, 15–16. Prof. Salop's study applied econometric regression to 2022-2024 data to determine whether Zillow Home Loans "charges different prices than other mortgage lenders for comparable conventional 30-year fixed-rate purchase mortgages." *Id.* at 6. The regression model controls for borrower income, loan amount, combined loan-to-value ratio, debt-to-income ratio, borrower age, race, and ethnicity. *Id.* at 16.

72. The analyzed sample of 30-year conventional loans contains 10,969 Zillow Home Loans and over 4.5 million loans from all lenders combined. *Id.* at 11. The sample was filtered to include "only conventional (non-government-backed) 30-year fixed-rate first-lien purchase mortgages for owner-occupied single-unit properties, with loan amounts between $25,000 and


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

$2,000,000, while excluding loans with non-standard features such as balloon payments, interest-only terms, or negative amortization." *Id.* at 6 n.21.

73. The report's findings "suggest that ZHL borrowers pay significantly higher mortgage costs than they would pay to other lenders, which are referred to as ZHL 'overcharges.'" *Id.* at 1. Across the 2022–2024 period, the estimated difference between ZHL and other lenders' APRs for a comparable conventional 30-year loan is approximately 10 basis points, which is equivalent to a net present value ("NPV") overcharge of approximately $2,881 per loan on an average loan size of approximately $320,666. *Id.* at 17. This result is highly statistically significant at the 1% level. *Id.* at 17.

74. In the aggregate, Professor Salop estimates that Zillow's pricing during this period resulted in approximately $31.6 million in total incremental costs to borrowers across the 10,969 conventional loans in the sample. *Id.* at 18.

75. Professor Salop opines that the empirical findings "provide some support for the concerns that Zillow has begun to steer its users to high-cost loans." *Id.* at 29. He further notes that Zillow's loan business has been growing rapidly, which "may substantially increase the total overcharges paid by all ZHL borrowers." *Id.*

76. In sum, the Report substantiates Plaintiffs' allegations by providing robust empirical evidence that homebuyers steered to ZHL through Defendants' lead-distribution and referral system pay significantly higher mortgage costs than borrowers with similar characteristics who obtain loans from other lenders. The overcharges are statistically significant, economically meaningful, and are growing over time. These findings directly support Plaintiffs' claims that the Defendants exchanged "things of value"—including continued and priority access to leads, participation in a money-making program, and increased loan-origination revenue—pursuant to agreements or understandings that real estate settlement services would be referred to ZHL, resulting in concrete financial harm to the Class through the payment of elevated mortgage costs and fees.

**E. Current and Former Preferred Agents Confirm Zillow's RESPA Violations**

77. Current and former Preferred (previously "Flex") agents, as well as bank loan officers, have confirmed that the allegations detailed in this Complaint are not isolated incidents, or


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

the result of "rogue" agents. Instead, it is Zillow's deliberate policy to steer clients to ZHL, even though Zillow knows—and the agents know—that the customers are receiving an inferior product at ZHL. The accounts of these agents are detailed below.

**1. Confidential Real Estate Agent 1**

78. Confidential Real Estate Agent 1 ("CA1") worked in the Zillow Premier Agent Flex program (as an agent and a team lead) from the Fall 2019 to Spring 2023 in the Southwest. CA1 was very successful in the program; during CA1's time in the Flex program, CA1 completed over $45 million in sales from Zillow referrals, resulting in over four hundred thousand dollars paid to Zillow in referral fees.

79. According to CA1, Zillow tracked the performance of the agents participating in the Flex program through multiple metrics, including customer satisfaction, or "CSAT," and closed transactions (a/k/a "conversions").

80. According to CA1, in 2023, Zillow introduced a new performance metric, "transfers to Zillow Home Loans," to its Flex agent partners. The new performance metric required Flex partners to refer buyers (who had been referred to the agent/team by Zillow) back to Zillow Home Loans during the home buying process, provided that the buyer in question had "opted-in" on the Zillow website to receive information from Zillow Home Loans. The requirement was for 25% of these leads to be referred to Zillow's lender through a "transfer" initiated by the agent through the Zillow Premier Agent app. The "opt-in" by the buyer was based on the pre-ticked box on the Zillow website, and was often unintentionally left there by buyers, who indicated that they had no interest in speaking with Zillow Home Loans.

81. According to CA1, this performance metric (transferring buyers to Zillow Home Loans) became a central performance metric that was used to define which agents were allowed to continue participating in the Flex program (*i.e.*, who would continue to receive leads generating business income) and who would be dropped from the program.

82. CA1 is and was familiar with RESPA and understands that RESPA prohibits giving anything "of value" in exchange for a referral of a settlement service, including residential mortgage


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

loans. According to CA1, the ability to continue participating in the Flex program was undoubtedly something of substantial value.

83. According to CA1, based on CA1's experience, including speaking with Zillow Home Loans loan officers, the rates offered by Zillow Home Loans were substantially higher than those of other lenders (often times by more than a full point). CA1 also knows this from the purchase of CA1's own house.

84. CA1 was deeply uncomfortable with steering buyers to Zillow Home Loans, which CA1 believed were more expensive and not beneficial to the buyers. CA1 was dropped from the program because of CA1's "failure" to steer a sufficient number of buyers to ZHL.

85. During CA1's participation in the Flex program, CA1 "failed" to comply with the performance requirement to transfer at least 25% of Zillow buyers who had "opted in" to Zillow Home Loans for a number of reasons. But the majority of the "opt in" buyers assigned to CA1 and CA1's team made it clear they had, in fact, not deliberately opted in to be contacted by Zillow Home Loans (but had rather failed to untick the pre-ticked box as an oversight). In addition, when CA1 discovered that the interest rates charged by ZHL greatly exceeded the interest rates offered by other lenders (and thereby market rates), CA1 felt that it would be unethical and a violation of CA1's fiduciary duties to CA1's clients if CA1 encouraged his/her clients to use Zillow Home Loans.

86. According to CA1, it was, and remains, CA1's belief that Zillow is abusing the consumer trust that it has gained over the years to charge buyers excessive interest on its mortgage loans.

**2. Confidential Real Estate Agent 2**

87. According to a real estate broker in the mid-Atlantic region of the United States (Confidential Real Estate Agent 2, or "CA2") who has supervised a Zillow Flex Agent team as well as Premier Zillow agents, Flex agents are facing increased pressure to steer buyers to ZHL; otherwise, they will lose their Flex status. As of now, they must meet a specific quota to retain their Flex status and lead flow. As a result, the buyers are receiving an inferior product, in that they are not being informed about loan programs that Zillow does not offer, including first time buyer down


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

payment assistance. As a whole, Zillow customers are receiving loans that could have higher costs and less benefits when compared to local lender products. This also affects buyers since it makes them less likely to win an offer when in a competitive bidding scenario.

**3. Confidential Real Estate Agent 3**

88. Confidential Real Estate Agent 3 ("CA3") has been in real estate and mortgage banking for over 25 years. CA3 is currently in the Zillow Flex program. According to CA3, Zillow only offers basic loans, and buyers need to have very good credit or they have difficulty getting pre-approved. Zillow also does not offer chattel loans (which are used, for example, for manufactured housing in trailer parks).

89. According to CA3, Zillow is steering customers to Zillow Home Loans, with consistent threats to drop agents from the Flex program if they do not meet certain quotas. Through ZHL, buyers are paying more at the back end, at closing, than other loan programs.

**4. Confidential Real Estate Agent 4**

90. Confidential Real Estate Agent 4 ("CA4") has been a real estate agent for over six years in the mid-Atlantic region of the United States. CA4 is a team lead with over 10 agents on his/her team. CA4 has not participated in the Zillow Flex or Premier program but has seen and observed the impact of Zillow on the real estate industry.

91. According to CA4, most sellers will want to see the buyer use a local lender, and not a Zillow Home Loan. Zillow Home Loans sometimes does not run all the necessary credit checks, and it does not offer competitive rates on its loans.

**5. Confidential Real Estate Agent 5**

92. Confidential Real Estate Agent 5 ("CA5") has been in real estate since 2021 in California and worked as a Zillow "Flex" agent for two years. According to CA5, beginning in 2022, Zillow has been adamant that agents should send leads to Zillow Home Loans. CA5 believed that this also violated RESPA, but was told to not worry about it because, if this was Zillow's policy (which had been vetted by lawyers), then it must be fine. But CA5 had his/her own loan officers that he/she liked to use and did not think ZHL was a good deal for his/her clients. In particular, CA5


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

stated that, in his/her experience, ZHL has higher fees and higher interest rates. ZHL would "cherry-pick" the clients to get the best and easiest clients, and disregard or drop clients that required more work. CA5 believed that the pressure to steer clients to ZHL violated CA5's fiduciary duties and, as a result, CA5 quit the Flex program.

**6. Confidential Real Estate Agent 6**

93. Confidential Real Estate Agent 6 ("CA6") has been a real estate agent for about 10 years in the Mountain West area of the United States. CA6 has been on a Flex team since the year 2020.

94. According to CA6, although Zillow does not put it in writing, Zillow's representatives tell agents in the Zillow Flex and Premier programs that they need to steer clients to Zillow Home Loans, and that the more clients agents steer to Zillow Home Loans, the better their leads will be. Zillow also has certain minimum quotas that the agents must meet, or they are kicked out of the program.

95. According to CA6, Zillow Home Loans sends out inaccurate and misleading closing schedules, which it does frequently. For example, to secure the business, ZHL will release a closing schedule that does not include all the closing costs. At closing, the buyer has the choice to either pay the costs that were not disclosed or walk away from the deal. CA6 had a buyer who got upset with CA6 when this occurred, even though the figures came from ZHL. If CA6 complained, Zillow would reduce his/her leads.

**7. Confidential Real Estate Agent 7**

96. Confidential Real Estate Agent 7 ("CA7") has been a realtor for over 20 years in the Mountain West region of the United States and is intimately familiar with the Zillow Flex program. According to CA7, beginning at least as early as 2019, Zillow representatives were pressuring CA7 to push clients to use Zillow's products, including Zillow Mortgage. Zillow representatives told CA7 that CA7 needed to push these products, including Zillow Mortgage, and if not, CA7's leads would dry up. CA7 also knows that other agents were facing similar pressure during that time period.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

97. According to CA7, Zillow agents now visit Flex Agents in person, so that they can talk about the performance metrics (including the rate at which agents steer clients to ZHL) without putting anything in writing.

**8. Confidential Real Estate Agent 8**

98. Confidential Real Estate Agent 8 ("CA8"), who is from the southeastern part of the United States, was recently a Flex Agent, but was removed from the program because CA8 refused to refer customers to ZHL based on CA8's belief that ZHL does not serve the best interests of potential buyers. If an agent does not get 10% or more of his/her clients to obtain a pre-approval letter from ZHL, the agent is dropped from the program. But the 10% figure is hard to reach because a substantial number of the clients did not see that the "Get financial information" box was pre-checked.

99. According to CA8, ZHL offers loans with higher interest rates compared to others on the market. CA8 has had the experience of seeing potential buyers get offers from ZHL that are nearly one percent higher than what other loans offered.

100. CA8 believed that steering customers to ZHL in exchange for something of value (leads on buyers) was a clear RESPA violation. When CA8 refused to steer clients to ZHL, CA8 was told that he/she was not a "team player."

101. CA8 was previously a very successful agent, with about $15 million in sales last year. But CA8 was dropped from the program simply because CA8 refused to violate the law.

102. CA8 provided the following screenshots that show how Zillow monitors and coerces agents into referring clients to ZHL:





HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX




103. CA8 also shared screenshots demonstrating that, if asked directly about loan packages that ZHL does not offer, like Down Payment Assistance programs, Zillow trains agents to avoid the question and refer them to ZHL anyway, despite the obvious conflict with the client's interests:




**9. Confidential Real Estate Agent 9**

104. Confidential Real Estate Agent 9 ("CA9") is a real estate agent in the Midwest who worked on a Zillow Flex team for nearly two years. According to CA9, Flex agents are pushed aggressively by Zillow to use ZHL, and—if agents do not steer clients to ZHL—they will receive fewer leads or be cut from the program. CA9 believes this clearly violates RESPA. In addition, ZHL often failed to fully disclose fees. Partly for this reason, and consistent with an agent's fiduciary duties, CA9 would encourage his/her clients to use another lender.

105. According to CA9, Zillow now avoids written or recorded communications as part of its training program. Instead, Zillow flies their people out to Flex team offices to avoid putting anything in writing, which CA9 regards as "shady" and "just not right."



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**10. Confidential Loan Officer 1**

106. According to Confidential Loan Officer 1 ("LO1"), a licensed mortgage loan officer in the Pacific Northwest with more than 30 years of experience in the real estate and mortgage industry, the loan products and lending practices of Zillow Home Loans are consistently substandard compared to those offered by traditional lenders and independent mortgage professionals.

107. ***Limited Loan Programs and Misrepresentation of Options.*** According to LO1, Zillow Home Loans offers only a narrow range of loan products, which often prevents buyers from obtaining the most advantageous financing available. For example, Zillow does not participate in or disclose the existence of Down Payment Assistance programs, which are critical for helping many first-time and moderate-income buyers achieve homeownership. By failing to inform clients about these options, Zillow effectively steers buyers into higher-cost loans or disqualifies them altogether from purchasing.

108. According to LO1, Zillow also does not offer USDA loans for eligible rural borrowers, and the VA loan programs, and it frequently carries higher interest rates and additional fees than comparable VA products offered through other lenders. In several cases observed by LO1, borrowers who initially began with Zillow were able to obtain significantly better terms after transferring their loans to LO1's company.

109. Additionally, according to LO1, Zillow does not provide non-conforming or specialized loan products, which are often necessary for self-employed borrowers or those with complex financial profiles. In today's market, this limitation excludes a large portion of qualified buyers who would otherwise be able to obtain financing.

110. ***Lack of Transparency and Inaccurate Disclosures.*** According to LO1, and based on LO1's professional experience, Zillow loan officers frequently misrepresent or omit important details regarding the borrower's true costs at closing. In one documented instance, a Zillow representative offered a rate that appeared lower than LO1's competing quote; however, the Zillow quote understated the property tax obligations associated with the home purchase. The buyer later discovered the true tax costs were substantially higher, leading to unexpected expenses and potential


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

risk of losing the transaction. According to LO1, the Zillow loan officer involved in that transaction was not licensed in the same state where the property was located and was unfamiliar with that state's tax structure and lending requirements—an issue that LO1 notes is common among Zillow's remote lending staff.

111. ***Targeting Only "Easy" Borrowers.*** According to LO1, Zillow's business model appears focused on quickly closing loans for highly qualified borrowers while abandoning applicants who present any complexity—such as moderate credit, higher debt-to-income ratios, or non-traditional income sources. According to LO1, and based on LO1's experience and conversations with industry colleagues, Zillow's system emphasizes speed and volume over borrower advocacy, often leaving more challenging clients without proper guidance or access to suitable loan alternatives.

112. ***Inexperienced Staff and Incentive-Driven Culture.*** According to LO1, Zillow employs inexperienced loan officers, often paying them substantially below industry standards. Their compensation is structured around loan volume, incentivizing them to process as many applications as possible rather than ensuring that each client receives accurate, personalized, and compliant guidance. This approach leads to poor communication, inaccurate disclosures, and inconsistent client service.

113. ***Coercive Steering Practices and Agent Mandates.*** According to LO1, Zillow is now forcing its Premier Agents to convert into the Flex Program. Under the Flex Program, Zillow mandates that at least one out of every five buyer leads must close through Zillow Home Loans. Agents who fail to meet this quota or who decline to participate in the Flex program altogether are removed from Zillow's lead distribution system and terminated from the program.

114. According to LO1, this requirement effectively coerces agents to steer their clients toward Zillow's inhouse lending arm, regardless of whether the loan is the most suitable or cost-effective option for the buyer. In LO1's professional opinion, this practice creates a serious conflict of interest, undermines consumer choice, and violates fundamental ethical and fiduciary obligations owed by real estate professionals to their clients.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**11. Confidential Loan Officer 2**

115. Confidential Loan Officer 2 ("LO2") has been working in the mortgage loan industry for over 10 years in the American Southwest and works extensively with Zillow-affiliated agents (including Zillow Flex Agents). According to LO2, Zillow only provides loans to customers with "Grade A paper"—meaning those who have a top credit score and do not pose any substantive risk. Zillow does not loan to potential buyers with lower scores, nor does Zillow offer jumbo loans, assistance to first time home buyers, or loans for fabricated homes, among other things.

116. According to LO2, since 2022, Zillow has been requiring agents to steer clients to Zillow loan officers, and steering customers away from loan officers (like LO2) with proven track records and a history of success in closing real estate sales. According to LO2, Zillow loan officers are often less experienced and less knowledgeable than other officers, and less successful in closing deals, leading to many frustrated buyers who cannot close with a Zillow Home Loan.

117. According to LO2, Zillow's steering efforts begin when a potential buyer is on Zillow's website and signs up for a tour (or selects "Contact Agent"), and the box indicating the buyer's interest in "financing" is pre-checked. According to LO2, many times the buyer does not see the pre-checked box and has no interest in getting financing information from Zillow. Other times, the buyers may have an interest in "financing," but not necessarily through Zillow Home Loans. In either case, however, according to LO2, Flex agents tell these buyers that the agents have no choice but to refer them to Zillow Home Loans because the buyers did not uncheck the pre-checked box—a direct acknowledgement that the agents are steering potential buyers to Zillow Home Loans.

118. According to LO2, the agents are measured and judged based on metrics created by Zillow that capture how many clients that supposedly expressed an interest in "financing" are pre-approved for a loan by Zillow Home Loans. Zillow then threatens to remove, and does remove, Zillow Flex agents who fail to meet Zillow's 10% quota. But the 10% quota is even harder to meet because a great number of those buyers never had an interest in "financing," or Zillow Home Loans, in the first place. Nevertheless, according to LO2, even if the agents are otherwise high performers


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

and skilled at their jobs, they are terminated from the program if they do not steer enough clients to Zillow Home Loans.

119. According to LO2, Zillow also requires Zillow-affiliated agents to use its Customer Relationship Management ("CRM") software called Follow-Up Boss. Agents must pay to use this software, which provides a phone number for the agents to use when they communicate with their clients through a Follow-Up Boss app. According to LO2, Zillow uses the Follow-Up Boss app and software to actively monitor the Zillow Flex Agents, to make sure that they are following the scripts and rules that Zillow imposes. The Follow-Up Boss software captures agents' communications with their clients, including phone calls and text messages. According to LO2, this is a violation of an agent's fiduciary duty to his/her clients to keep this information confidential. Zillow is not the agent and should not be privy to the clients' confidential information. The Follow-Up Boss also only offers Zillow Home Loans as an option for a buyer looking for financing.

120. According to LO2, part of the effect of Zillow monitoring all communications is that Zillow's loan officers can identify cases in which the Zillow Flex agents are recommending loan officers who are not with Zillow. In those cases, Zillow loan officers ask Zillow Flex agents why the clients are not being referred to Zillow Home Loans. According to LO2, much like the Zillow Flex agents, the Zillow loan officers are not particularly skilled or experienced, are paid a small salary, and earn only small commissions on each loan they close. As a result, the incentive is for the loan officers (just like the Zillow Flex agents) to churn through as many loans as possible and only take on clients that will be easy to get approved.

121. However, according to LO2, the loan officers often tell the Zillow-affiliated agents to not refer certain clients to them because they can see that the clients are either not interested in Zillow Home Loans or pose too much of a credit risk. Just like with the Zillow Flex agents, Zillow loan officers need to close on a certain percentage of clients that are referred to them, and Zillow loan officers do not want "bad" leads that make it more difficult for the loan officers to make their numbers.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

122. According to LO2, agents now fear Zillow, and Zillow is monetizing that fear and violating RESPA in the process. According to LO2, the purpose of RESPA was to create an open and free market. Yet, according to LO2, the net effect of Zillow's policies is to force Zillow-affiliated agents to steer clients to Zillow Home Loans, regardless of whether this is in the clients' interests. According to LO2, the success of Zillow's program is evident in looking at Zillow's performance compared with the market overall.

123. In the end, LO2 paid a great deal of money to Zillow for leads on mortgages for several years, but—starting in 2022—Zillow turned on LO2 by steering clients away from him/her. LO2 had great success with Zillow's referral program because LO2 was skilled at closing loans and had developed a strong reputation in the industry. But Zillow now steers clients away from LO2 and toward loan officers that are not skilled or knowledgeable, and not able to effectively serve the buyers' interests.

**F. Real Estate Agents Owe a Duty of Candor and Loyalty to their Clients**

124. The breach of a real estate agent's fiduciary duties to her client is alleged herein because it is directly relevant to Plaintiffs' due diligence in investigating their claims. As explained below (*see supra* Part VI), Plaintiffs' claims are properly tolled because they reasonably relied on their real estate agents to provide honest and transparent representation, and had no reason to believe that they were complicit in Zillow's steering campaign.

125. Real estate agents owe clients a duty of candor and loyalty. Clients, including Plaintiffs, reasonably rely on agents to fulfill that duty when agents help clients purchase a home.

126. In Alaska, where Plaintiff Armstrong purchased her property, "among the fiduciary duties owed by real estate agents to their clients are the duty to exercise reasonable care, skill, and judgment in securing for the principal the best bargain possible and the duty to make full, fair, and timely disclosure to the principal of known facts material to the principal's interests."[48] Real estate agent D.M. failed to meet this duty to Plaintiff Armstrong by steering her to use Zillow Home Loans solely to serve D.M.'s financial self-interest at the expense of his/her client's interest. Zillow aided

[48] *See Lee Houston & Assoc., Ltd. v. Racine*, 806 P.2d 848, 853 (Alaska 1991) (cleaned up).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

and abetted this breach by compelling agents to steer clients to use Zillow Home Loans in exchange for leads given to the agents. Plaintiff Armstrong naturally and reasonably expected D.M. to fulfill his/her statutory obligations, and hence did not know, and could not have known, that Zillow and the real estate agent agreed to exchange a "thing of value" in related to Plaintiff Armstrong's property purchase.

127. In Nevada, where Plaintiff Liao purchased his property, "a real estate broker owes a fiduciary duty to those they undertake to serve in a professional capacity."[49] Under Nevada law, a real estate "[s]hall disclose to each party to the real estate transaction as soon as is practicable: (a) Any material and relevant facts, data or information which the licensee knows, or which by the exercise of reasonable care and diligence should have known, relating to the property which is the subject of the transaction." Nev. Rev. Stat. § 645.252(1). A real estate agent must also "exercise reasonable skill and care with respect to all parties to the real estate transaction." *Id.* § 645.252(2). Real estate agent V.P. failed to meet this duty to Plaintiff Liao by steering him to use Zillow Home Loans solely to serve V.P.'s financial self-interest at the expense of his/her client's interest, despite the existence of less expensive and more affordable options. Zillow aided and abetted this breach by compelling agents to steer clients to use Zillow Home Loans in exchange for leads given to the agents. Plaintiff Liao naturally and reasonably expected V.P. to fulfill his/her statutory obligations, and hence did not know, and could not have known, that Zillow and the real estate agent agreed to exchange a "thing of value" in related to Plaintiff Liao's property purchase.

128. In Oklahoma, where Plaintiff Wilson purchased his property, a real estate broker has several duties to "all parties in a transaction, which are mandatory and may not be abrogated or waived by a broker," including "[t]reat[ing] all parties with honesty and exercise reasonable skill and care." OK St. Ann. § 858-353(A). Agents also must refrain from "untrustworthy, improper, fraudulent or dishonest dealings." *Id.* § 858-312(8); § 605:10-17-4. Real estate agent J.M. failed to meet this duty to Plaintiff Wilson by steering him to use Zillow Home Loans solely to serve J.M.'s financial interest at the expense of his/her client's interests. Zillow aided and abetted this breach by

[49] *See Miyayama v. Burke*, 2025 WL 1540791, at * 11 (D. Nev. May 29. 2025).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

compelling agents to steer clients to use Zillow Home Loans in exchange for leads given to the agents. Plaintiff Wilson naturally and reasonably expected D.M. to fulfill his/her statutory obligations, and hence did not know, and could not have known, that Zillow and the real estate agent agreed to exchange a "thing of value" in related to Plaintiff Wilson's property purchase.

129. In Pennsylvania, where Plaintiff Daugherty purchased his property, a real estate agent has a duty to her clients "(1) to exercise reasonable professional skill and care which meets the practice standards required by this act; (2) to deal honestly and in good faith; [] (7) to timely disclose to the consumer any conflicts of interest; [] (9) to ensure that all services that are to be provided to the consumer are provided in a reasonable, professional and competent manner in accordance with the practice standards of this act; [and] (13) to provide disclosure to the consumer regarding any financial interest, including, but not limited to, a referral fee or commission, which a licensee has in any services to be provided to the consumer by any other person, including, but not limited to, financial services, title transfer and preparation services, insurance, construction, repair or inspection services. The licensee shall also provide disclosure regarding any financial interest which an affiliated licensee may have in any services to be provided to the consumer by any other person." PA Stat. 63 P.S. § 455.606a. Real estate agent N.D. failed to meet this duty to Plaintiff Daugherty by steering him to use Zillow Home Loans solely to serve N.D.'s financial interest at the expense of his/her client's interests. Zillow aided and abetted this breach by compelling agents to steer clients to use Zillow Home Loans in exchange for leads given to the agents. Plaintiff Daugherty reasonably expected N.D. to fulfill his/her statutory obligations, and hence did not know, and could not have known, that Zillow and the real estate agent agreed to exchange a "thing of value" in related to Plaintiff Daugherty's property purchase.

130. In Michigan, where Plaintiff Robbins purchased her property, a real estate agent owes several duties to her client, including "(a) The exercise of reasonable care and skill in representing the client and carrying out the responsibilities of the agency relationship; [and] (c) Loyalty to the interest of the client." MI Stat. § 339.2517(3)(1). These duties further include "loyalty, fidelity, care


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

and disclosure."[50] Real estate agent K.M. failed to meet this duty to Plaintiff Robbins by steering her to use Zillow Home Loans solely to serve K.M.'s financial interest at the expense of his/her client's interests. Zillow aided and abetted this breach by compelling agents to steer clients to use Zillow Home Loans in exchange for leads given to the agents. Plaintiff Robbins naturally and reasonably expected K.M. to fulfill his/her statutory obligations, and hence did not know, and could not have known, that Zillow and the real estate agents agreed to exchange a "thing of value" in related to Plaintiff Robbin's property purchase.

### G. Zillow's Choice of Law Clause

131. According to Zillow's "Terms of Use," Washington State law applies to any disputes between Zillow and its users.[51]

## V. CLASS ACTION ALLEGATIONS

132. Plaintiffs Araba Armstrong, David Liao, Furgus Wilson, Brandon Daugherty, and Rebecca Robbins bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of the following nationwide Class based on violations of RESPA and the Washington CPA:

> All persons and entities in the United States who, since October 1, 2018, (i) purchased a home listed on Zillow.com, and were represented by a Zillow Preferred or Zillow Flex agent; and (ii) used Zillow Home Loans to finance the purchase.

133. Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officers presiding over this action and the members of their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

134. The Class may be readily identified based upon publicly available property transactions and Zillow's business records.

---

[50] *See Kasey, Inc. v. Alpine Realty Now, Inc.*, 2012 WL 10998, at *2-*3 (Ct. App. Mich. Jan. 3, 2012).

[51] *See Zillow Terms of Use*, Zillow (May 20, 2025), https://www.zillow.com/z/corp/terms/ (last visited Sept. 18, 2025).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

135. The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class have at least thousands of members, the exact number and their identities being known to Defendants.

136. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

137. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

a. Whether Defendants engaged in the alleged conduct;

b. Whether Defendants' conduct violated RESPA;

c. Whether Defendants' required agents to steer homebuyers to use Zillow Home Loans;

d. Whether Defendants provided agents with a "thing of value" in exchange for referrals they provided to agents;

e. Whether the referrals that agents received from Defendants are a "thing of value";

f. Whether Defendants conditioned the number of leads an agent received based on whether the agent steered clients to use Zillow Home Loans;

g. Whether Zillow Home Loans' terms and costs were inferior to other loan options;

h. Whether the conduct of Defendants caused injury to the business or property of Plaintiffs and the other members of the Class;

i. Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

j. Whether Defendants' conduct led to their unjust enrichment; and



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

k. The appropriate class-wide measures of damages.

138. Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to each member. There are no defenses available to Defendants that are unique to Plaintiffs or to any particular Class members.

139. Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interest incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

140. A class action is the superior method for the efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Because of the size of the individual Class members' claims, no Class member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

141. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

adjudication, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI. TOLLING OF THE STATUES OF LIMITATIONS

142. As of the date of this Complaint, Defendants do not disclose to potential buyers that Zillow Preferred agents are required to steer buyers to ZHL. (Indeed, Defendants conceal the very identity of Zillow Preferred agents.) There was no reasonable way for the public, including Plaintiffs, to know that Zillow required Preferred agents to steer buyers to ZHL, which offers a substandard product.

143. During the course of purchasing her property, Plaintiff Armstrong did not know, and could not have known, that Zillow Preferred agents, including her agent, were required to steer her to Zillow Home Loans in connection with the property she purchased, in exchange for leads that Zillow provided to the agent. *See supra* Part II.A.1. Plaintiff Armstrong exercised due diligence related to her claims, including relying on her agent's obligations to comply with state law governing real estate agents' fiduciary duties, and could not have discovered the violations through reasonable diligence. *See supra* Part IV.F.

144. During the course of purchasing his property, Plaintiff Liao did not know, and could not have known, that Zillow Preferred agents, including his agent, were required to steer him to Zillow Home Loans in connection with the property he purchased, in exchange for leads that Zillow provided to the agent. *See supra* Part II.A.2. Plaintiff Liao exercised due diligence related to his claims, including relying on his agent's obligations to comply with state law governing real estate agents' fiduciary duties, and could not have discovered the violations through reasonable diligence. *See supra* Part IV.F.

145. During the course of purchasing his property, Plaintiff Wilson did not know, and could not have known, that Zillow Preferred agents, including his agent, were required to steer him


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

to Zillow Home Loans in connection with the property he purchased, in exchange for leads that Zillow provided to the agent. *See supra* Part II.A.3. Plaintiff Wilson exercised due diligence related to his claims, including relying on his agent's obligations to comply with state law governing real estate agents' fiduciary duties, and could not have discovered the violations through reasonable diligence. *See supra* Part IV.F.

146. During the course of purchasing her property, Plaintiff Daughtery did not know, and could not have known, that Zillow Preferred agents, including his agent, was required to steer him to Zillow Home Loans in connection with the property he purchased, in exchange for leads that Zillow provided to the agent. *See supra* Part II.A.4. Plaintiff Daugherty exercised due diligence related to his claims, including relying on his agent's obligations to comply with state law governing real estate agents' fiduciary duties, and could not have discovered the violations through reasonable diligence. *See supra* Part IV.F.

147. During the course of purchasing her property, Plaintiff Robbins did not know, and could not have known, that Zillow Preferred agents, including her agent, was required to steer her to Zillow Home Loans in connection with the property she purchased, in exchange for leads that Zillow provided to the agent. *See supra* Part II.A.5. Plaintiffs Robbins exercised due diligence related to her claims, including relying on her agent's obligations to comply with state law governing real estate agents' fiduciary duties, and could not have discovered the violations through reasonable diligence. *See supra* Part IV.F.

148. There was also no way for the public, and Plaintiffs, to know that Zillow agents were being trained by Zillow personnel on the steering policy, in person, without putting it in writing, on the requirements to meet certain steering benchmarks. These are affirmative acts of fraudulent concealment. As a result, Plaintiffs and other members of the public did not discover and reasonably could not have discovered Zillow's RESPA violations. And applicable statutes of limitations or response are accordingly tolled.

149. As a separate and independent basis for tolling, Defendants also continue to violate RESPA, and thus Defendants' actions amount to a continuing violation. Each monthly payment


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

collected from Plaintiffs on a loan originated through the unlawful referral scheme constitutes a continuing collection of fees on a settlement service that was procured through an illegal referral, and therefore constitutes a new violation within the limitations period.[52] Each collection of fees on the loans represents a violation of RESPA that resets the statute of limitations clock.

## VII. CLAIMS FOR RELIEF

### CLAIM I

### VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 US.C. 2607(a) (On behalf of a Nationwide Class, against the Zillow Defendants)

150. Plaintiffs Armstrong, Liao, Wilson, Daugherty, and Robbins bring this claim for themselves and on behalf of the Nationwide Class against Zillow Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

151. RESPA Section 8(a), 12, U.S.C. § 2607(a), provides that "no person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

152. A "thing of value" is "broadly defined" under RESPA's implementing regulation by the CFPB under "Regulation X," and includes, among other things, "the opportunity to participate in a money-making program." 12 C.F.R. § 1024.14(d).

153. The real estate agents who receive referrals from Zillow treasure and rely on these referrals, and these agents consider Zillow referrals as a thing of value. As a result, Zillow referrals are a thing of value under RESPA.

154. Regulation X defines a "referral" to include "any oral or written action directed to a person which has the effect of affirmatively influencing the selection of any person of a provider of a settlement service." 12 C.F.R. § 1024.14(f)(1). And "an agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a pattern, practice or course of conduct." 12 C.F.R. § 1024.14(e).

---

[52] *See Blake v. JPMorgan Chase Bank, N.A.*, 259 F. Supp. 3d 249, 256 (E.D. Pa. 2017).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

155. In addition, "when a thing of value is received repeatedly and is connected in any way with the volume or value of business referred, the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business." 12 C.F.R. § 1024.14(e).

156. Pursuant to 12 U.S.C. § 2602(3), "the term 'Settlement services' includes any service in connection with a real estate settlement including, but not limited to, the following: . . . the origination of a federally related mortgage loan." As detailed above, each Plaintiff paid Zillow Home Loans loan origination fees, and consequently paid for settlement services at the time of closing. *See supra* Part II.A. The loan origination fees each Plaintiff paid are the "charge paid for such settlement service" within the meaning of 12 U.S.C. § 2607(d)(2).

157. Pursuant to 12 C.F.R. § 1024.2(b), "Settlement Service means any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following: (1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans) . . . [or] (3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan."[53] Zillow is accordingly a person under Section 8 of RESPA pursuant to 12 U.S.C. §§ 2602(5), 2607.

158. Under these definitions, the mortgage lending services provided by Zillow Home Loans for federally related loans were "settlement services" under RESPA.

159. ZHL is a "creditor" pursuant to 15 U.S.C. § 1602(g), and as incorporated by reference into RESPA at 12 U.S.C. § 2602(1)(B)(iv). ZHL makes or invests in residential real estate loans totaling more than one million dollars per year. *See* 12 U.S.C. § 2602(1)(B)(iv).

160. The vast majority of mortgages originated by ZHL during the relevant time period were "federally related mortgage loans" as that term is defined by 12 U.S.C. § 2602(1) and 12 C.F.R. 1024.2(b).[54]

---

[53] *See also* 12 U.S.C. § 2602(3) ("the term 'Settlement services' includes any service provided in connection with a real estate settlement, including, but not limited to, the following: [] services rendered by a real estate agent or broker").

[54] *See*, *e.g.*, Zillow 10-K Annual Report (Feb. 11, 2025).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

161. ZHL originates residential mortgage loans secured by one-to-four-family dwellings, which are federally related mortgage loans. 12 U.S.C. § 2602(1); C.F.R. § 1024.2(b). The origination of those loans—and the services provided in connection with or incident to such settlements, including the marketing, lead-generation, referral, and coordination functions performed by Zillow Group, Inc. and Zillow, Inc.—are settlement services within the meaning of 12 U.S.C. § 2602(3). Accordingly, each Defendant participates in, benefits from, or provides services incident to real-estate settlement services covered by § 2607(a).

162. Defendants entered into and enforced agreements or understandings, express or implied, that agents receiving Zillow leads would refer homebuyers to ZHL for mortgage pre-approval and financing. These understandings were established by Defendants' pattern, practice, and course of conduct, including setting and monitoring ZHL pre-approval quotas, tying lead flow to ZHL adoption rates, and penalizing agents who failed to meet those targets. 12 C.F.R. § 1024.14(e). As further reflected in Regulation X, a "referral" includes any oral or written action directed to a person that has the effect of affirmatively influencing the selection of a settlement-service provider. 12 C.F.R. § 1024.14(f)(1).

163. Through these arrangements, Defendants both gave and accepted "things of value." Defendants gave value to Participating Agents, such as participation in a money-making program, continued and priority access to leads, enhanced ad placement and visibility, and increased lead quality and volume, and accepted economic benefits, such as profits from Participating Agents' advertising expenditures, referral-based "success fees," and increased loan-origination revenue through Zillow Home Loans. *See* 12 U.S.C. § 2602(2); 12 C.F.R. § 1024.14(d).

164. As alleged above, Defendants knowingly structured and operated their lead-distribution systems so that lead flow, placement, and quality were conditioned on ZHL referrals and pre-approvals, ensuring that business incident to settlement services would be referred to ZHL. Zillow thus gave things of value to induce referrals and accepted things of value in return for those referrals, conduct that violates both the plain text of § 2607(a) and its implementing regulation. As


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

an operator of a "settlement services" digital comparison-shopping platform, Zillow violates RESPA when it receives a "thing of value" for this referral activity.[55]

165. Defendants cannot invoke RESPA's safe harbors. 12 U.S.C. § 2607(c); 12 C.F.R. § 1024.14(g). The benefits Zillow provides are not "bona fide" payments because they are not fixed compensation for goods or services actually furnished, but conditional incentives and performance-based rewards tied to the number of ZHL referrals or pre-approvals achieved. *See* 12 U.S.C. § 2607(c)(1)-(2).

166. The broker-to-broker referral exemption likewise does not apply, as Zillow does not act as a real-estate broker or perform brokerage functions in these transactions. Its Premier program operates as a referral marketplace that sells and allocate consumer leads, collects contingent "success fees" tied to closed transactions, and performs no brokerage services in the purchase or sale of property. *See* 12 U.S.C. § 2607(c)(3).

167. Nor can Defendants invoke the affiliated-business-arrangement safe harbor because participating agents are independent contractors, not affiliates; consumers are not provided compliant written disclosures; and Zillow's design effectively conditions agents' continued access to leads—and therefore their livelihood—on funneling buyers to ZHL, eliminating any genuine freedom of choice. *See* 12 U.S.C. § 2607(c)(4).

168. Defendants' unlawful conduct deprived consumers of impartial advice**,** restricted competition among real estate agents and mortgage lenders, and increased the costs of mortgage credit and settlement services. Plaintiff and the Class suffered injury by paying higher rates and fees and b**y** losing access to unbiased information and competing loan options.

169. Plaintiff and Class Members seek all forms of relief available under the Real Estate Settlement Procedures Act, including treble damages equal to three times the amount of any charge paid for the settlement services involved in the unlawful referrals, pursuant to 12 U.S.C. § 2607(d)(2). Each Class Member paid charges for mortgage-origination services provided by Zillow Home Loans that were incident to or part of the settlement services unlawfully referred through Zillow's programs.

---

[55] *See* Real Estate Settlement Procedures Act (Regulation X); Digital Mortgage Comparison-Shopping Platforms and Related Payments to Operators, 88 Fed. Reg. 9162 (Feb. 13, 2023) (to be codified at 12 C.F.R pt. 1024).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Plaintiff and Class Members also seek reasonable attorneys' fees and costs, as well as any equitable or ancillary relief the Court finds appropriate to prevent ongoing violations, remedy unjust enrichment, and deter similar conduct in the future. 12 U.S.C. § 2607(d).

**CLAIM II**

**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Wash. Rev. Code Ann. § 19.86.010, *et seq*.)**
**(On Behalf of a Nationwide Class)**

170. Plaintiffs Armstrong, Liao, Wilson, Daugherty, and Robbins bring this claim for themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs (for purposes of all Washington Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

171. Plaintiffs bring this Count on behalf of the nationwide Class based on violations of the Washington Consumer Protection Act, Wash. Rev. Code Ann. 19.86.

172. The Zillow Defendants ("Defendants," for purposes of this Count), Plaintiffs, and each member of the nationwide Class are "person[s]" under Wash. Rev. Code Ann. 19.86.010(1).

173. At all relevant times, Defendants were and are engaged in "trade" or "commerce" under Wash. Rev. Code Ann. 19.86.010(2).

174. The Washington CPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. 19.86.020. Defendants' conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. In short, Defendants' conduct has been deceptive because they have the capacity or tendency to deceive.

175. Defendants' conduct violated the Washington CPA in two respects: (1) Defendants failed to disclose the unlawful steering; and (2) Defendants' conduct violated RESPA, which is a *per se* unfair practice.

176. Defendants developed and implemented this scheme for nationwide deployment at its headquarters, in Seattle, Washington.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## A. Failure to Disclose Steering

177. At all relevant times, Defendants' acts and practices were deceptive and unfair because they failed to disclose to consumers that Zillow required Zillow Preferred Agents (previously known as "Flex Agents") to steer homebuyers to use Zillow Home Loans. These undisclosed arrangements and steering requirements created conflicts of interest that deprived homebuyers of impartial advice, aided and abetted the breach of a real estate agent's fiduciary duties, misrepresented the independence of Zillow Preferred Agents, and caused consumers to be steered into higher-cost mortgage products, pay inflated interest rates and fees, and lose access to lower-cost or more suitable loan options.

178. Zillow's disclosures do not cure this deception. The Terms of Use, Touring Agreement, and Affiliated Business Arrangement Disclosure are generic boilerplate and do not reveal the specific quid pro quo alleged here—namely, that a Zillow Preferred agent's continued access to Zillow leads is conditioned on steering homebuyers to ZHL. Nor do they inform consumers that their agent has a direct financial incentive to steer them to ZHL, or that ZHL's loans are more expensive for homebuyers. They also do not disclose the findings of Prof. Salop's report. The Affiliated Business Arrangement Disclosure merely states that an affiliated relationship exists; it does not disclose that Zillow coerces agents to recommend ZHL under threat of losing leads.

## B. *Per se* Unfair Practice

179. Defendants' conduct also constitutes a *per se* unfair practice because it violates the Section 8(a) of RESPA, 12 U.S.C. § 2607(a), which is a statute enacted for the public interest and establishes standards for real estate transactions.[56]

180. Defendants' acts and practices also violate the public interest because they undermine the integrity of the home-buying process, interfere with consumers' ability to make informed choices among competing lenders, and erode public confidence in real-estate professionals who are legally obligated to act in the best interests of their clients. These practices are inherently capable of repetition and affect a substantial segment of the public.

[56] *See Tierney*, 2021 WL 5280022, at *6.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

181. Defendants' conduct offends the strong public policy embodied in both RESPA and Washington law, which safeguard consumers from hidden financial conflicts and self-dealing in real-estate transactions. Zillow's undisclosed quota and incentive structure is immoral and unscrupulous because it exploits the trust consumers place in their agents' independence, manipulates the market through coercive lead control, and results in tangible financial harm to homebuyers in the form of higher loan costs and reduced access to competitive mortgage programs.

**C. Injury to Plaintiffs**

182. Defendants' conduct proximately caused injuries to Plaintiffs and the other Class members.

183. Plaintiffs and the other Class members were injured as a proximate result of Defendants' conduct in that Plaintiffs and the other Class members paid out-of-pocket excessive fees and costs that they would not otherwise have paid. *See supra* Part IV.D. The Salop Study establishes that ZHL borrowers paid approximately 10 basis points more than comparable borrowers, resulting in an average overcharge of $2,881 per loan. But for the agents' steering, each Plaintiff could have obtained financing from a competing lender offering lower rates and fees. Market alternatives were available, and, on information and belief, ZHL's rates exceeded prevailing market rates during each Plaintiff's transaction. These injuries are the direct and natural consequence of Defendants' misrepresentations, fraud, deceptive practices, and omissions.

184. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein impact the public interest because they affect thousands of residential real estate transactions, systematically costs and fees paid by homebuyers, and undermine transparency in the real estate marketplace.

185. Plaintiffs and other Class members suffered actual damages as a result of Defendants' conduct.

186. Defendants are liable to Plaintiffs and the Class members for damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and treble damages up to $25,000 per Plaintiff or Class member, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code Ann. 19.86.090.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully requests that the Court enter judgment in his favor and against Defendants, as follows:

A. Determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the Classes; and declare Plaintiffs as the representatives of the Classes;

B. Enter joint and several judgments against the Defendants and in favor of Plaintiffs and the Class;

C. Award the Class damages in an amount to be determined at trial;

D. Order disgorgement in the amount by which Defendants' ill-gotten gains exceed the treble damages awarded in this case;

E. Permanently enjoin Defendants' ongoing anticompetitive and deceptive conduct;

F. Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

G. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: August 17, 2026

Respectfully submitted,

By: */s/ Steve W. Berman*
Steve W. Berman (WSBA No. 12536)
By: */s/ Jerrod C. Patterson*
Jerrod C. Patterson (WSBA No. 43325)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com
jerrodp@hbsslaw.com

By: /s/ Adam J. Levitt
Adam J. Levitt, *admitted pro hac vice*
Amy E. Keller, *admitted pro hac vice*
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Telephone: (312) 214-7900
Email: alevitt@dicellolevitt.com
akeller@dicellolevitt.com

Corban Rhodes, *admitted pro hac vice*
Emma Bruder, *admitted pro hac vice*
**DICELLO LEVITT LLP**
485 Lexington Avenue, Tenth Floor
New York, NY 10017
Telephone: (646) 933-1000
Facsimile: (646) 494-9648
Email: crhodes@dicellolevitt.com
ebruder@dicellolevitt.com

*Plaintiffs' Interim Class Counsel*

Douglas J. McNamara, *admitted pro hac vice*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Email: dmcnamara@cohenmilstein.com

Theodore J. Leopold, *admitted pro hac vice*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-1400
Email: tleopold@cohenmilstein.com

*Attorneys for Plaintiffs and the Proposed Classes*